# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

NAVAJO NATION,

                Plaintiff,

v.

No. 2:20-cv-602

ANDREW WHEELER, in his official capacity
as Administrator of the United States
Environmental Protection Agency; UNITED
STATES ENVIRONMENTAL PROTECTION
AGENCY; RICKEY DALE "R.D." JAMES, in
his official capacity as Assistant Secretary for
Civil Works, Department of the Army; and
UNITED STATES ARMY CORPS OF
ENGINEERS,

                Defendants.

---

## COMPLAINT

## INTRODUCTION

1.      On the Navajo Nation, as elsewhere, water is an essential resource used for drinking, washing, other domestic uses, recreation, fishing, agriculture, and tourism. Water sources also support aquatic and wildlife habitat. The protection of water quality is vital for these reasons alone.

2.      Additionally, the Navajo Nation is located in the arid Southwest, where every drop of water has value. The scarcity of water on the Navajo Nation—which on top of its customary arid climate also is undergoing a prolonged drought—makes protection of water quality all the

more important. In many instances scarcity of water also increases the impact of water pollution, because the concentration of contaminants is less likely to be diluted.

3.     Clean water is also important to Navajo culture. Natural springs and other water sources must be protected for use in religious and ceremonial observances. Wildlife, plants, and fisheries, which rely on clean water sources, are an essential part of Navajo culture. Navajo traditional ceremonies and practices use feathers from specific birds and pelts and oils from specific animals. Navajo traditions include fashioning implements from the bones of certain animals, baskets from specific plants, and bows using the sinew of certain species of deer. Numerous plants and insects are also used for traditional medicines. The Navajo world view is a holistic one in which the air, water, people, and wildlife are all related to one another, and it is imperative for the Navajo people to protect Mother Earth and Father Sky and maintain harmony and balance with all living beings within their ecosystem.

4.     Clean water is, therefore, essential to the Navajo Nation's survival, as well as to the survival of all the people in this country and to our environment. Congress recognized the importance of clean water by enacting the Clean Water Act (CWA), in which Congress stated unequivocally that the purpose of the statute is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." CWA § 101(a), 33 U.S.C. § 1251(a). To achieve this purpose, the Clean Water Act, among other things, prohibits the discharge without a permit of pollutants into "navigable waters," which are defined as "the waters of the United States, including the territorial seas" (WOTUS). CWA §§ 301(a), 502(7); 33 U.S.C. §§ 1311(a), 1362(7). The term "waters of the United States" is not defined in the statute.

5.     The United States Environmental Protection Agency (EPA) and the Army Corps of Engineers (Corps) (together, Agencies) first promulgated definitions of "waters of the United States" in the 1970s. More recently, the Corps updated the definition in 1986 and EPA duplicated the Corps' definition in 1988. Over time, the Agencies found that they were "evaluating the jurisdiction of waters on a case-specific basis far more frequently than is best for clear and efficient implementation of the CWA," 79 Fed. Reg. 22,188, 22,188 (Apr. 21, 2014), and they therefore embarked on a process to promulgate a new updated definition. After rigorous review and public participation, including the submittal of over one million comments by states, tribes (including Plaintiff Navajo Nation), industry, environmental organizations, and numerous other stakeholders, the Agencies promulgated the 2015 Clean Water Rule based on "the text of the statute, Supreme Court decisions, the best available peer-reviewed science, public input, and the agencies' technical expertise and experience in implementing the statute." 80 Fed. Reg. 37,054, 37,055 (June 29, 2015).

6.     For the past three years, however, in response to Executive Order 13,778 of February 28, 2017, 82 Fed. Reg. 12,497 (Mar. 3, 2017), the Agencies have unlawfully sought to delay, rescind, and ultimately replace the 2015 Clean Water Rule.

7.     The Agencies' Delay Rule, 83 Fed. Reg. 5,200 (Feb. 6, 2018), would have added to the 2015 Clean Water Rule an "applicability date" of February 6, 2020, that is, four and a half years after the 2015 rule was set to become effective. The Delay Rule has been found unlawful and has been vacated. *S.C. Coastal Conservation League v. Pruitt*, 318 F. Supp. 3d 959, 967 (D.S.C. 2018).

8.      This Court similarly should vacate the Agencies' rescission of the 2015 Clean Water Rule, which also reverted to the prior "waters of the United States" rule dating back to 1986, 84 Fed. Reg. 56,626 (Oct. 22, 2019) (Rescission Rule), and their subsequent promulgation of a significantly narrower definition of "waters of the United States" than was in the 2015 Clean Water Rule. 85 Fed. Reg. 22,250 (Apr. 21, 2020) (2020 WOTUS Rule).

9.      In order to promulgate the Rescission Rule and 2020 WOTUS Rule, the Agencies were obliged to reject the factual and scientific record established during the development of the 2015 Clean Water Rule. The Agencies did so without providing any new facts or analysis, and instead conjured up an interpretation of the Clean Water Act and associated case law that suited the conclusion they had already been directed to reach, by Executive Order 13,778, regarding the scope of the term "waters of the United States."

10.     With respect to the Rescission Rule, the Agencies revealed their preordained intentions when they limited the issues for public comment and did not provide a rationale for their actions until they issued the final rule.

11.     With respect to the 2020 WOTUS Rule, the Agencies accomplished their preordained intentions by promulgating a rule that conflicts with the text and stated objective of the Clean Water Act, contravenes controlling Supreme Court precedent, ignores sound science, and does not even provide the clarity they claimed as a rationale.

12.     The Agencies' actions significantly diminish the number and extent of Navajo Nation waters that are included within the definition of WOTUS, as well as diminishing Clean Water Act protections for those waters which remain covered by the definition. What's more, not

only did the Agencies fail to consider the impacts of their actions on the Navajo Nation and its waters, but they also failed to do so for waters throughout the United States.

13.     The Agencies' actions violated the Administrative Procedure Act (APA), the Clean Water Act, the Navajo Nation's treaty rights, the federal trust responsibility, and the Due Process clause of the Constitution, as articulated below.

14.     The Navajo Nation therefore requests that this Court set aside the Rescission Rule and 2020 WOTUS Rule. The Agencies should resume implementation of the 2015 Clean Water Rule, which provides a definition of "waters of the United States" that respects controlling law, is grounded in sound science, and reflects a reasonable analysis of its impacts.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over the claims set forth in this complaint pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 702. *See Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 623 (2018) (challenges to the Agencies' regulations defining "waters of the United States" must be brought in federal district courts). The relief sought is authorized by 28 U.S.C. § 2201(a), 28 U.S.C. § 2202, and 5 U.S.C. § 706.

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(c)(2) and (e)(1). This action seeks relief against federal agencies and federal officers acting in their official capacities.

## PARTIES

17.     The Navajo Nation is a federally recognized Indian tribe with a government-to-government relationship with the United States. The formal Navajo Reservation was established by the Treaty of June 1, 1868, 15 Stat. 667, and was thereafter expanded by successive executive orders. The Navajo Nation currently encompasses approximately 17,627,262 acres of sovereign

territory, consisting of formal reservation land and tribal trust land, allotted land, and dependent Indian communities, and extends into northwestern New Mexico, northeastern Arizona, and southeastern Utah.

18.     There are approximately 39,000 miles of streams and 17,057 acres of lake and ponds within the Navajo Nation.[1] Three major river basins drain the Navajo Nation: the Lower Colorado River, the Upper Colorado River, and the Rio Grande. *Id*. Ephemeral (flowing only in response to precipitation) and intermittent (flowing weekly to seasonally) streams make up over 81% of all streams in the arid and semi-arid Southwest, including Arizona, New Mexico and Utah where the Navajo Nation is located, according to the U.S. Geological Survey National Hydrography Dataset.

19.     The Navajo Nation is a sovereign with proprietary interests in its lands and waters and governmental interests in the management of its natural resources, including providing clean and adequate water supplies to meet the needs of its residents and its economy; protect the public health, safety, welfare, and the environment; and ensure that its lands may serve as a permanent homeland for Navajo people. The Navajo Nation also has treaty rights that include the right to hunt, fish, and gather, activities which are dependent on clean water. *See* Treaty of June 1, 1868.

20.     Defendant Andrew Wheeler is the Administrator of the EPA, the highest-ranking official in the EPA, and signer of the Rescission Rule and 2020 WOTUS Rule. Plaintiff Navajo Nation sues Administrator Wheeler in his official capacity.

---

[1] U.S. Envtl. Prot. Agency Pac. Sw. Region 9 Water Div., *Tribal Water Quality Accomplishments*, EPA-909-K-06-001, at 12 (2006), https://www.epa.gov/sites/production/files/2015-08/documents/tribal-water-quality-accomplishments.pdf.

21.     Defendant United States Environmental Protection Agency is the federal agency charged with implementing and enforcing the majority of the Clean Water Act. Together with the Corps, EPA issued the Rescission Rule and 2020 WOTUS Rule.

22.     Defendant Rickey Dale "R.D." James is the Assistant Secretary of the Army for Civil Works and supervises the Army Corps' Civil Works program, including its implementation of the Clean Water Act. Assistant Secretary James signed the Rescission Rule and 2020 WOTUS Rule for the United States Army Corps of Engineers. Plaintiff Navajo Nation sues Assistant Secretary James in his official capacity.

23.     Defendant United States Army Corps of Engineers is the federal agency responsible for the implementation of CWA § 404, 33 U.S.C. § 1344(a), which provides for issuance of permits for the discharge of dredge and fill material into the "waters of the United States." The Corps is housed within the United States Army, as part of the United States Department of Defense. Together with EPA, the Corps issued the Rescission Rule and 2020 WOTUS Rule.

## STATUTORY AND REGULATORY BACKGROUND

**Navajo Nation Treaty Rights and Federal Government Trust Obligations**

24.     The Navajo Nation has treaty rights that include the right to hunt, fish, and gather, *see* Treaty of June 1, 1868. These treaty rights require water quality sufficient to protect the habitat supporting those rights. *United States v. Adair*, 723 F.2d 1394 (9th Cir. 1983).

25.     Treaty rights are property rights that require federal protection. *Washington v. Wash. State Comm. Passenger Fishing Vessel Ass'n*, 443 U.S. 658 (1979); *Menominee Tribe of Indians v. United States*, 391 U.S. 404 (1968). Federal agencies cannot abrogate treaty rights

without specific and clearly expressed Congressional authorization. *Herrera v. Wyoming*, 139 S. Ct. 1696 (2019); *Menominee Tribe*, 391 U.S. at 412-13.

26.     The United States government, including the Corps and all other federal agencies, are responsible for ensuring that treaty rights are given full effect, and not abrogated or impinged upon by agency actions absent an act of Congress. *N.W. Sea Farms, Inc. v. U.S. Army Corps of Eng'rs*, 931 F. Supp. 1515 (W.D. Wash. 1996); *Confederated Tribes of the Umatilla v. Alexander*, 440 F. Supp. 553 (D. Or. 1977); *see also Nance v. Envtl. Prot. Agency*, 645 F.2d 701, 710-11 (9th Cir. 1981) ("It is fairly clear that any Federal government action is subject to the United States' fiduciary responsibilities toward the Indian tribes.").

27.     Along with these treaty rights, the Navajo Nation has reserved water rights that protect the Navajo Nation's uses of its water. *Winters v. United States*, 207 U.S. 564 (1908). Regardless of the type of water flow, and whether those reserved rights have been confirmed through settlement or adjudication, the Navajo Nation's reserved water rights and the waters that satisfy those rights are trust assets subject to federal protection and jurisdiction. *See, e.g.*, 55 Fed. Reg. 9,223 (Mar. 12, 1990).

28.     The United States has a trust responsibility to recognize and protect tribal lands, assets, and resources, which include the water that flows over and through tribal lands and the natural resources that depend on that water. *See, e.g.*, *Seminole Nation v. United States*, 316 U.S. 286, 296-97 (1942) (United States has a "moral obligation of the highest responsibility and trust"); American Indian Policy Review Commission (1973) (U.S. trust responsibilities include protection and proper management of Indian resources, properties, and assets).

29.     In its Indian Policy, EPA recognizes the federal trust responsibility and states it will "give special consideration to Tribal interests in making Agency policy," including "in making decisions and managing environmental programs affecting reservation lands."[2]

30.     Similarly, the Corps states in its Tribal Consultation Policy that "[t]he trust responsibility will be honored and fulfilled" and that the Corps "will ensure that it addresses Tribal concerns regarding protected tribal resources, tribal rights (including treaty rights) and Indian lands."[3]

**The Administrative Procedure Act**

31.     The APA governs the requirements for federal agency decisionmaking, including the agency rulemaking process.

32.     An agency must publish notice of a proposed rulemaking in the Federal Register and provide a meaningful opportunity for public participation through submission of comments or other information. 5 U.S.C. § 553(b)-(c).

33.     A rule is unlawful and must be set aside when an agency acts in a manner that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, . . . or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

---

[2] E. Scott Pruitt, *Reaffirmation of the U.S. Environmental Protection Agency's Indian Policy*, at 1, 3 (Oct. 11, 2017), https://www.epa.gov/sites/production/files/2018-03/documents/11oct17_epa_reaffirmation_pruitt.pdf.

[3] U.S. Army Corps of Eng'rs, *Tribal Consultation Policy*, at 2-3 (Oct. 4, 2012), https://www.spk.usace.army.mil/Portals/12/documents/tribal_program/USACE%20Native%20American%20Policy%20brochure%202013.pdf.

34.     A rule must be based on a consideration of the relevant factors. The agency must examine relevant data and articulate a satisfactory explanation for its action, *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), and a rule is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

35.     "Agencies are free to change their existing policies," but they must "provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (citing *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981-82 (2005)); *Renewable Fuels Ass'n v. U.S. Envtl. Prot. Agency*, 948 F.3d 1206, 1255 (10th Cir. 2020). While an agency need not show that a new rule is "*better*" than the rule it replaced, it still must demonstrate that there are good reasons for it and that it is permissible under the statute. *FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009).

36.     Further, an agency must "provide a more detailed justification than what would suffice for a new policy created on a blank slate" when "its new policy rests upon factual findings that contradict those which underlay its prior policy," "or when its prior policy has engendered serious reliance interests that must be taken into account." *Id.* (internal citation omitted). Any "[u]nexplained inconsistency" in agency policy is "a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." *Brand X*, 545 U.S. at 981.

37.     "[W]hen an agency rescinds a prior policy its reasoned analysis must consider the 'alternative[s]' that are 'within the ambit of the existing [policy].'" *Dep't of Homeland Security v.*

*Regents of Univ. of Cal.*, No. 18-587, 2020 WL 3271746, at *14 (U.S. June 18, 2020) (quoting *State Farm*, 463 U. S., at 51) (second and third alterations in original).

38.     "The reasoned explanation requirement of administrative law . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dept. of Commerce v. New York*, 139 S. Ct. 2,551, 2,575-76 (2019). "Accepting contrived reasons would defeat the purpose for the enterprise[.]" *Id.* at 2,576.

**The Clean Water Act**

**Legislative Intent**

39.     Congress enacted the Clean Water Act with the objective "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." CWA § 101(a), 33 U.S.C. § 1251(a).

40.     Congress took a "broad, systemic view" of maintaining and improving water quality, with the word "integrity" referring "'to a condition in which the natural structure and function of ecosystems is [are] maintained.'" *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 132 (1985) (quoting H.R. Rep. No. 92-911, at 76 (1972) (alteration in original)).

41.     The Clean Water Act was designed to be "an all-encompassing program of water pollution regulation," replacing an ineffective patchwork of state laws. *City of Milwaukee v. Illinois*, 451 U.S. 304, 318 (1981). Congress recognized that this state-led scheme had been "inadequate in every vital respect," leaving many of the nation's navigable waters "severely polluted." S. Rep. No. 92-414, at 3674 (1972).

42.     The Clean Water Act's coverage of waters is broad because Congress recognized that "[p]rotection of aquatic ecosystems . . . demanded broad federal authority to control pollution[.]" *Riverside Bayview Homes*, 474 U.S. at 132-33.

43.     The Conference Report makes clear that the extensive jurisdictional reach of the statute was deliberate: "The conferees fully intend that the term 'navigable waters' be given the *broadest possible constitutional interpretation* unencumbered by agency determinations which have been made or may be made for administrative purposes." S. Rep. No. 92-1236, at 144 (1972) (Conf. Report), *as reprinted in* 1972 U.S.C.C.A.N. 3776, 3822 (emphasis added); *see also United States v. Hubenka*, 438 F.3d 1026, 1033 (10th Cir. 2006) (quoting *Quivira Min. Co. v. U.S. Envtl. Prot. Agency*, 765 F.2d 126, 129 (10th Cir. 1985)) (CWA was intended "to cover, as much as possible, all waters of the United States instead of just some")).

44.     Congress therefore defined "navigable waters" broadly, as meaning the "waters of the United States."

**Structure of the Clean Water Act**

45.     The Clean Water Act controls pollution at its source by requiring permits for discharges into "waters of the United States." *See* S. Rep. No. 92-414 at 3742 (1972) ("[I]t is essential that discharge of pollutants be controlled at the source"); CWA §§ 301(a), 402, 404, 33 U.S.C. §§ 1311(a), 1342, 1344. These permits must include conditions designed to ensure compliance with applicable water quality standards, which are established on a state-by-state (or tribe-by-tribe) basis. The Clean Water Act establishes two main categories of permits.

46.     The first category consists of permits for the discharge of pollutants from point sources into "waters of the United States," also referred to as National Pollutant Discharge

Elimination System (NPDES) permits. NPDES permits are issued by EPA under CWA § 402, 33 U.S.C. § 1342, unless EPA authorizes a state (or tribe) to operate this permit program within its borders.

47.     Currently, all states except Massachusetts, New Hampshire, and New Mexico are authorized to operate the NPDES permitting program.[4] EPA operates the program in those states, the District of Columbia, U.S. territories, and for all tribal land. The Navajo Nation Environmental Protection Agency assists EPA with implementing the NPDES program on the Navajo Nation.

48.     The second category, permits for the discharge of dredge and fill materials into "waters of the United States," are issued by the Corps under CWA § 404, 33 U.S.C. § 1344, unless EPA authorizes a state (or tribe) to operate this permit program within its borders.

49.     Currently, Michigan and New Jersey have assumed administration of the Section 404 permit program; the Corps administers the program for the rest of the country, including for all tribal lands.

50.     In addition, CWA § 401, 33 U.S.C. § 1341, prohibits a federal agency from permitting or licensing a discharge into "waters of the United States" unless the state (or tribe) where the discharge originates issues a certification that the permit or license will comply with applicable water quality requirements, or waives its right to do so. All states and 61 tribes, including the Navajo Nation, have authority to exercise their CWA § 401 certification authority.

51.     CWA § 311(b), 33 U.S.C. § 1321(b), prohibits discharges or threatened discharges of oil or hazardous substances into the "waters of the United States." Section 311 further provides

---

[4] Idaho received approval to operate the NPDES program with a phased transfer of authority starting in July 2018 and ending by July 2021. 83 Fed. Reg. 27,769 (June 14, 2018).

for facilities to develop plans to prevent oil spills into "waters of the United States" and for funding response actions for such spills. *Id.* § 1321(j)(5), (s).

52.      The Clean Water Act also establishes nationwide minimum pollution controls that are applicable to the "waters of the United States," creating a uniform national floor of protective measures against water pollution. *See* CWA §§ 301, 302, 304, 306, 307, 510(1), 33 U.S.C. §§ 1311, 1312, 1314, 1316, 1317, 1370(1). Without a protective nationwide baseline that furthers the Act's purpose of protecting water quality, upstream states might impose less stringent standards on pollution sources in their states. Those less stringent controls would harm the waters of downstream states or tribes.

### Treating Tribes as States under the CWA

53.      In 1987, Congress added Section 518 to the Clean Water Act, 33 U.S.C. § 1377. Section 518(e) authorizes EPA to grant eligible Indian tribes "treatment as a state" (TAS) for a variety of purposes, including administering and enforcing each of the principal CWA regulatory programs. *Id.* § 1377(e). The EPA has established specific TAS application processes for six Clean Water Act regulatory programs: Section 303(c) water quality standards; Section 303(d) impaired water listing and total maximum daily load programs; Section 401 water quality certification programs; Section 402 NPDES permitting and other provisions; Section 404 dredge-and-fill permitting; and Section 405 sewage sludge management programs. 40 C.F.R. §§ 123.31, 130.16, 131.8, 233.60, 501.23.

54.      Tribes are not required to apply for TAS. Sixty-two tribes, however, including the Navajo Nation, have TAS approvals for either water quality standards, water quality certifications, or both. From planning to approval to implementation, the process takes years to complete.

55.     No tribe has TAS for any Clean Water Act permitting programs or Section 303(d) impaired water listing and total maximum daily load programs. Most tribes lack the capacity to develop and administer these programs, which are resource-intensive, and have not applied for TAS for these programs. Instead, tribes rely on the Agencies' implementation of these programs on their behalf. Indeed, even the states rely on the Corps to implement the CWA § 404 program.

56.     If the Agencies' narrow definition of "waters of the United States" in the 2020 WOTUS Rule is allowed to stand, discharges into the newly excluded waters may no longer require a NPDES or dredge-and-fill permit. In the Navajo Nation's case, because so many of its waters are ephemeral, the majority of its waters may not be protected from immediate or upstream contamination.

**Prior Regulations and Case Law on "Waters of the United States"**

57.     Between the 1970s and early 2000s, the Agencies and courts interpreted the scope of the Clean Water Act broadly to cover "virtually all bodies of water," *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 492 (1987).

58.     In the 1980s, the Agencies generally defined the "waters of the United States" to cover: (1) waters used or susceptible of use in interstate and foreign commerce, commonly referred to as navigable-in-fact or "traditionally navigable" waters; (2) interstate waters; (3) the territorial seas; and (4) other waters that could affect interstate commerce. *See* 51 Fed. Reg. at 41,250; 53 Fed. Reg. at 20,774.

59.     Beginning in 1985 in *Riverside Bayview*, followed by *Solid Waste Agency of Northern Cook County (SWANCC) v. U.S. Army Corps of Engineers*, 531 U.S. 159 (2001), and culminating with *Rapanos v. United States*, 547 U.S. 715 (2006), the Supreme Court issued

decisions about the scope of the Clean Water Act, and in particular its coverage of "non-adjacent" wetlands.

60.     In *Rapanos*, the Court addressed whether the Clean Water Act protects wetlands lying near ditches or tributaries "that eventually empty into traditional navigable waters," 547 U.S. at 729, resulting in Justice Kennedy's "significant nexus" test.

61.     In a plurality opinion authored by Justice Scalia, four Justices adopted an extremely narrow view of the Clean Water Act. In their view, the phrase "waters of the United States" includes only "relatively permanent, standing or continuously flowing bodies of water 'forming geographic features'" described as streams, oceans, rivers, and lakes. *Id.* at 739 (citing Webster's New International Dictionary 2882 (2d ed. 1954)). The plurality further found that only "those wetlands with a continuous surface connection" to other "waters of the United States" are covered by the CWA. *Id.* at 742.

62.     The other five Supreme Court Justices rejected the *Rapanos* plurality's interpretation of "waters of the United States" as inconsistent with the text, structure, and purpose of the Clean Water Act. *See* 547 U.S. at 768, 776 (Kennedy, J., concurring in the judgment), 800 (Stevens, J., dissenting).

63.     According to Justice Kennedy, wetlands "come within the statutory phrase 'navigable waters'" if they share a "significant nexus" with a traditionally navigable water, meaning that the wetlands, "either alone or in combination with" other similarly situated wetlands, "significantly affect the chemical, physical, and biological integrity" of a traditionally navigable water. *Id.* at 779-80.

64.     In arriving at this conclusion, Justice Kennedy explained that the plurality's first requirement—standing water or continuous flow, at least for a period of "some months"—made "little practical sense in a statute concerned with water quality." *Id*. at 769. Justice Kennedy stated that, on the contrary, "nothing in the statute" suggests that Congress intended to exclude waterways that flow irregularly, such as in response to rainfall. *Id.* at 770. Justice Kennedy also rejected a "continuous surface connection" requirement for wetlands, *id.* at 772, noting that it "may be the absence of an interchange of waters . . . that makes protection of wetlands critical to the statutory scheme," *id.* at 775.

65.     The significant nexus test had already been followed by the Tenth Circuit, based on *SWANCC*. *Hubenka*, 438 F.3d at 1033-34 (citing *SWANCC*, 531 U.S. at 167-68).

66.     The four dissenting Justices in *Rapanos* similarly rejected the plurality's "revisionist reading" of the Clean Water Act. 547 U.S. at 793 (Stevens, J., dissenting).

67.     In 2008, the Agencies issued the *Rapanos* Guidance, which provided direction on how to implement Justice Kennedy's significant nexus standard.[5]

68.     The *Rapanos* Guidance included as jurisdictional the following categories of waters: (1) navigable waters and their adjacent wetlands; (2) non-navigable tributaries of navigable waters that are relatively permanent; and (3) wetlands that directly abut those non-navigable tributaries. Adjacent wetlands were defined in the Guidance to include those with a surface or shallow sub-surface connection to jurisdictional waters, wetlands separated from jurisdictional

---

[5] Clean Water Act Jurisdiction following the U.S. Supreme Court's Decision in <u>Rapanos v. United States & Carabell v. United States</u> (Dec. 2, 2008), at 1, https://www.epa.gov/sites/production/files/2016-02/documents/cwa_jurisdiction_following_rapanos120208.pdf (*Rapanos* Guidance).

waters by barriers, and wetlands reasonably close in proximity to jurisdictional waters. *Rapanos* Guidance at 5.

69.     The *Rapanos* Guidance further provided that non-navigable, non-relatively permanent tributaries and their adjacent wetlands would be assessed on a case-by-case basis according to the Agencies' significant nexus analysis, which considered various hydrologic and ecological factors such as flow characteristics and various functions of those waters, "to determine if they significantly affect the chemical, physical and biological integrity of downstream traditional navigable waters." *Id.* at 1, 8-11.

**2015 Clean Water Rule**

70.     In 2015, the Agencies promulgated the Clean Water Rule to clarify the scope of the Clean Water Act and to ensure "predictability," "consistency," and "protection for the nation's public health and aquatic resources[.]" 80 Fed. Reg. at 37,054, 37,056-57.

71.     In developing the regulation, the Agencies reviewed and relied on the "best available peer-reviewed science," the decisions of the Supreme Court, and the clear objective of the Clean Water Act. *Id*. at 37,055-57. Consistent with the Clean Water Act and Supreme Court precedent, the 2015 Clean Water Rule applied the Act's safeguards to wetlands and tributaries if they, "either alone or in combination with similarly situated waters in the region, significantly affect the chemical, physical, or biological integrity of traditional navigable waters, interstate waters, or the territorial seas," *id.* at 37,060, as encapsulated by the "significant nexus" standard.

72.     In preparing the 2015 Clean Water Rule, the Agencies' extensive public outreach began in 2011 and continued through the end of the rulemaking process. That consultation included

outreach to state and local governments, Indian tribes, and governmental organizations. *See id.* at 37,102-03.

73.    The agencies also compiled a considerable scientific record that supported the approach taken in the 2015 Clean Water Rule, including its application of the "significant nexus" test.[6]

74.    After synthesizing more than 1,200 peer-reviewed studies, the Connectivity Report reached "major conclusions" that would serve as the foundation of the 2015 Clean Water Rule. Connectivity Report at ES-2.

75.    First, the report confirmed that "streams, individually or cumulatively, exert a strong influence on the integrity of downstream waters." *Id.* Tributary streams, the report declared, "including perennial, intermittent, and ephemeral streams, are physically, chemically, and biologically connected to downstream rivers . . . ." *Id.*

76.    The report also concluded that "[w]etlands and open waters in non-floodplain landscape settings . . . provide numerous functions that benefit downstream water integrity," including "storage of floodwater; recharge of ground water that sustains river baseflow; retention and transformation of nutrients, metals, and pesticides; export of organisms or reproductive propagules to downstream waters; and habitats needed for stream species." *Id.* at ES-3. Thus, evaluation "of the degree of connectivity for specific groups or classes of wetlands (e.g., prairie

---

[6] U.S. EPA Office of Research and Dev., Connectivity of Streams and Wetlands to Downstream Waters: A Review and Synthesis of the Scientific Evidence, Docket No. EPA-HQ-OW-2011-0880-20858 (Jan. 2015), http://cfpub.epa.gov/ncea/risk/recordisplay.cfm?deid=296414 (Connectivity Report).

potholes or vernal pools)" required a science-based "case-by-case analysis." *Id.* at ES-4; *see also* 80 Fed. Reg. at 37,057, 37,063.

77.     The Agencies translated this science into regulatory standards that were "easier to understand, consistent, and environmentally more protective" than the prior regulations and guidance. 80 Fed. Reg. at 37,057. The 2015 Clean Water Rule organized the nation's waters into three classes: "[w]aters that are jurisdictional in all instances, waters that are excluded from jurisdiction, and a narrow category of waters subject to case-specific analysis to determine whether they are jurisdictional." *Id.*

78.     The class of waters deemed "jurisdictional in all instances" includes traditional navigable waters, interstate waters, and the territorial seas, along with "impoundments" of such waterbodies. *Id.* at 37,057-58. To this list of waters, the 2015 Clean Water Rule added both "tributaries" that contribute flow to a primary water and have "a bed and banks and an ordinary high water mark[,]" and "waters adjacent" to other jurisdictional waters, "including wetlands, ponds, lakes, oxbows, impoundments, and similar waters[.]" *Id.* at 37,075-80, 37,104. The Agencies explained that "[t]he great majority of tributaries as defined by the rule are headwater streams that play an important role in the transport of water, sediments, organic matter, nutrients, and organisms to downstream waters." *Id.* at 37,058.

79.     As to "adjacent waters," the 2015 Clean Water Rule used "bright line boundaries" to target only "those waters that . . . possess the requisite connection to downstream waters and function as a system to protect the chemical, physical, or biological integrity of those waters." *Id.*

80.     The Agencies excluded from jurisdiction essentially the same waters as were excluded based on 1980s regulations and longstanding Agency practice. *Id.* at 37,098.

81.     Finally, the Agencies explained that "waters within the 100-year floodplain of a traditional navigable water, interstate water, or the territorial seas and waters within 4,000 feet of the high tide line or the ordinary high water mark of a traditional navigable water, interstate water, the territorial seas, impoundments, or covered tributary are subject to case-specific significant nexus determinations," unless the water is excluded. *Id.* at 37,059. The Agencies explained that the science available today does not establish those are categorically jurisdictional, but the science establishes that many of them have a significant effect on downstream waters. *Id.*

**The Agencies' Attempts to Rescind, Delay, and Replace the 2015 Clean Water Rule**

   **The Rescission Rule and the Suspension Rule**

82.     In contrast to the 2015 Clean Water Rule, which relied on science to improve the prior agency practice of protecting waters that significantly affect the chemical, physical, and biological integrity of navigable waters, the Agencies' recent efforts to dismantle the 2015 rule are based purely on legal statements and interpretations concocted to rationalize a preordained conclusion.

83.     On February 28, 2017, President Trump issued an executive order directing the EPA Administrator and the Assistant Secretary of the Army for Civil Works to review the Clean Water Rule "for consistency with the [Executive Order's] policy . . . and publish for notice and comment a proposed rule rescinding or revising the rule, as appropriate and consistent with law." Exec. Order No. 13,778, § 2(a). The Order instructed "the Administrator and the Assistant Secretary . . . [to] consider interpreting the term 'navigable waters[]' . . . in a manner consistent with the opinion of Justice Antonin Scalia in *Rapanos*," *id.* § 3, an opinion which was rejected by a majority of the Supreme Court in that case.

84.     While signing the Order, President Trump stated he was "directing the EPA to take action, paving the way for the elimination of this very destructive and horrible rule," which he claimed regulated "nearly every puddle or every ditch on a farmer's land, or anyplace else that they decide -- right? It was a massive power grab."[7] In fact, the 2015 Clean Water Rule specifically exempted all puddles from the definition of "waters of the United States." *See, e.g.*, 80 Fed. Reg. at 37,105 (previously codified at 33 C.F.R. § 328.3(b)(4)(vii)); *see also id.* at 37,099.

85.     On July 27, 2017, EPA, under then-Administrator Pruitt, and the Corps proposed the Rescission Rule, which would rescind the 2015 Clean Water Rule and recodify the 1986 definition of WOTUS in its place. 82 Fed. Reg. 34,899. The Agencies accepted public comments on the proposed Rescission Rule generally but stated that they were not seeking public comment concerning the pre-2015 definition of "waters of the United States," 82 Fed. Reg. at 34,903, which they would not be reconsidering.

86.     During this rulemaking, in August 2017, then-Administrator Pruitt attended an event organized by the National Cattlemen's Beef Association. The Association produced a video in which Administrator Pruitt appears; in it, he criticizes the 2015 Clean Water Rule, stating that in the 2015 rule "the Obama Administration re-imagined their authority under the Clean Water Act and defined a Water of the United States as being a puddle, a dry creek bed, and ephemeral drainage ditches across this country" and urged the Association's members to submit comments

---

[7] Remarks by President Trump at Signing of Waters of the United States (WOTUS) Executive Order (Feb 28, 2017), https://web.archive.org/web/20170228223332/https://www.whitehouse.gov/the-press-office/2017/02/28/remarks-president-trump-signing-waters-united-states-wotus-executive.

on the proposal to rescind the Rule.[8] The Association's video directed viewers to visit BeefUSA.org to file WOTUS comments; that website in turn instructed visitors to "Tell EPA to Kill WOTUS Today!" and provided sample comments that were critical of the Rule.[9]

87.     On November 22, 2017, rather than awaiting the outcome of the rescission rulemaking, the Agencies switched course and published a proposal to suspend the 2015 Clean Water Rule by delaying its effective date until 2020. 82 Fed. Reg. 55,542 (Suspension Rule).

88.     The proposed Suspension Rule contained many of the same flaws as the proposed Rescission Rule, including its suppression of public comment as to the impact of the rule on the chemical, physical, and biological integrity of the Nation's waters. *See, e.g.*, 82 Fed. Reg. at 55,545 ("The agencies do not intend to engage in substantive re-evaluation of the definition of 'waters of the United States' until the Step Two rulemaking").

89.     The Agencies finalized the Suspension Rule on February 6, 2018. 83 Fed. Reg. 5,200.

90.     On August 16, 2018, the United States District Court for the District of South Carolina vacated the Suspension Rule, concluding that the Agencies had refused to consider or

---

[8] BeltwayBeef, *EPA Administrator Scott Pruitt Urges Ranchers to File WOTUS Comments* (Aug. 16, 2017), https://www.youtube.com/watch?v=vTVd54WyhDQ&hd=1.

[9] National Cattlemen's Beef Association, *Take Action Now- Tell EPA to Kill WOTUS Today!* (Aug. 10, 2017), https://web.archive.org/web/20170810080042/http://www.beefusa.org/newsreleases1.aspx?NewsID=6381; Home – Beef USA (Aug. 21, 2017), https://web.archive.org/web/20170821133629/http://www.beefusa.org/ (third image panel saying "Tell the EPA to #DitchTheRule"); *see also* National Cattlemen's Beef Association, *In New NCBA Video, EPA Administrator Pruitt Urges Ranchers to Submit WOTUS Comments* (Aug. 16, 2017), https://www.ncba.org/newsreleases.aspx?NewsID=6391.

receive meaningful public comments in violation of the Administrative Procedure Act. *S.C.*
*Coastal Conservation League*, 318 F. Supp. 3d 959; *see also Puget Soundkeeper All. v. Wheeler*,
No. C15-1342-JCC, 2018 WL 6169196, at *5 (W.D. Wash. Nov. 26, 2018) (same).

91.     In the meantime, on July 12, 2018, the Agencies published a supplemental notice
of proposed rulemaking for the proposed Rescission Rule. 83 Fed. Reg. 32,227. In the
supplemental notice, the Agencies stated that they "propose to conclude that regulatory certainty
would be best served by repealing the 2015 Rule and recodifying the scope of CWA jurisdiction,"
and invited comment on "issues that are relevant to consideration of whether to repeal the 2015
Rule." *Id.* at 32,228, 32,231.

92.     In the supplemental notice, the Agencies did not address, evaluate, or request public
comment on the potential impacts of their proposed rule on the integrity of the Nation's waters.

93.     The Navajo Nation submitted comments on the proposed Rescission Rule on
August 23, 2017, primarily noting that the Agencies had not examined the effects of rescinding
the 2015 Clean Water Rule.

94.     On December 11, 2018, Administrator Wheeler, like previous Administrator Pruitt,
interfered with the rulemaking process. Administrator Wheeler published an article in the Kansas
City Star describing the Agencies' WOTUS rulemakings, in which he stated as follows:

> In 2015, the Obama EPA put forward a definition that further expanded
> Washington's reach into privately owned lands. They claimed it was in the interest
> of water quality. But it was really about power — power in the hands of the federal
> government over states and landowners. . . . The rule was issued in spite of the fact
> that Missouri, and most other states, already have their own protections for waters

within their borders, regardless of whether they are federally regulated as waters of the United States.[10]

Administrator Wheeler further describes the 2015 Clean Water Rule:

> Under the 2015 rule, more farmers, developers and landowners across the U.S. would need to apply for a federal permit to exercise control over their own property — a costly and time-consuming action that runs counter to our republican idea of government. Not only can the process to obtain a federal permit cost tens of thousands of dollars, but the 2015 definition also put local land use decisions in the hands of distant, unelected bureaucrats.

*Id.*

95.     On October 22, 2019, the Agencies published the final Rescission Rule, which repealed the 2015 Clean Water Rule and re-adopted the 1986 definition.

96.     The Agencies gave four reasons for repealing the 2015 Clean Water Rule and re-adopting the 1986 definition: the 2015 Clean Water Rule 1) exceeded the Agencies' authority under the CWA, including the limits imposed by Justice Kennedy's significant nexus test, 2) failed to give due weight to the rights of states under the CWA, 3) "push[ed] the envelope of [the Agencies'] constitutional and statutory authority absent a clear statement from Congress," and 4) lacked record support with respect to the Rule's distance-based limitations. 84 Fed. Reg. at 56,626.

97.     In their *post hoc* rationalization, the Agencies relied almost entirely on two 2019 district court decisions, issued *after* the close of the Rescission Rule comment period, that found aspects of the 2015 Clean Water Rule unlawful. *See* 84 Fed. Reg. at 56,628-30, 56,639-40, 56,647-54, 56,657-59 (citing *Georgia v. Wheeler*, No. 2:15-cv-00079, 2019 WL 3949922 (S.D. Ga. Aug.

---

[10] Andrew Wheeler, *Trump Administration's Waters of the United States Rule Gives Power Back to States*, Kansas City Star (Dec. 12, 2018), https://www.kansascity.com/opinion/readers-opinion/guest-commentary/article222945575.html.

21, 2019) and *Texas v. U.S. Envtl. Prot. Agency*, No. 15-cv-162, 2019 WL 2272464 (S.D. Tex. May 28, 2019)). The Agencies state "[b]y repealing the 2015 Rule," they were "responding to these court orders," *id.* at 56,640, even though both cases were decided nearly two years after the agencies proposed and initiated the rescission rulemaking process. In fact, *Georgia v. Wheeler* was decided *after* the Final Rescission Rule had been sent to the White House Office of Management and Budget for final review.[11]

98.　　The Agencies did not address the factual and scientific findings that they had made in the 2015 Clean Water Rule, including their findings regarding categories of waters that are not navigable-in-fact but significantly affect the integrity of downstream navigable waters.

99.　　The Agencies did not address impacts to tribal waters from the Rescission Rule.

100.　　The final Rescission Rule purports to adopt a district court finding that the 2015 Clean Water Rule did not comply with the "significant nexus" requirement in Justice Kennedy's *Rapanos* opinion. 84 Fed. Reg. at 56,626. That is, in October 2019 the Agencies repealed the 2015 Clean Water Rule on grounds that it did not comply with the significant nexus test, which is the same test the Agencies rejected in the 2020 WOTUS Rule.

**The 2020 WOTUS Rule**

101.　　As directed by Executive Order No. 13,778, on February 14, 2019 the Agencies also proposed to redefine "waters of the United States." 84 Fed. Reg. 4,154.

---

[11] *See* OIRA Conclusion of EO 12866 Regulatory Review, Definition of "Waters of the United States" - Recodification of Preexisting Rule, RIN 2040-AF74, https://www.reginfo.gov/public/do/eoDetails?rrid=129319 (received date of July 12, 2019).

102.    The Agencies proposed a definition of "waters of the United States" that adhered to Justice Scalia's opinion in *Rapanos* and discarded the significant nexus test at the core of Justice Kennedy's opinion and prior Court opinions. *See, e.g.*, *id.* at 4,170 (claiming adherence to Justice Scalia's plurality opinion in *Rapanos*), 4,196 (downplaying the significant nexus test as the view of a "single justice" despite the fact that a majority of the Court in *Rapanos* voted to affirm jurisdiction if the test is satisfied).

103.    The Agencies proposed these changes without considering the major diminishment that their new definition would cause in the scope of Clean Water Act protections throughout the nation, and without meaningfully accounting for the significant harms to water quality that would result. The Agencies stated that such analysis was prevented by lack of data and technical limitations, as well as uncertainties in the way states or tribes might respond to the changed definition. *Id.* at 4,200.

104.    By failing to analyze the impacts of their proposed rule on the health of the Nation's waters, the Agencies denied the public a clear picture of the impacts of the proposed change.

105.    The Navajo Nation submitted comments on the proposal. Among other things, the Navajo Nation explained the importance of water quality to the Navajo Nation and federal obligations to protect it, explained that the proposed rule would result in substantially fewer Navajo waters being protected, and argued that the Agencies improperly failed to consider the impacts of the proposal on tribal waters.

106.    On June 13, 2019, the Navajo Nation also engaged in a government-to-government consultation with the Agencies in which it discussed its concerns with the proposed rule. *See, e.g.*, Exec. Order No. 13,175, 65 Fed. Reg. 67,249 (Nov. 9, 2000). During the meeting, the Navajo

Nation suggested that the Agencies consider carving out tribal waters from the new WOTUS rule and leaving them subject to the 2015 Clean Water Rule, due to the special relationship between the federal government and Indian tribes, and rights that stem from that relationship, that require the federal government to provide additional protections for tribal waters compared to those for state waters. Alternatively, the Navajo Nation suggested that the Agencies provide for regional flexibilities when promulgating the rule, to account for factors such as the reliance of the arid Southwest on ephemeral waters. The Agencies agreed to consider supplemental comments from the Navajo Nation on these issues.

107.    In response to the proposal, EPA's Science Advisory Board advised EPA that the proposed rulemaking both neglected and departed from established science.

108.    In October 2019, the Science Advisory Board provided Administrator Wheeler with a draft commentary on the proposed Rule, which explained:

> The proposed definition of WOTUS is not fully consistent with established EPA recognized science, may not fully meet the key objectives of the CWA –'to restore and maintain the chemical, physical and biological integrity of the Nation's waters,' and is subject to a lack of clarity for implementation. The departure of the proposed Rule from EPA recognized science threatens to weaken protection of the nation's waters by disregarding the established connectivity of ground waters and by failing to protect ephemeral streams and wetlands which connect to navigable waters below the surface. These changes are proposed without a fully supportable scientific basis, while potentially introducing substantial new risks to human and environmental health.[12]

---

[12] Office of the Adm'r Sci. Advisory Bd., *Draft Commentary on the Proposed Rule Defining the Scope of Waters Federally Regulated Under the Clean Water Act*, at 3-4 (Oct. 16, 2019),
https://yosemite.epa.gov/sab/sabproduct.nsf/ea5d9a9b55cc319285256cbd005a472e/5939af1252d dadfb852584e10053d472/$FILE/WOTUS%20SAB%20Draft%20Commentary_10_16_19_.pdf.

109.    Defendants Wheeler and James signed the final rule on January 23, 2020, before the final commentary was provided.

110.    The Science Advisory Board's final comments on the proposed Rule concluded that it "does not incorporate the best available science," is "inconsistent with the body of science previously reviewed by [the Board]," and "lacks a scientific justification, while potentially introducing new risks to human and environmental health."[13]

111.    The 2020 WOTUS Rule was published on April 21, 2020. Under the 2020 WOTUS Rule significant portions of the nation's waters are not "waters of the United States," 85 Fed. Reg. at 22,253-54, but are left to states and tribes to address.

112.    The Agencies relied principally on the *Rapanos* plurality opinion to significantly narrow the definition of "waters of the United States," cutting back on the federal protections afforded by regulations and guidance implementing the Clean Water Act and dating back many decades.

113.    The 2020 WOTUS Rule lists four categories of waters as "waters of the United States": (1) The territorial seas and traditional navigable waters; (2) perennial and intermittent tributaries that contribute surface water flow to such waters; (3) certain lakes, ponds, and impoundments of jurisdictional waters; and (4) wetlands adjacent to other jurisdictional waters. *See id.* at 22,273, 22,338.

---

[13] Office of the Adm'r Sci. Advisory Bd., *Commentary on the Proposed Rule Defining the Scope of Waters Federally Regulated Under the Clean Water Act*, at 1, 3-4 (Feb. 27, 2020) https://yosemite.epa.gov/sab/sabproduct.nsf/WebBOARD/729C61F75763B8878525851F00632 D1C/$File/EPA-SAB-20-002+.pdf.

114.    The rule excludes ephemeral streams from "waters of the United States" because, according to the Agencies, "the requirement that a tributary be perennial or intermittent and be connected to a traditional navigable water is reasonable and reflects the [*Rapanos*] plurality's description of a 'wate[r] of the United States' as '*i.e.*, a relatively permanent body of water connected to traditional interstate navigable waters.'" *Id*. at 22,289 (quoting *Rapanos*, 547 U.S. at 742.) (second alteration in original).

115.    The Agencies similarly relied on the *Rapanos* plurality opinion to define wetlands that are protected under the Act (*e.g.*, those which are "inseparably bound up with" other jurisdictional waters in a typical year, such as wetlands directly abutting or inundated by flooding from such waters), and those which are excluded (*e.g.*, wetlands with a shallow sub-surface connection as well as wetlands lacking direct hydrologic surface connection to jurisdictional waters. *Id.* at 22,309, 22,278-80.

116.    The 2020 WOTUS Rule specifically excludes from protection "[e]phemeral features that flow only in direct response to precipitation, including ephemeral streams, swales, gullies, rills, and pools." *Id*. at 22,251.

117.    As a result, the following wetlands that were formerly protected as "adjacent" wetlands under the *Rapanos* Guidance, the 2015 Rule, and the 2019 Rule are no longer protected under the 2020 WOTUS Rule: (1) wetlands with a shallow sub-surface, rather than surface, connection to jurisdictional waters; (2) wetlands physically separated from jurisdictional waters by human-made dikes or barriers, and lacking a direct hydrologic surface connection in "a typical year"; and (3) neighboring wetlands sufficiently close to a jurisdictional water so as to have a functional ecological connection with such water. *See Rapanos* Guidance at 5-6.

118.    The 2020 WOTUS Rule defines the term "typical year" as a year "when precipitation and other climatic variables are within the normal periodic range (*e.g.*, seasonally, annually) for the geographic area of the applicable aquatic resource based on a rolling thirty-year period." 85 Fed. Reg. at 22,274. The rule explains that this definition is intended to measure, in a Goldilocks fashion, "the characteristics of a waterbody at times that are not too wet and not too dry." *Id.*

119.    The 2020 WOTUS Rule also does not include "interstate" waters as a separate category of "waters of the United States," and therefore excludes many waters that cross state or tribal borders and have long been protected by the Clean Water Act. *See id.* at 22,338.

120.    As a result of these new exclusions, a vast number of streams and wetlands—previously covered by the CWA for decades—will no longer receive CWA protections.

121.    In the 2020 WOTUS Rule, the Agencies state that they do not view the new, narrower definition of "waters of the United States" "as conclusively determining which of the nation's waters warrant environmental protection and which do not," but instead view the definition as drawing the line between "waters subject to federal requirements under the CWA and those waters that States and Tribes are free to manage under their independent authorities." *Id.* at 22,270.

122.    The Agencies acknowledge that the new rule will affect tribes differently from states. *Id.* at 22,270, 22,336-37. They offhandedly dismiss this disparity, however, stating that they were unable to quantify the final rule's effects on tribal waters because they were not aware of datasets showing the potential effects and they could not quantify how tribes would react to the

Rule.[14] Similarly, the Agencies' Economic Analysis did "not consider how the 573 federally recognized tribes might react to a change in CWA jurisdiction, nor does [the Economic Analysis] include tribes in its calculations of costs and benefits."[15]

123.    The Agencies did not analyze impacts on tribes or treaty rights, even though they acknowledged that tribes do not have the resources to implement their own permitting programs and so are dependent on federal permitting programs to protect tribal waters, which programs will be diminished under the new rule. *See id.*

124.    The Economic Analysis also does not account for potential effects related to subsistence fishing, the growing of wild rice, or other cultural uses of water that are unique to tribes, nor does it address the reliance of many tribes on waters that will no longer be considered jurisdictional under the Final Rule. *Id.*; *RTC Topic 11*, at 35, 40. For example, many plants and other wildlife of traditional importance to Navajo people are found in ephemeral waters and wetlands.

125.    The Economic Analysis includes a case study that encompasses the Pecos River from southeast Santa Fe, New Mexico to the Texas-Mexico border. *Economic Analysis* at 153-71. In the less than one-page section on potential impacts to tribal resources, the case study explains that tribal lands intersect with this basin and that changes in the scope of Clean Water Act programs

---

[14] U.S. Envtl. Prot. Agency and Dep't of the Army, *The Navigable Waters Protection Rule – Public Comment Summary Document (RTC) Topic 11: Economic Analysis and Resource and Programmatic Assessment*, (2020), at 35, 40. The full Response to Comments is available at https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0149-11574.

[15] U.S. Envtl. Prot. Agency and Dep't of the Army, *Economic Analysis for the Navigable Waters Protection Rule: Definition of "Waters of the United States"*, (2020), at 50, https://www.epa.gov/sites/production/files/2020-01/documents/econ_analysis_-_nwpr.pdf.

could potentially expose tribal resources to pollution and other adverse effects. *Id.* at 163-64. The case study mentions that there is one active oil well on the Navajo Nation within this basin. *Id.* at 164. This is the extent of tribal water analysis performed to support the 2020 WOTUS Rule.[16]

126.    The Agencies do not address in any substantive fashion the Navajo Nation's and other tribes' comments requesting that the agencies carve out the Navajo Nation and other tribes from the 2020 definition of "waters of the United States."

127.    In the 2020 WOTUS Rule, the Agencies respond to the Science Advisory Board's concerns by stating that they used the Connectivity Report to inform certain aspects of the definition of "waters of the United States," but that where to draw the line between federal and state waters is a legal question that must not dictated by science. 85 Fed. Reg. at 22,261.

**The Rescission Rule and 2020 WOTUS Rule Harm the Navajo Nation**

128.    The Rescission Rule and 2020 WOTUS Rule harm the sovereign, governmental, environmental, economic, and proprietary interests of the Navajo Nation.

129.    The Rescission Rule and 2020 WOTUS Rule harm the Navajo Nation by denying the protection of the Clean Water Act to a substantial number of Navajo waters, creating a risk that they will be polluted, destroyed, or otherwise degraded.

130.    Because the CWA § 402 NPDES permit program and CWA § 404 dredge-and-fill permit program apply only to "waters of the United States," these rules may result in fewer permits

---

[16] *See also* U.S. Envtl. Prot. Agency and Dep't of the Army, *Resource and Programmatic Assessment for the Navigable Waters Protection Rule: Definition of "Waters of the United States"*, (2020), at 50-58, https://www.epa.gov/sites/production/files/2020-01/documents/rpa_-_nwpr_.pdf (acknowledging that the Agencies "directly implement most of the programs under the CWA in the vast majority of Indian country," but providing no analysis of any impacts).

being required and issued by the Agencies and the Navajo Nation may have fewer opportunities to work with the Agencies to protect its waters.

131.    The Navajo Nation operates a certification program under CWA § 401. Federally approved permits for discharges into waters of the United States must be certified as including sufficiently protective conditions, but with a narrowed definition of "waters of the United States," fewer certifications are likely to be required.

132.    Innumerable waterbodies within the Navajo Nation are located downstream from or otherwise hydrologically connected to a network of waterbodies that have lost Clean Water Act protections under the Rescission Rule and 2020 WOTUS Rule. The Rescission Rule and 2020 WOTUS Rule limit the Navajo Nation's ability to be involved in certifications in neighboring jurisdictions that would impact Navajo Nation waters. *See* CWA §§ 401(a)(2), 402(a)(3), (b)(5), 404(h)(1)(E), 33 U.S.C. §§ 1341(a)(2), 1342(a)(3), (b)(5), 1344(h)(1)(E).

133.    The narrower definition of "waters of the United States" limits the applicability of CWA § 311, which protects tribal waters from oil spills by requiring spill prevention, containment and countermeasure (SPCC) plans to prevent releases of oil into waters of the United States and provides for inspections and emergency response. There are significant oil and gas production activities taking place on portions of the Navajo Nation, as well as pipelines traversing Navajo lands, and SPCC plans and requirements are often the only mechanism for addressing the releases that occur all too frequently from these activities.

134.    The narrowing of federal responsibilities upstream of Navajo waters leaves the Navajo Nation subject to more instances of state regulation of water quality. This outcome will result in conflicting water quality regimes. It also will undermine the federal trust responsibility

34

and the government-to-government relationship between the federal government and the Navajo Nation, as well as treaty rights dependent on water quality, since states are not necessarily subject to these commitments.

## FIRST CLAIM FOR RELIEF

(2020 WOTUS Rule - Violation of the Administrative Procedure Act, 5 U.S.C. § 706 and Clean Water Act, 33 U.S.C. § 1251-1387)

135.     Plaintiff incorporates by reference the allegations in the preceding paragraphs.

136.     A court must "set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

137.     Congress declared that the objective of the Clean Water Act "is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters," without limitations. 33 U.S.C. § 1251(a).

138.     The Clean Water Act requires the Agencies to assert jurisdiction over "navigable waters," defined as "waters of the United States." 33 U.S.C. §§ 1311(a), 1342(a), 1344(a), 1362(7), 1362(12).

139.     The Supreme Court has interpreted this authority to mean that adjacent wetlands would fall within the scope of the Clean Water Act if, either alone or in combination with "similarly situated lands in the region," they have a "significant nexus" to traditional navigable waters. *Rapanos*, 547 U.S. at 779-80 (Kennedy, J., concurring).

140.     The 2020 WOTUS Rule relies instead on the plurality opinion authored by Justice Scalia. Five Justices rejected that interpretation of "waters of the United States" as inconsistent

with the text, structure, and purpose of the Clean Water Act. *See* 547 U.S. at 768-97 (Kennedy, J., concurring), 800 (Stevens, J., dissenting).

141.    The 2020 WOTUS Rule excludes entire categories of waters that Congress directed the Agencies to protect, decreases protection for our nation's waters, and is inconsistent with the objective of restoring and maintaining "the chemical, physical and biological integrity" of these waters, in violation of the Clean Water Act's statutory objective. 33 U.S.C. § 1251(a).

142.    The 2020 WOTUS Rule violates the Clean Water Act and is "short of statutory right" and "not in accordance with law" under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C).

## SECOND CLAIM FOR RELIEF

(Rescission Rule and 2020 WOTUS Rule - Violation of the Administrative Procedure Act, 5 U.S.C. § 706)

143.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

144.    A court must set aside final agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

145.    Agency action is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law when:

> (1) An agency fails to articulate a satisfactory explanation for its action backed by relevant data, fails to consider an important aspect of the problem, or offers an explanation for its decision that runs counter to the evidence before the agency. *State Farm*, 463 U.S. at 43.

(2) An agency's departure from prior practice constitutes an "unexplained inconsistency." *Renewable Fuels Ass'n*, 948 F.3d at 1255 (quoting *Encino Motorcars*, 136 S. Ct. at 2126).

(3) "[T]he agency has relied on factors which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43.

146.    In this case, first, the Agencies failed to meaningfully consider whether the Rescission Rule or the 2020 WOTUS Rule would promote or frustrate the Clean Water Act's sole objective, which is to protect the "chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Even if, as the Agencies incorrectly claim, there was insufficient information to assess this crucial factor, it was arbitrary and capricious for the Agencies to promulgate the Rules with such significant uncertainty and not backed by any data.

147.    The Agencies also do not reasonably explain how they could have "balanced" the statutorily mandated objective to protect water quality with other purported policy objectives without understanding, and thus weighing, the magnitude of the rules' negative impacts on water quality. *See* 85 Fed. Reg. at 22,261. The Agencies' failure to consider "important aspects of the problem" renders their action invalid. *Dep't of Homeland Security*, 2020 WL 3271746, at *8-*15.

148.    Moreover, the Rescission Rule and 2020 WOTUS Rule disregard the scientific findings that underpin the 2015 Clean Water Rule. The Agencies claim that the Rescission Rule and 2020 WOTUS Rule are "informed" by the science, but misrepresent the evidence on which they purport to rely and ignore other relevant scientific evidence without any explanation. Although EPA's Science Advisory Board as well as many public commenters raised concerns

about the lack of scientific support for the 2020 WOTUS Rule, the Agencies did not adequately address or respond to those comments.

149.    Second, the Rescission Rule and the 2020 WOTUS Rule constitute a significant departure from past agency practice regarding the definition of "waters of the United States," resulting in a substantial reduction in the number of ephemeral streams, intermittent streams, tributaries, and wetlands that will be protected by the Clean Water Act. The Agencies excluded many waters that, according to the Agencies' own prior findings, significantly impact the quality of traditionally navigable waters. The Agencies disregarded their prior findings and drew contradictory conclusions about the significance of those waters without offering any new evidence contradicting their prior findings or providing any other satisfactory explanation for the change in policy. The Agencies further failed to address the Navajo Nation's significant reliance interests on the prior Agency practices. The rules are therefore arbitrary and capricious and an abuse of discretion for this reason as well.

150.    The Agencies claim that the 2020 WOTUS Rule will promote "clarity," "predictability," and "certainty" as a reason for changing their prior practice. To the contrary, the record demonstrates that key aspects of the 2020 WOTUS Rule will create uncertainty and unpredictability. The Agencies' own statements demonstrate that it will be difficult to distinguish between "intermittent" streams (which are protected) and "ephemeral" streams (which are unprotected). *See, e.g.*, 85 Fed. Reg. at 22,293 (agreeing "that there is no universally accepted methodology" to identify perennial, intermittent, and ephemeral classifications but dismissing the concern). In addition, the Agencies' definition of "typical year" fails to define key terms within that definition or provide principles to guide agency discretion for conducting the case-by-case

analyses that application of the definition will require. *See, e.g.*, 85 Fed. Reg. at 22,274, 22,311. The Agencies therefore further failed to "consider an important aspect of the problem," or "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (1983) (citation omitted).

151.    Third, in the 2020 WOTUS Rule, the Agencies relied on multiple "factors which Congress has not intended [them] to consider," including speculation about voluntary actions of the regulated industry and states outside of the Clean Water Act (which the Agencies did not even meaningfully evaluate), and a supposedly predominant role for states under Clean Water Act Section 101(b) at the expense of fulfilling the primary goal of the Act in Section 101(a).

152.    The Rescission Rule and the 2020 WOTUS Rule should be set aside because they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), (C).

**THIRD CLAIM FOR RELIEF**

(Rescission Rule and 2020 WOTUS Rule - Violation of Administrative Procedure Act, 5 U.S.C. § 706, the Navajo Nation's Treaty Rights, and the Agencies' Trust Responsibility)

153.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

154.    The Agencies have a duty to consider the Navajo Nation's treaty rights, including reserved water rights and rights to hunt, fish, and gather, when taking other actions, and to avoid taking actions that would damage, degrade or destroy these rights. To meet this duty, the Agencies must assess the impacts of their actions and ensure that the Navajo Nation's treaty rights will be safeguarded. This responsibility is affirmed by the Agencies' Indian and Tribal Consultation Policies.

155.    The Agencies failed to analyze or even consider the impacts of the Rescission Rule and the 2020 WOTUS Rule on tribal waters and tribal treaty rights, including those belonging to the Navajo Nation. This failure to consider an important aspect of the problem violates the Agencies' trust responsibility and renders the Rescission Rule and 2020 WOTUS Rule arbitrary and capricious.

156.    The Rescission Rule and 2020 WOTUS Rule will damage, degrade, and destroy Navajo Nation treaty rights without express Congressional authorization. As a result, the Rescission Rule and 2020 WOTUS Rule are arbitrary, capricious, and otherwise not in accordance law.

## FOURTH CLAIM FOR RELIEF

(Rescission Rule and 2020 WOTUS Rule - Violation of Administrative Procedure Act, 5 U.S.C. § 706, and the Due Process Clause)

157.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

158.    Under the APA, an agency must provide the public a meaningful opportunity to comment, consider all of the relevant comments received, and respond to them on the record.

159.    "If the notice of proposed rule-making fails to provide an accurate picture of the reasoning that has led the agency to the proposed rule, interested parties will not be able to comment meaningfully upon the agency's proposals." *Conn. Light and Power v. Nuclear Regulatory Comm'n*, 673 F.2d 525, 530-31 (D.C. Cir. 1982).

160.    The Due Process Clause of the Constitution requires rulemakings to be undertaken with an open mind. *Ass'n of Nat'l Advertisers v. FTC*, 627 F.2d 1151, 1170 (D.C. Cir. 1979). Decision-makers violate the Due Process Clause when they act with an unalterably closed mind

and are unwilling to rationally consider arguments. *Air Transp. Ass'n of Am. v. Nat'l Mediation Bd.*, 663 F.3d 476, 487 (D.C. Cir. 2011).

161.    Before the Rescission Rule notice was published, the Agencies "had already reached a prejudged political conclusion" to repeal the 2015 Clean Water Rule. *Int'l Snowmobile Mfrs. Ass'n v. Norton*, 340 F. Supp. 2d 1249, 1261 (D. Wyo. 2004).

162.    As Attorney General of Oklahoma, former EPA Administrator Scott Pruitt declared his opposition to the Clean Water Rule. Former Administrator Pruitt continued his opposition to the rule when he came to EPA.

163.    President Trump's Executive Order 13,778 directed the Agencies to conduct the rulemakings for both the Rescission Rule and the 2020 WOTUS Rule. Since then, the Agencies have been set on achieving a pre-determined goal: repealing the 2015 Clean Water Rule and promulgating a rule based on Justice Scalia's decision in *Rapanos*.

164.    The Agencies prohibited comment on the substance of both the 2015 Clean Water Rule and the prior case-by-case regime that they proposed to re-codify in their initial notice to repeal the 2015 Clean Water Rule. *See, e.g.*, 82 Fed. Reg. at 34,903.

165.    In the Supplemental Notice, the Agencies set forth their "proposed" conclusions, without any supporting analysis, and solicited comments to support those pre-ordained conclusions. 83 Fed. Reg. at 32,228.

166.    Rather than disavow the closed mind of former Administrator Pruitt, Administrator Wheeler continued on the same path of engrained opposition to the 2015 Clean Water Rule based on factors outside the scope of the Clean Water Act.

167.     Throughout the rulemaking process, the outcome was already assured. The Agencies went through the motions of giving notice and taking comment without truly considering adverse comments or providing any legitimate rationale to support the predetermined result, namely, the new 2020 WOTUS Rule that essentially codified Justice Scalia's opinion in *Rapanos*.

168.     The Agencies unlawfully denied the public a meaningful opportunity to comment on the Rescission Rule because the agencies did not disclose their rationale until issuing the Final Rule. Moreover, because the Agencies operated with an unalterably closed mind, relying on contrived *post hoc* rationales and determined to arrive at a pre-determined outcome, the Agencies deprived the public of a meaningful opportunity to comment on both the Rescission Rule and the 2020 WOTUS Rule.

## FIFTH CLAIM FOR RELIEF

(2020 WOTUS Rule - Violation of the Administrative Procedure Act, 5 U.S.C. § 706)

169.     Plaintiff incorporates by reference the allegations in the preceding paragraphs.

170.     An agency "need not address every comment, but it must respond in a reasoned manner to those that raise significant problems." *City of Waukesha v. Envtl. Prot. Agency*, 320 F.3d 228, 257 (D.C. Cir. 2003) (quoting *Reytblatt v. Nuclear Regulatory Comm'n*, 105 F.3d 715, 722 (D.C. Cir. 1997)).

171.     The failure to respond to significant comments demonstrates that the agency's decision was not based on a consideration of the relevant factors. *Tex. Mun. Power Agency v. Envtl. Prot. Agency*, 89 F.3d 858, 876 (D.C. Cir. 1996).

172.     The Navajo Nation requested that the Agencies "carve out" Navajo Nation waters from the proposed new definition of "waters of the United States" and allow the 2015 Clean Water

Rule to remain applicable to the Navajo Nation. Other tribes and a tribal organization made similar requests, and all provided justifications for their requests.

173.    In addition to failing to meaningfully consider the differences between tribal and state waters, the Agencies failed to respond to this request altogether, and therefore the 2020 WOTUS Rule was not based on a consideration of all the relevant factors.

## REQUEST FOR RELIEF

Plaintiff respectfully requests that the Court:

A.    Declare that the agencies acted arbitrarily and unlawfully in promulgating the challenged rules, "Definition of 'Waters of the United States'—Recodification of Pre-Existing Rules," 84 Fed. Reg. 56,626 (Oct. 22, 2019) and "The Navigable Waters Protection Rule: Definition of 'Waters of the United States,'" 85 Fed. Reg. 22,250 (April 21, 2020);

B.    Vacate and set aside the challenged regulations;

C.    Award Plaintiff its reasonable fees, costs, and expenses, including attorneys' fees, associated with this litigation; and

D.    Grant Plaintiff such further and additional relief as the Court may deem just and proper.


Dated: June 22, 2020

Respectfully submitted,

JILL GRANT & ASSOCIATES, LLC

/s/ Jill Elise Grant
Jill Elise Grant, Bar No. 7571
Ian Paul Fisher,* D.C. Bar No. 1672524
1319 F Street NW, Suite 300
Washington, D.C. 20004
Telephone: (202) 821-1950

Email: jgrant@jillgrantlaw.com
Email: ifisher@jillgrantlaw.com
* D.N.M.LR-Civ. 83.3(a) certification pending

*Attorneys for Plaintiff Navajo Nation*