**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

|  |  |  |
|---|---|---|
| NAVAJO NATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 2:20-cv-602-MV-GJF |
| | ) | |
| ANDREW WHEELER, *et al*., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF NAVAJO NATION'S BRIEF IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. ii

TABLE OF AUTHORITIES ....................................................................................... iv

INTRODUCTION ........................................................................................................ 1

LEGAL AND FACTUAL BACKGROUND ............................................................... 3

    The Clean Water Act and the Term "Waters of the United States" ............................ 3

    Tribal Treatment as a State ......................................................................................... 5

    Prior Interpretations of WOTUS ................................................................................ 6

        Court Decisions ...................................................................................................... 6

        The Agencies' Interpretations ................................................................................ 8

    The Agencies' Repeal of the Clean Water Rule ....................................................... 12

    The Replacement Rule .............................................................................................. 15

STANDING ................................................................................................................ 17

STANDARD OF REVIEW ........................................................................................ 22

ARGUMENT .............................................................................................................. 24

    I.      The Agencies' Repeal Rule was Arbitrary and Capricious and Not in
            Compliance with Prescribed Procedures, in Violation of the APA ........................... 24

        A.     The Agencies Did Not Provide a Reasoned Explanation for Repealing the
              Clean Water Rule and Ignoring its Scientific Record ............................................ 24

        B.     The Agencies Failed to Consider Important Aspects of the Problem ................. 31

            1.     The Agencies Failed to Consider Whether the Repeal Rule Met the
                 Objective of the CWA ..................................................................................... 32

            2.     The Agencies Failed to Consider the Impact of the Repeal Rule on
                 Tribal Waters and Treaty Rights ..................................................................... 33

        C.     The Agencies Promulgated the Repeal Rule Based on a Predetermined
              Outcome, Depriving the Public of a Meaningful Opportunity to Comment ....... 37

    II.     The Agencies' Replacement Rule was Arbitrary, Capricious, and Not in
            Accordance With Law or Prescribed Procedures, in Violation of the APA .............. 41

        A.     The Interpretation of WOTUS in the Replacement Rule is Not Permissible
              Under the CWA or Controlling Caselaw .............................................................. 41

            1.     The Replacement Rule is Inconsistent with the Text, Structure, and
                 Purpose of the CWA ........................................................................................ 41

            2.     The Agencies Should Not Have Followed the *Rapanos* Plurality
                 Opinion Because It was Rejected by a Five-Justice Majority ........................ 43

B.    The Replacement Rule was Arbitrary and Capricious........................................... 45

    1.    The Agencies Failed to Provide a Reasoned Explanation for Their Departure from Past Practice and the Scientific Record................................. 45

    2.    The Agencies Failed to Consider Important Aspects of the Problem............. 52

        a.    The Agencies Failed to Consider How the Replacement Rule Would Meet the Objective of the CWA ..................................... 52

        b.    The Agencies Failed to Consider the Replacement Rule's Impact on Tribal Waters and Treaty Rights........................................... 54

        c.    The Agencies Failed to Consider and Respond to Significant Comments ................................................................................. 56

    3.    The Agencies Promulgated the Replacement Rule Based on a Predetermined Outcome, Depriving the Public of a Meaningful Opportunity to Comment .............................................................. 58

CONCLUSION.................................................................................................... 59

# TABLE OF AUTHORITIES

**Cases**

*Air All. Houston v. EPA*, 906 F.3d 1049 (D.C. Cir. 2018)......................................................... 34, 35

*Air Transp. Ass'n of Am. v. Nat'l Mediation Bd.*, 663 F.3d 476 (D.C. Cir. 2011) ...................... 44

*Alexander v. Sandoval*, 532 U.S. 275 (2001)................................................................................ 51

*Alexander v. Choate*, 469 U.S. 287 (1985)................................................................................... 51

*Allina Health Servs. v. Sebelius*, 746 F.3d 1102 (D.C. Cir. 2014)................................................ 28

*Altera Corp. & Subsidiaries v. Comm'r*, 926 F.3d 1061 (9th Cir. 2019) ............................... 27, 65

*Arkansas v. Oklahoma*, 503 U.S. 91 (1992) ................................................................................... 7

*Asarco, Inc. v. EPA*, 616 F.2d 1153 (9th Cir. 1980)..................................................................... 62

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281 (1974) ............................... 37

*California v. Wheeler*, 20-cv-03005-RS, 2020 WL 3403072 (N.D. Cal. June 19, 2020)............. 20

*Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984) ............................................................ 27, 52

*Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971)........................................ 26, 28

*City of Milwaukee v. Illinois*, 451 U.S. 304 (1981) ....................................................................... 2

*City of Waukesha v. EPA*, 320 F.3d 228 (D.C. Cir. 2003)............................................................ 65

*Colorado v. EPA*, 445 F. Supp. 3d 1295 (D. Colo. 2020) ................................................. 20, 51, 68

*Confederated Tribes of the Umatilla v. Alexander*, 440 F. Supp. 553 (D. Or. 1977).................. 41

*Ctr. for Biol. Diversity v. Kelly*, 93 F. Supp. 3d 1193 (D. Idaho 2015)........................................ 34

*D&F Afonso Realty Trust v. Garvey*, 216 F.3d 1191 (D.C. Cir. 2000) ................................... 33, 58

*Dep't of Comm. v. New York*, 139 S. Ct. 2551 (2019)................................................................. 45

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891 (2020) ...................... passim

*Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016) ......................................... 28, 29, 53

*Farmers Union Cent. Exch., Inc. v. F.E.R.C.*, 734 F.2d 1486 (D.C. Cir. 1984).......................... 37

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)....................................... 29, 32, 36, 53

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ...................................... 26, 32

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000)................ 21

*Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050 (D.C. Cir. 1986) ...................................... 62

iv

*Gresham v. Azar*, 950 F.3d 93 (D.C. Cir. 2020) .................................................... 38, 62

*Guertin v. United States*, 743 F.3d 382 (2d. Cir. 2014) ........................................... 28

*Herrera v. Wyoming*, 139 S. Ct. 1686, 1696 (2019) ............................................... 39, 58

*Home Box Office Inc. v. FCC*, 567 F.2d 9 (D.C. Cir. 1977) ..................................... 34, 47

*In re: The General Adjudication of All Rights to Use Water in the Little Colorado River System*
*and Source*, Contested Case No. CV6417-300, *In re Navajo Nation* (Apache Cty. Super. Ct.
AZ) ........................................................................................................................ 40

*Int'l Paper Co. v. Ouellette*, 479 U.S. 481 (1987) .............................................. 2, 7, 10

*Maislin Indus. U.S. Inc. v. Primary Steel*, 497 U.S. 116 (1990) ................................. 50

*Mashantucket Pequot Tribe v. Town of Ledyard*, 722 F.3d 457 (2d Cir. 2013) ........... 21

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ......................................................... 21

*McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317 (D.C. Cir. 1988) ........... 44, 46, 66

*Menominee Tribe of Indians v. United States*, 391 U.S. 404 (1968) ......................... 39

*Michigan v. EPA*, 576 U.S. 743, 758 (2015) ......................................................... 61

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1 (1983) ............... 51

*Motor Vehicle Mfrs. v. State Farm*, 463 U.S. 29 (1983) ................................... passim

*Mozilla Corp. v. FCC*, 940 F.3d 1 (D.C. Cir. 2019) ................................................ 52

*Murray Energy Corp. v. EPA*, No. 15-3751, (6th Cir. Nov. 1, 2016) ......................... 15

*N.C. Growers' Ass'n v. United Farm Workers*, 702 F.3d 755 (4th Cir. 2012) ............ 47

*N.M. Health Connections v. U.S. Dep't of Health & Hum. Servs.*,
946 F.3d 1138 (10th Cir. 2019) .......................................................................... 37

*N.M. Health Connections v. U.S. Dep't of Health & Human Servs.*,
340 F. Supp. 3d 1112 (D.N.M. 2018) ................................................................... 65

*N.W. Sea Farms, Inc. v. U.S. Army Corps of Eng'rs*,
931 F. Supp. 1515 (W.D. Wash. 1996) ............................................................. 41, 63

*Nance v. EPA*, 645 F.2d 701 (9th Cir. 1981) ....................................................... 41

*Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005) ....... 28, 29, 53

*New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683 (10th Cir. 2009) ...... 44

*No Oilport! v. Carter*, 520 F. Supp. 334 (W.D. Wash. 1981) ................................... 39

*NRDC v. Costle*, 568 F.2d 1369 (D.C. Cir. 1977) .......................................................... 6

*Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560 (10th Cir. 1994)....................... 27, 28

*Organized Vill. of Kake v. Dep't of Agric.*, 795 F.3d 956 (9th Cir. 2015).................................... 57

*Padilla-Caldera v. Holder*, 637 F.3d 1140 (10th Cir. 2011) ........................................ 52

*Penobscot Air Servs., Ltd. v. FAA*, 164 F.3d 713 (1st Cir. 1999) ................................ 52

*Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199 (2015) ............................................... 64

*Prometheus Radio Project v. FCC*, 652 F.3d 431 (3d Cir. 2011)................................... 34

*Pub. Lands Council v. Babbitt*, 167 F.3d 1287 (10th Cir. 1999)................................... 27

*Puget Soundkeeper All. v. Wheeler*, No. C15-1342-JCC, 2018 WL 6169196

  (W.D. Wash. Nov. 26, 2018) .................................................................................. 17

*Quivira Mining Co. v. EPA*, 765 F.2d 126 (10th Cir. 1985)..................................... 5, 48

*R.F.M. v. Nielsen*, 365 F. Supp. 3d 350 (S.D.N.Y. 2019)............................................ 58

*Renewable Fuels Ass'n v. EPA*, 948 F.3d 1206 (10th Cir. 2020) ........................... 29, 36

*Reytblatt v. Nuclear Regul. Comm'n*, 105 F.3d 715 (D.C. Cir. 1997).......................... 65

*S.C. Coastal Conservation League*, 318 F. Supp. 3d 959 (D.S.C. 2018) .............. 17, 46

*SEC v. Chenery Corp.*, 332 U.S. 194 (1947) ............................................................... 28

*Seminole Nation v. United States*, 316 U.S. 286 (1942) ............................................... 40

*Sierra Club v. EPA*, 972 F.3d 290 (3d Cir. 2020)................................................... 33, 58

*Solid Waste Agency of Northern Cook County v. Army Corps of Engineers*, 531 U.S. 159 (2001)

  ....................................................................................................... 8, 9, 11, 48

*State of New Mexico ex rel. State Eng'r v. United States*, CV-75-184, *Claims of the Navajo*

  *Nation*, No. AB-07-001, (11th Jud. Dist. NM, Nov. 1, 2013) ................................. 40

*State of Okla. ex. rel. E. Scott Pruitt v. EPA*, No. 4:15-cv-CVE-FHM (July 8, 2015) ................ 14

*Succar v. Ashcroft*, 394 F.3d 8, 23 (1st Cir. 2005) ...................................................... 50

*Tex. Mun. Power Agency v. EPA*, 89 F.3d 858 (D.C. Cir. 1996)................................... 65

*United States v. Adair*, 723 F.2d 1394, 1411 (9th Cir. 1983) ...................................... 39

*United States v. Carrizales-Toledo*, 454 F.3d 1142 (10th Cir. 2006).......................... 52

*United States v. Donovan*, 661 F.3d 174 (3d Cir. 2011)............................................... 52

*United States v. Duvall*, 740 F.3d 604 (D.C. Cir. 2013)............................................... 52

*United States v. Gila River Valley Irrigation Dist.*, 920 F. Supp. 1444 (D. Ariz. 1996).............. 40

*United States v. Hubenka*, 438 F.3d 1026 (10th Cir. 2006) ............................................. 5, 9, 48

*United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121 (1985)........................ 4, 8, 11, 48

*United States. v. Ashland Oil & Transp. Co.*, 504 F.2d 1317 (6th Cir. 1974). ............................ 4

*United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279 (D.C. Cir. 2019) ........................ 56

*Util. Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014) ............................................................. 27, 50

*Winters v. United States*, 207 U.S. 564 (1908) ............................................................................ 40

**Statutes**

Administrative Procedure Act, 5 U.S.C. §§ 500 *et seq.*...................................................... passim

Clean Water Act, 33 U.S.C. §§ 1251 *et seq.*...................................................................... passim

33 U.S.C. § 1251 ................................................................................................................... passim

33 U.S.C. § 1251(a) .................................................................................................................... 4

33 U.S.C. § 1251(b) ................................................................................................................. 7, 33

33 U.S.C. § 1311 ......................................................................................................................... 6

33 U.S.C. § 1311(a) .................................................................................................................... 4

33 U.S.C. § 1312 ......................................................................................................................... 6

33 U.S.C. § 1314 ......................................................................................................................... 6

33 U.S.C. § 1316 ......................................................................................................................... 6

33 U.S.C. § 1317 ......................................................................................................................... 6

33 U.S.C. § 1321(b) ................................................................................................................. 6, 26

33 U.S.C. § 1321(j)(5) ................................................................................................................. 6

33 U.S.C. § 1321(s) ..................................................................................................................... 6

33 U.S.C. § 1341(a)(1) ............................................................................................................... 25

33 U.S.C. § 1341(a)(2) ............................................................................................................... 26

33 U.S.C. § 1341(d) .................................................................................................................... 25

33 U.S.C. § 1342 .................................................................................................................. 4, 5, 23

33 U.S.C. § 1344 .................................................................................................................. 4, 5, 23

33 U.S.C. § 1362(12) ................................................................................................................... 4

33 U.S.C. § 1370(1) ..................................................................................................................... 6

33 U.S.C. § 1377 ............................................................................................................. 7

5 U.S.C. § 553(b) ........................................................................................................... 43

5 U.S.C. § 553(c) ...................................................................................................... 38, 43

5 U.S.C. § 706(2) ................................................................................................ 26, 28, 38

4 N.N.C. § 1302(43) ...................................................................................................... 22

4 N.N.C. § 1303(A) ....................................................................................................... 23


**Other Authorities**

Resolution of the Navajo Nation Council, CAP-47-95 (April 25, 1995) ....................... 2

42 Fed. Reg. 37,122 (July 19, 1977) ............................................................................. 8

51 Fed. Reg. 41,206 (Nov. 13, 1986) ........................................................................... 16

53 Fed. Reg. 20,764 (June 6, 1988) .............................................................................. 16

55 Fed. Reg. 9,223 (Mar. 12, 1990) ............................................................................. 40

79 Fed. Reg. 22,187 (Apr. 21, 2014) ........................................................................... 12

80 Fed. Reg. 37,054 (June 29, 2015) .................................................................... passim

82 Fed. Reg. 12,532 (Mar. 6, 2017) ............................................................................. 16

82 Fed. Reg. 34,899 (July 27, 2017) .................................................................... passim

82 Fed. Reg. 55,542 (Nov. 22, 2017) ............................................................... 16, 17, 19

83 Fed. Reg. 32,227 (July 12, 2018) ................................................................. 17, 33, 46

83 Fed. Reg. 5,200 (Feb. 6, 2018) ................................................................................ 17

84 Fed. Reg. 4,154 (Feb. 14, 2019) ......................................................................... 18, 66

84 Fed. Reg. 56,626 (Oct. 22, 2019) .................................................................... passim

85 Fed. Reg. 22,250 (Apr. 21, 2020) .................................................................... passim

Exec. Order No. 12,866, 58 Fed. Reg. 190 (Oct. 4, 1993) .......................................... 47

Exec. Order No. 13,778, 82 Fed. Reg. 12,497 (Mar. 3, 2017) ............................... passim

H.R. Rep. No. 92-911 (1972) ......................................................................................... 3

S. Rep. No. 92-1236 (1972) ........................................................................................... 5

S. Rep. No. 92-414 (1971) ................................................................................... 4, 7, 48

Navajo-Utah Water Rights Settlement Act, § 1102 of Consolidated Appropriations Act, 2021,
   Pub. L. No. 116-260 (2020) ................................................................................................ 40

Treaty of June 1, 1868, 15 Stat. 667 ........................................................................................ 21

Andrew R. Wheeler, *Reaffirmation of the EPA's Indian Policy* (April 5, 2019),
   https://www.epa.gov/sites/production/files/2019-04/documents/10apr19memo_reaffirming_
   epas_1984_indian_policy.pdf ............................................................................................. 42

EPA Policy for the Administration of Environmental Programs on Indian Reservations (Nov. 8,
   1984), https://www.epa.gov/sites/production/files/2015-04/documents/indian-policy-84.pdf. 42

R.L. Van Antwerp, *Memorandum for Commanders, Directors, and Chiefs of Separate Offices,
   US Army Corps of Engineers Re: Sovereignty and Government-to-Government relations with
   American Indian and Alaska Native Tribal Governments: USACE Tribal Policy Principles*,
   (May 10, 2010), https://www.spk.usace.army.mil/Portals/12/documents/tribal_program
   /USACE%20Native%20American%20Policy%20brochure%202013.pdf ............................ 42

## INTRODUCTION

Beginning in 2017, following a directive from President Trump, Exec. Order No. 13,778, 82 Fed. Reg. 12,497 (Mar. 3, 2017), the U.S. Environmental Protection Agency (EPA) and the Army Corps of Engineers (Corps) (together, Agencies) proposed and finalized two integrally related rules narrowing the scope of the Clean Water Act (CWA or Act). 84 Fed. Reg. 56,626 (Oct. 22, 2019) (Repeal Rule); 85 Fed. Reg. 22,250 (Apr. 21, 2020) (Replacement Rule). The Navajo Nation is appealing both of those rules in this proceeding.

As discussed below, the CWA applies to "navigable waters," which are defined as "waters of the United States" (WOTUS), 33 U.S.C. § 1362(7), but the term WOTUS is not defined in the Act. The Agencies defined the term in 2015 in the Clean Water Rule, 80 Fed. Reg. 37,054 (June 29, 2015), after they conducted a rigorous review of the scientific literature and provided for extensive public participation, including the submittal of over one million comments by states, tribes, industry, farmers, environmental organizations, and other stakeholders. This massive effort resulted in a definition of WOTUS based on "the text of the statute, Supreme Court decisions, the best available peer-reviewed science, public input, and the agencies' technical expertise and experience in implementing the statute." *Id*. at 37,055. The two rules at issue here repealed and replaced the Clean Water Rule without any such support or consideration.

The Repeal Rule rescinded the Clean Water Rule and recodified the 1986 definition of WOTUS, while the Replacement Rule replaced that old definition with a definition that is so restrictive it is unprecedented in the almost 50-year history of the modern-day CWA. For example, the Agencies excluded all ephemeral streams—waters that flow in response to precipitation—from the definition of WOTUS and thus from protection under the CWA. They also excluded all other

streams that do not contribute surface flow in a "typical year" to one of the limited categories of waters considered WOTUS under the Replacement Rule. The Agencies further excluded most wetlands that do not have a surface water connection to a covered WOTUS.

These restrictions undermine Congress's intent to provide "an all-encompassing program of water pollution regulation" that "applies to all point sources and virtually all bodies of water." *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 492 (1987) (internal quotations omitted); *City of Milwaukee v. Illinois*, 451 U.S. 304, 318 (1981). They are particularly harmful on the Navajo Nation and in the arid Southwest, where ephemeral and intermittent streams make up over 81% of all streams. *See* Declaration of Ronnie Ben ¶ 9. They also are inconsistent with the Navajo view that "the integrity and health of the Navajo environment are intimately related to the health and well-being of present and future generations of Navajo people." Ben Decl. ¶ 11 (quoting Resolution of the Navajo Nation Council, CAP-47-95 (April 25, 1995), ¶ 3).

In this brief, the Navajo Nation provides an overview of the relevant history and provisions of the CWA and the evolution of the definition of WOTUS in light of that history. The Navajo Nation then explains how the Agencies' two-step rulemaking violated the Administrative Procedure Act (APA) in almost every possible way. Specifically, in the Repeal Rule, the Agencies did not provide a reasoned explanation for departing from past practice, ignored the scientific record, failed to consider how the Repeal Rule would meet the Act's water quality objective, failed to consider the impact of the rule on the Navajo Nation and other tribes, and engaged in the rulemaking with a predetermined outcome, thus depriving the public of a meaningful opportunity to comment. The Replacement Rule suffers from all the same defects and, in addition, conflicts with the CWA and with Supreme Court precedent on the definition of WOTUS. Instead of

fulfilling the purpose of the CWA, these rules will result in significant harm to the Navajo Nation's waters and the waters of the United States as a whole. The Navajo Nation therefore respectfully requests that this Court find the Repeal Rule and Replacement Rule unlawful and vacate both rules.

## LEGAL AND FACTUAL BACKGROUND

### The Clean Water Act and the Term "Waters of the United States"

By 1970, after decades of federal deference to state authority to protect water quality, the nation's waters were "in serious trouble, thanks to years of neglect, ignorance and public indifference." Ex. 6, H.R. Rep. No. 92-911, at 66 (1972). Congress recognized that the state-led scheme had been "inadequate in every vital respect," leaving many of the nation's navigable waters "severely polluted." S. Rep. No. 92-414, at 7 (1971), *reprinted in* 1972 U.S.C.C.A.N. 3668, 3674. Record numbers of fish kills were reported and both the Rouge River in Dearborn, Michigan and the Cuyahoga River in Cleveland, Ohio had burst into flames. *United States. v. Ashland Oil & Transp. Co*., 504 F.2d 1317, 1325-26 (6th Cir. 1974). In response, Congress passed the CWA with the sole objective "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." CWA § 101(a), 33 U.S.C. § 1251(a). The Act "incorporated a broad, systemic view of the goal of maintaining and improving water quality," one that "demanded broad federal authority to control pollution." *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 132-33 (1985).

The Clean Water Act's suite of water pollution controls applies to all "navigable waters," 33 U.S.C. §§ 1311(a), 1342, 1344, 1362(12), which "Congress chose to define . . . broadly" as "the waters of the United States," *Riverside Bayview*, 474 U.S. at 133. By defining "navigable waters" as waters of the United States, the Act "makes it clear that the term 'navigable' . . . is of limited

3

import." *Id.* Congress intended "that the term 'navigable waters' be given the *broadest possible constitutional interpretation* unencumbered by agency determinations which have been made or may be made for administrative purposes." S. Rep. No. 92-1236, at 144 (1972) (Conf. Rep.), *reprinted in* 1972 U.S.C.C.A.N. 3776, 3822 (emphasis added); *see also United States v. Hubenka*, 438 F.3d 1026, 1033 (10th Cir. 2006) (quoting *Quivira Mining Co. v. EPA*, 765 F.2d 126, 129 (10th Cir. 1985) (CWA was intended "to cover, as much as possible, all waters of the United States instead of just some").

The CWA controls pollution at its source by requiring permits for discharges into WOTUS. CWA §§ 402, 404, 33 U.S.C. §§ 1342, 1344. These permits must include conditions incorporating the best technology-based controls and designed to ensure compliance with applicable water quality standards, which are established on a state-by-state (or tribe-by-tribe) basis. The CWA establishes two main categories of permits: (1) for the discharge of pollutants from point sources into WOTUS, also referred to as National Pollutant Discharge Elimination System (NPDES) permits, and (2) for the discharge of dredged and fill materials into WOTUS. NPDES permits are issued by EPA under CWA § 402 and dredge and fill permits are issued by the Corps under CWA § 404, unless EPA authorizes a state (or tribe) to operate either or both of these permit programs within its borders.

In addition, CWA § 401 prohibits a federal agency from permitting or licensing a discharge into a WOTUS unless the state (or tribe) where the discharge originates issues a certification that the permit or license will comply with applicable water quality requirements, or waives its right to do so. Moreover, CWA § 311(b), 33 U.S.C. § 1321(b), prohibits discharges or threatened discharges of oil or hazardous substances into WOTUS. Section 311 further requires facilities to

develop plans to prevent oil spills into WOTUS and provides funding to respond to such spills. *Id.* § 1321(j)(5), (s). The CWA also establishes nationwide minimum pollution controls that are applicable to WOTUS, creating a uniform national floor of protective measures against water pollution. *See* CWA §§ 301, 302, 304, 306, 307, 510(1), 33 U.S.C. §§ 1311, 1312, 1314, 1316, 1317, 1370(1). Without a protective nationwide baseline that furthers the Act's purpose of protecting water quality, some states might impose lenient standards, for example to attract industry, frustrating the purpose of the CWA and negatively impacting water quality in downstream states. *See NRDC v. Castle*, 568 F.2d 1369, 1378 (D.C. Cir. 1977).

In accordance with the scheme of cooperative federalism underlying this and many other environmental statutes, Congress recognized "the primary responsibilities and rights of States to prevent, reduce and eliminate pollution," including, among other things, for the states to "implement the permit programs under sections 1342 and 1344 of this title." CWA § 101(b), 33 U.S.C. § 1251(b); *see* S. Rep. No. 92-414, at 11, *reprinted in* 1972 U.S.C.C.A.N. 3668, 3678 ("The States are declared to have the primary responsibility and right to implement such a goal."). Accordingly, within the CWA framework, states' rights and responsibilities are carried out as part of a "regulatory partnership," *Int'l Paper Co.*, 479 U.S. at 499, "between the States and the Federal Government, animated by a shared objective: 'to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.'" *Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992) (quoting 33 U.S.C. § 1251(a)).

**Tribal Treatment as a State**

In 1987, Congress added Section 518 to the CWA, 33 U.S.C. § 1377. Section 518(e) authorizes EPA to grant eligible Indian tribes "treatment as a state" (TAS) for a variety of purposes,

5

including administering and enforcing each of the principal CWA regulatory programs. Tribes are not required to apply for TAS. Seventy tribes, however, including the Navajo Nation, have TAS approvals for either water quality standards, water quality certifications, or both.[1] From planning to approval to implementation, the TAS process takes years to complete. Ben Decl. ¶ 13. Importantly, no tribe has applied for TAS for any CWA permitting programs. Most tribes lack the capacity to develop and administer these programs, which are resource intensive. Instead, tribes work with and rely on the Agencies to implement these programs on their behalf. *See*, *e.g.*, 85 Fed. Reg. at 22,336 (acknowledging tribal resource limitations and reliance on federal implementation).

**Prior Interpretations of WOTUS**

**Court Decisions**

The Supreme Court has repeatedly found that the term WOTUS is reasonably interpreted to encompass not only traditional navigable waters but also non-navigable streams and wetlands that significantly affect the quality of the nation's navigable waters. In *Riverside Bayview*, the Supreme Court found reasonable the Corps' determination that the CWA extends to adjacent wetlands, or those which "'border . . . or are in reasonable proximity to other waters of the United States,'" because they are "inseparably bound up with the 'waters' of the United States" and "may affect the water quality of adjacent lakes, rivers, and streams even when the waters of those bodies do not actually inundate the wetlands." 474 U.S. at 134 (quoting 42 Fed. Reg. 37,122, 37,128 (July 19, 1977)).

In *Solid Waste Agency of Northern Cook County v. Army Corps of Engineers*

---

[1] EPA, Tribes Approved for Treatment as a State (TAS), https://www.epa.gov/tribal/tribes-approved-treatment-state-tas (last updated Dec. 28, 2020).

("*SWANCC*"), the Court rejected the Corps' regulation of the isolated, intrastate ponds in abandoned sand and gravel pits based on their use as habitat for migratory birds, but it distinguished *Riverside Bayview* and explained that "it was the significant nexus between the wetlands and 'navigable waters' that informed our reading of the CWA" in that case. 531 U.S. 159, 167 (2001). Following *SWANCC*, the Tenth Circuit in *Hubenka* applied the significant nexus test to hold that the Corps' decision to regulate non-navigable tributaries of navigable and interstate waters was reasonable because "the potential for pollutants to migrate from a tributary to navigable waters downstream constitutes a 'significant nexus' between those waters." 438 F.3d at 1033-34.

Four months after *Hubenka*, the Supreme Court split 4-1-4 over the appropriate interpretation of WOTUS. In *Rapanos v. United States*, a majority of five Justices voted to vacate and remand a decision that certain wetlands were WOTUS so that the district court could consider the issue based on the proper definition of the term. 547 U.S. 715, 757 (2006) (Scalia, J., plurality opinion); *id*. at 759 (Kennedy, J., concurring in the judgment). Justice Scalia's plurality opinion proposed an interpretation that would have restricted the CWA to waters with "a continuous surface connection" to "relatively permanent, standing or continuously flowing bodies of water 'forming geographic features' that are described in ordinary parlance as 'streams[,] . . . oceans, rivers, [and] lakes,'" *id.* at 739, 742 (alterations in original). But a majority of five Justices disagreed and held that the CWA protects non-navigable waters and wetlands with a "significant nexus" to navigable waters. *Id*. at 780, 786-87 (Kennedy, J., concurring); *id.* at 788, 810 (Stevens, J., joined by three other Justices, dissenting).

These Justices rejected the plurality's proposed standard as contrary to the CWA and the Supreme Court's cases interpreting the Act. *Id.* at 776 (Kennedy, J., concurring); *id.* at 800

(Stevens, J., dissenting). Justice Kennedy explained that the plurality's first proposed requirement—standing water or continuous flow, at least for a period of "some months"—made "little practical sense in a statute concerned with water quality." *Id*. at 769. He stated that "nothing in the statute" suggests that Congress intended to exclude waterways that flow irregularly, such as in response to rainfall. *Id.* at 770. He noted that in the western United States, "irregular flows" in streams that are "often-dry water-courses" have significant downstream effects. *Id.* at 769. He also rejected a "continuous surface connection" requirement for wetlands, *id.* at 772, explaining that "wetlands have 'significant effects on water quality and the aquatic ecosystem'" regardless of whether their "moisture originat[ed]" in "flooding or permeation" from "neighboring waterways." *Id*. at 773-74 (citations omitted). Therefore, Justice Kennedy explained, waters that satisfy the significant nexus test "come within the statutory phrase 'navigable waters,'" *id.* at 780. Similarly, Justice Stevens explained that the plurality's "relatively permanent" requirement ignored "the importance of preserving jurisdiction over water beds that are periodically dry"; was arbitrary; and defied common sense and common usage. *Id.* at 800-01 (Stevens, J., dissenting). However, "no opinion command[ed] a majority of the Court on how precisely to read Congress' limits on the reach of the Clean Water Act." *Id*. at 758 (Roberts, J., concurring). This gap left an opportunity for clarification from the Agencies.

**The Agencies' Interpretations**

Between the 1970s and early 2000s, before *Rapanos*, the Agencies interpreted the term WOTUS broadly to cover "virtually all bodies of water." *Int'l Paper Co.*, 479 U.S. at 492. Instances of confusion arose, however, as is evident from the *Riverside Bayview/SWANCC/Rapanos* series of decisions, leading the Agencies to attempt to provide more

clarity in the definition. The Agencies first relied on guidance, which they issued in 2008. *Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in Rapanos v. United States & Carabell v. United States* (Dec. 2, 2008), R2017-0203-15631 (*Rapanos* Guidance).[2] The *Rapanos* Guidance provided direction on how to implement Justice Kennedy's significant nexus standard and included as jurisdictional waters the following categories: (1) navigable waters and their adjacent wetlands; (2) non-navigable but relatively permanent tributaries of navigable waters; and (3) wetlands that directly abut those non-navigable tributaries. *Id.* at 1, 8. Adjacent wetlands were defined to include wetlands with a surface or shallow subsurface connection to jurisdictional waters, wetlands separated from jurisdictional waters by barriers, and wetlands reasonably close to jurisdictional waters. *Id.* at 5. The *Rapanos* Guidance further provided that non-navigable, non-relatively permanent tributaries and their adjacent wetlands would be assessed on a case-by-case basis according to the Agencies' significant nexus analysis, which considered various hydrologic and ecological factors such as flow characteristics and functions of those waters, "to determine if they significantly affect the chemical, physical and biological integrity of downstream traditional navigable waters." *Id.* at 1, 8-11. Even with the *Rapanos* Guidance, however, both the public and agency staff were left with uncertainty. *See, e.g.*, 80 Fed. Reg. at 37,056.

To further clarify the definition of WOTUS, the Agencies began a thorough scientific

---

[2] Documents included in the administrative records for the two rules at issue, as certified by the Agencies in ECF Nos. 16 and 17, are cited in this brief using their title, the letter "R" and the document number (including the year) contained in the Docket Document ID listed in the Index for each rule. Thus, a document identified in the administrative record Index for the Repeal Rule as https://www.regulations.gov/document?D=EPA-HQ-OW-2017-0203-15631 is identified in the brief as "R2017-0203-15631." A document identified in the administrative record Index for the Replacement Rule as https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0149-11691 is identified in the brief as "R2018-0149-11691.

analysis of how streams and wetlands "affect the integrity" of downstream waters. Their analysis ultimately was contained in a "Connectivity Report" reviewing more than 1,200 peer-reviewed publications and finding that "intermittent" and "ephemeral" tributaries, floodplain wetlands, and many non-floodplain wetlands significantly impact the quality of downstream waterways. Connectivity of Streams and Wetlands to Downstream Waters: A Review and Synthesis of the Scientific Evidence, at ES-2 to ES-4, 2-22 to 2-30, 3-1 to 3-45, 4-20 to 4-39 (Jan. 2015), R2018-0149-11691 (Connectivity Report). The Connectivity Report considered comments from an expert panel convened by EPA's Science Advisory Board, as well as from the public. *Id.* at xii; SAB Review of the Draft EPA Report Connectivity of Streams and Wetlands to Downstream Waters: A Review and Synthesis of the Scientific Evidence, (Oct. 17, 2014), R2017-0203-15632.

On April 21, 2014, the Agencies published the Proposed Clean Water Rule to "enhance protection for the nation's public health and aquatic resources, and increase CWA program predictability and consistency by increasing clarity as to the scope of 'waters of the United States' protected under the Act." 79 Fed. Reg. 22,187, 22,188 (Apr. 21, 2014). The Agencies provided for extensive public participation, including 400 public meetings held nationwide and more than 200 days for public comment, and they received over 1 million comments, the majority of which supported the proposal. 80 Fed. Reg. at 37,057.

The Clean Water Rule aimed to protect waters that "either alone or in combination with similarly situated waters in the region, significantly affect the chemical, physical, or biological integrity of traditional navigable waters." 80 Fed. Reg. at 37,060. The rule identified clear categories of jurisdictional and non-jurisdictional waters based on whether the waters "significantly affect" traditional navigable waters, as well as a small category of waters subject to

a case-specific analysis. *Id.* at 37,057-58. In addition to finding navigable waters, interstate waters, territorial seas, and impoundments of such waters to be jurisdictional, the rule defined WOTUS to cover: (1) non-navigable tributaries to covered waters, including ephemeral streams, defining "tributary" as a water with sufficient volume, frequency, and duration of flow to create the physical indicators of a bed and banks and an ordinary high-water mark; (2) wetlands adjacent to otherwise covered waters, defining "adjacent" as bordering, contiguous or neighboring, including wetlands with connections to other waters through either surface water or shallow subsurface water and groundwater flows; and (3) other waters based on case-specific significant nexus analyses. *Id.* at 37,058, 37,060, 37,104-06. The Agencies explained that there was strong scientific evidence supporting the inclusion of all such tributaries as WOTUS. *Id.* at 37,064. The Agencies also explained that the scientific literature "consistently supports the conclusion that covered adjacent waters," including wetlands outside the annual floodplain of navigable waters, "provide similar functions and work together to maintain the chemical, physical, and biological integrity of downstream traditional navigable waters." *Id.* at 37,069.

The Agencies determined that wetlands within 100 feet of a protected water or, for those in the 100-year floodplain of a protected water, within 1,500 feet of that water, are "adjacent" waters and therefore WOTUS. *Id.* at 37,085-86. The Agencies identified important chemical, physical, and biological functions performed by these adjacent wetlands. *Id.* Finally, the Agencies concluded that, even if not within 1,500 feet of the protected waters, other waters within the 100-year floodplain of a protected water and waters within 4,000 feet of the protected water "are subject to case-specific significant nexus determinations," unless the water is excluded. *Id.* at 37,059. They explained that their experience and expertise indicated there are many such waters "where the

science demonstrates that they have a significant effect on downstream waters." *Id.*

The Agencies found that all these waters covered by the Clean Water Rule "require[d] protection in order to restore and maintain the chemical, physical or biological integrity of traditional navigable waters, interstate waters, and the territorial seas." *Id.* at 37,055. They explicitly found that tributaries, "including . . . ephemeral streams" are WOTUS because "they significantly affect the chemical, physical, or biological integrity" of downstream waters and are therefore "vital" to downstream water integrity. *Id.* at 37,063, 37,066, 37,068. By evaluating prior jurisdictional determinations and generally using conservative assumptions about the impact a change in the scope of jurisdiction would have on various CWA programs, the Agencies found that the Clean Water Rule benefits exceeded its costs. Economic Analysis of the EPA-Army Clean Water Rule, at vii, ix-xi (May 20, 2015), R2017-0203-15648 (Clean Water Rule EA).[3]

## The Agencies' Repeal of the Clean Water Rule

On February 28, 2017, President Trump issued Exec. Order 13,778, "Restoring the Rule of Law, Federalism, and Economic Growth by Reviewing the 'Waters of the United States' Rule," directing the Agencies to "publish for notice and comment a proposed rule rescinding or revising the [Clean Water Rule]." *Id.* § 2(a). The Order further instructed the Agencies to "consider

---

[3] Multiple states and private parties sued the Agencies seeking a stay and vacatur of the Clean Water Rule. *See* Compl. for Decl. and Inj. Relief, *State of Okla. ex. rel. E. Scott Pruitt v. EPA*, No. 4:15-cv-CVE-FHM (July 8, 2015) (former EPA Administrator Pruitt was the Attorney General of Oklahoma at the time); Opening Br. of State Pet'rs, *Murray Energy Corp. v. EPA*, No. 15-3751, ECF No. 130 (6th Cir. Nov. 1, 2016). The rule was eventually stayed in 28 states before it was repealed. *See* 84 Fed. Reg. at 56,629-30. Former EPA Administrator Pruitt agreed to recuse himself from Clean Water Rule litigation yet actively participated in the Repeal and Replacement rulemakings seeking the same result. *See* Comments of Att'y Gens. of N.Y., Cal., Me., Md., Mass., Or., Vt., Wash., and D.C., at 14-15 & n.5 (Sept. 27, 2017), R2017-0203-13569.

interpreting the term 'navigable waters,' as defined in 33 U.S.C. 1362(7), in a manner consistent with the opinion of Justice Antonin Scalia in *Rapanos v. United States*, 547 U.S. 715 (2006)." *Id.* § 3. While signing the Order, President Trump stated he was "directing the EPA to take action, paving the way for the elimination of this very destructive and horrible rule," which he claimed regulated "nearly every puddle or every ditch on a farmer's land, or anyplace else that they decide -- right? It was a massive power grab."[4] Remarks by President Trump at Signing of Waters of the United States (WOTUS) Exec. Ord., (Feb. 28, 2017), attachment to R2017-0203-13847; *see also* Comments of Jon P. Devine, Jr., Senior Att'y, NRDC, at 21 (Sept. 27, 2017), R2017-0203-11645. On that same day, then-EPA Administrator Pruitt stated that the Order would "withdraw the waters of the United States Rule" and that the withdrawal process was "already started." EPA Administrator Scott Pruitt Address to the American Farm Bureau Federation's Advocacy Conference (Feb. 28, 2017), attachment to R2017-0203-13847, *available at* https://www.youtube.com/watch?v=yVzz3IYrpac (*see* Fisher Decl. ¶ 3); *see also* Comments of Jon P. Devine, Jr. at 49-50. Indeed, that very day Administrator Pruitt signed a notice of intent to review and rescind or revise the Clean Water Rule. 82 Fed. Reg. 12,532 (published Mar. 6, 2017).

Only a few months later, the Agencies proposed to repeal the Clean Water Rule, reinstate the prior WOTUS regulations from 1986, and issue a second regulation to replace the Clean Water Rule. 82 Fed. Reg. 34,899, 34,900 (July 27, 2017) (Proposed Repeal Rule).[5] The Agencies stated

---

[4] In fact, the Clean Water Rule specifically exempted all puddles from the definition of "waters of the United States." *See, e.g.*, 80 Fed. Reg. at 37,105 (previously codified at 33 C.F.R. § 328.3(b)(4)(vii)); *see also id.* at 37,099.

[5] The Corps promulgated its WOTUS definition in 1986 and EPA promulgated a similar definition in 1988. 84 Fed. Reg. at 56,626 and n.1 (citing 51 Fed. Reg. 41,206 (Nov. 13, 1986); 53 Fed. Reg. 20,764 (June 6, 1988)).

that they "do not intend to engage in substantive reevaluation of the definition of 'waters of the United States' until the second step of the rulemaking," and they were not seeking public comment concerning the pre-2015 definition of "waters of the United States," *Id*. at 34,903.[6]

On July 12, 2018, the Agencies issued a Supplemental Notice ostensibly clarifying their proposed repeal of the Clean Water Rule and accepting limited additional comments on their proposal. 83 Fed. Reg. 32,227 ("The agencies clarify herein the scope of the solicitation of comment and the actions proposed."). Comments were limited to "the legal and policy reasons for or against the repeal of the 2015 Rule." *Id*. at 32,231. The Agencies devoted 19 of the Notice's 25 pages fortifying their legal and policy arguments for the Repeal Rule but omitted any meaningful factual or scientific analysis behind their action. The Agencies also did not produce any analysis regarding the impact of the Proposed Repeal Rule on water quality, such as its impact on tribal waters and resources. The Agencies provided only a 30-day comment period. The Agencies finalized the Repeal Rule in October 2019, reinstating the prior regulatory regime. 84 Fed. Reg. at 56,626.

---

[6] On November 22, 2017, the Agencies switched course and proposed to suspend the Clean Water Rule by retroactively delaying its effective date until 2020. 82 Fed. Reg. 55,542. The proposed "Suspension Rule" contained many of the same flaws as the Proposed Repeal Rule, including suppression of public comment as to the impact of the rule on the chemical, physical, and biological integrity of the nation's waters. *See, e.g.*, *id*. at 55,545 ("The agencies do not intend to engage in substantive re-evaluation of the definition of 'waters of the United States' until the Step Two rulemaking"). The Agencies finalized the Suspension Rule on February 6, 2018, 83 Fed. Reg. 5,200, but on August 16, 2018, the United States District Court for the District of South Carolina vacated the rule, concluding that the Agencies had refused to consider or receive meaningful public comments in violation of the Administrative Procedure Act. *S.C. Coastal Conservation League*, 318 F. Supp. 3d 959 (D.S.C. 2018); *see also Puget Soundkeeper All. v. Wheeler*, No. C15-1342-JCC, 2018 WL 6169196, at *5 (W.D. Wash. Nov. 26, 2018) (same).

**The Replacement Rule**

Before repealing the Clean Water Rule, the Agencies had already proposed a new definition of WOTUS. 84 Fed. Reg. 4,154 (Feb. 14, 2019) (Proposed Replacement Rule). They proposed to limit WOTUS to traditionally navigable waters, perennial or intermittent tributaries of navigable waters, and wetlands that touch or have a direct surface connection to other jurisdictional waters, and they expressly excluded ephemeral streams and non-adjacent wetlands. *Id*. at 4,155. The Agencies did not analyze the impacts that the Proposed Replacement Rule would have on water quality, claiming uncertainty. *Id.* at 4,200. The Agencies provided only 60 days for public comment, compared to over 200 days for the Clean Water Rule. 85 Fed. Reg. at 22,261.

On April 21, 2020, the Agencies finalized the Replacement Rule, imposing unprecedented restrictions on CWA jurisdiction over streams and wetlands. For the first time in the Act's history, the Replacement Rule categorically excluded ephemeral tributaries, 85 Fed. Reg. at 22,338-39, which comprise millions of the nation's stream miles.[7] The rule also excluded an untold number of intermittent tributaries, perennial streams, lakes, ponds, and other waters across the country, unless they carry perennial or intermittent flows to otherwise covered waters in a "typical year." 85 Fed. Reg. at 22,286; Economic Analysis for the Navigable Waters Protection Rule: Definition of "Waters of the United States", at 10-11, 22-23 (Jan. 22, 2020), R2018-0149-11572

---

[7] *E.g.*, Comments of Steve Moyer, Trout Unlimited, at 5, 13-14 (Apr. 15, 2019), R2018-0149-4912 (National Hydrography Dataset identifies 20% of nation's 6.5 million stream miles as ephemeral, but that misses millions of unmapped streams and on closer analysis ephemeral streams likely comprise closer to 57% of nation's stream miles, including 84% of Arizona's); *see also* Comments of James C. Kenney Cabinet Sec'y, N.M. Env't Dep't, at 2 (Apr. 15, 2019), R2018-0149-4964 (explaining 88,810 miles or 93% of New Mexico's streams and rivers are intermittent or ephemeral).

(Replacement Rule EA). And the Replacement Rule covered only those wetlands defined as "adjacent" to a WOTUS, that is, wetlands that abut or have a "surface connection" to navigable waters in a "typical year." 85 Fed. Reg. at 22,279. The rule confusingly defined "typical year" as "when precipitation and other climatic variables are within the normal periodic range . . . for the geographic area of the applicable aquatic resource based on a rolling thirty-year period." *Id.* at 22,339.

Throughout their campaign to suspend, repeal, and replace the Clean Water Rule, the Agencies repeatedly told the public that they would undertake a "substantive . . . reevaluation" of their removal of prior CWA protections at the replacement rule stage of the process. *See, e.g.*, 82 Fed. Reg. at 34,903; 82 Fed. Reg. at 55,542. But that "substantive reevaluation" never came; the Agencies erased protections without evaluating the impacts of their reversal on the nation's waters.

The Agencies asserted that they analyzed the impacts of the Replacement Rule on water quality by preparing a "Resource and Programmatic Assessment" (RPA) and an "Economic Analysis" (EA). *See* 85 Fed. Reg. at 22,331. The Agencies conceded that lost protections for these waters may cause multiple harms, including increased water pollution, flooding, contamination from oil spills, loss of aquatic habitat, reduced ecosystem services, and degraded drinking water. *E.g.*, Replacement Rule EA at 105. Internally, the Agencies estimated that up to 70 percent of the nation's streams and over half of the nation's wetlands may lose protection under limits similar to those in the Replacement Rule.[8] But the Agencies did not refine, finalize, or publish these estimates, and they failed to present any estimates of the streams, wetlands, lakes, and other waters

---

[8] *See* Email from Stacey M. Jensen to John Goodin, RE: Two Actions, at PDF pgs. 2-5, 9 (Sept. 5, 2017), R2018-0149-11767.

that would lose federal protections under the rule compared to their status under the Clean Water Rule and under the Repeal Rule.[9] The Agencies' reworking of the scope of the Act was not tethered to any findings about the effects of the Replacement Rule on the Act's objective to protect and restore the quality and integrity of waters nationwide. Moreover, the Agencies expressly disavowed the RPA and EA as bases for the rule. 85 Fed. Reg. at 22,332 ("the final rule is not based on the information in the agencies [EA] or [RPA]").

The Replacement Rule went into effect on June 22, 2020, except in Colorado, where a district court preliminarily enjoined the rule after holding that the state was likely to succeed on the merits of its claim that the rule unlawfully adopts the *Rapanos* plurality opinion rejected by the majority of the Supreme Court. *Colorado v. EPA*, 445 F. Supp. 3d 1295, 1312 (D. Colo. 2020), *appeals docketed*, Nos. 20-1238, 20-1262, 20-1263 (10th Cir. 2020).[10]

## STANDING

To satisfy the requirements of Article III standing, a plaintiff must have suffered an injury in fact that is fairly traceable to the defendant's conduct and that is likely to be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). "Tribes, like states, are afforded 'special solicitude in [Article III] standing analysis.'" *Mashantucket Pequot Tribe v. Town of Ledyard*, 722 F.3d 457, 463 (2d Cir. 2013)

---

[9] *E.g.*, Replacement Rule EA at xi ("unable to quantify" total changes), 9 ("unable to quantify" interstate water losses), 11 ("unable to quantify" stream losses), 15-17 ("unable to quantify" wetland losses), 18 ("unable to quantify" losses from exclusions); RPA for the Navigable Waters Protection Rule: Definition of "Waters of the United States", at 10, 20, 22-23, 27-28, 30, 31 (Jan. 23, 2020), R2018-0149-11573 (similar).

[10] A federal district court in California denied a motion to preliminarily enjoin the rule nationwide, *California v. Wheeler*, 20-cv-03005-RS, 2020 WL 3403072 (N.D. Cal. June 19, 2020).

(quoting *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007)). The Repeal and Replacement Rules injure the Navajo Nation, and these injuries can be redressed by this Court's vacatur of the rules.

The Navajo Nation is a federally recognized Indian tribe with a government-to-government relationship with the United States. The formal Navajo Reservation was established by the Treaty of June 1, 1868, 15 Stat. 667, and was expanded by successive executive orders. The Navajo Nation currently encompasses approximately 17,627,262 acres of sovereign territory, consisting of formal reservation land and tribal trust land, allotted land, and dependent Indian communities, extends into northwestern New Mexico, northeastern Arizona, and southeastern Utah, and shares a border with southwestern Colorado. Ben Decl. ¶ 7. The Navajo Nation also owns almost 30,000 acres of land in Colorado near Blanca Peak, one of the four Navajo sacred mountains. *Id.* There are approximately 39,000 miles of streams and 17,057 acres of lakes and ponds within the Navajo Nation. *Id.* ¶ 8.[11] Three river basins drain the Navajo Nation—the Lower Colorado River, the Upper Colorado River, and the Rio Grande—and interstate waters flow into all three. Streams that are either ephemeral (flowing only in response to precipitation) or intermittent (flowing during certain times of the year, e.g., seasonally) make up the majority of Navajo Nation waters. Ben Decl. ¶¶ 8-9.

The Navajo Nation has both proprietary interests in its land and water and governmental interests in the management of its natural resources, including providing clean and adequate water to meet the needs of its residents and its economy; protecting the use of its water for Navajo

---

[11] *See* EPA Pac. Sw. Region 9 Water Div., *Tribal Water Quality Accomplishments*, EPA-909-K-06-001, at 12 (2006), https://www.epa.gov/sites/production/files/2015-08/documents/tribal-water-quality-accomplishments.pdf.

traditional and cultural practices and its environment as a whole, in the Navajo way; and ensuring that its land may serve as a permanent homeland for Navajo people. *Id.* ¶¶ 10-11, 28-36. In addition, the Navajo Nation's treaty rights include the right to hunt, Treaty of June 1, 1868, 15 Stat. 667, an activity that depends on clean water to support the animals and their environment. The Navajo Nation also has reserved water rights that protect the Navajo Nation's uses of its waters; these rights exist regardless of whether the waters are perennial, ephemeral, intermittent, or connected to navigable waters, and these rights and the waters that satisfy them are trust assets subject to federal protection and jurisdiction.

The Navajo Nation has its own Navajo Nation CWA that defines "waters of the Navajo Nation" more broadly than the Agencies defined the corresponding term in the Replacement Rule. *Compare* 4 N.N.C. § 1302(43), *with, e.g.*, 40 C.F.R. § 120.2. The Navajo Nation determined that its broader definition—which is consistent with the Clean Water Rule—was necessary to fulfill its governmental obligations. *See* 4 N.N.C. § 1303(A). The Navajo Nation has not yet developed a CWA § 402 NPDES permit program nor a § 404 dredge and fill permit program, 33 U.S.C. §§ 1342, 1344, but instead has always relied on the Agencies to issue those permits because it does not currently have the resources to implement these permitting programs on its own. Ben Decl. ¶¶ 15-17, 21, 37. The Navajo Nation submitted comments supporting the Proposed Clean Water Rule, opposing the Proposed Repeal Rule, and opposing the Proposed Replacement Rule. *Id.* ¶ 39; Ex. 2, Navajo Nation Comments on Clean Water Rule (Oct. 27, 2014), https://www.regulations.gov/document?D=EPA-HQ-OW-2011-0880-15180; Ex. 3, Navajo Nation Comments on Repeal Rule, (Aug. 23, 2017), R2017-0203-4338; Ex. 4, Navajo Nation

Comments on Replacement Rule, (April 11, 2019), R2018-0149-4525.[12] The Navajo Nation stated that the Proposed Repeal Rule would negatively affect the Navajo Nation's enforcement of the Clean Water Act and that the Agencies should have conducted a thorough investigation of the effects of repealing the Clean Water Rule. Ex. 3 at 2. Similarly, in comments on the Proposed Replacement Rule, the Navajo Nation explained, among other things, the importance of water quality to the Navajo Nation, federal obligations to protect it, that the proposed rule would result in substantially fewer Navajo waters being protected, and that the Agencies improperly failed to consider the impacts of the proposal on Navajo Nation waters. Ex. 4 at 3-15.

The Navajo Nation also engaged in a government-to-government consultation with the Agencies in which it discussed its concerns with the Proposed Replacement Rule. Ben Decl. ¶¶ 39-40; Ex. 5, Navajo Nation Supplemental Comments on Replacement Rule, at 1 (July 15, 2019), attachment to R2018-0149-11774. During the meeting, the Navajo Nation requested that the Agencies carve out tribal waters from the Replacement Rule and leave those waters subject to the 2015 Clean Water Rule, due to the special relationship between the federal government and Indian tribes that requires the federal government to provide additional protections for tribal waters compared to those for state waters. Ben Decl. ¶ 40; Ex. 5, NN Supp. Comments at 1-2. Alternatively, the Navajo Nation requested that the proposed new WOTUS definition be modified so that it would include Navajo Nation waters. Ben Decl. ¶ 40; Ex. 5, NN Supp. Comments at 2-8. The Agencies agreed to consider supplemental comments from the Navajo Nation on these issues, which the Navajo Nation submitted. Ben Decl. ¶¶ 39-40; Ex. 5, NN Supp. Comments at 1.

---

[12] The Navajo Nation also submitted comments opposing the Proposed Suspension Rule, (Dec. 14, 2017), https://www.regulations.gov/document?D=EPA-HQ-OW-2017-0644-0701.

Unfortunately, the Agencies failed to respond to the Navajo Nation's comments.

The Navajo Nation has and will continue to suffer injuries traceable to the Repeal and Replacement Rules that can be redressed by vacatur of the rules. First, the Navajo Nation will suffer harm to its waters and water protection programs. Ben Decl. ¶¶ 19-29. Second, the Navajo Nation will suffer harm to its wildlife, with concomitant harms to its rights to hunt and fish, and also will suffer harm to cultural uses of water and water-dependent resources. *Id.* ¶¶ 30, 36. Third, the Navajo Nation will suffer harm to its property. *Id.* ¶¶ 7-9, 19-20, 24, 26-27, 30-35. Fourth, the Navajo Nation will suffer from the increased expenses and administrative burdens incurred to reduce the other harms caused by these rules, including adverse impacts on tourism, agriculture, and livestock. *Id.* ¶¶ 21-23, 31-35, 37-38.

Under the Clean Water Rule, the Agencies issued permits for discharges into virtually all Navajo Nation waters. The Repeal Rule and the Replacement Rule, however, exclude the majority of Navajo Nation waters from CWA protection; the Replacement Rule does so explicitly, and the Repeal Rule does so indirectly by leaving all but the clearest interpretations of WOTUS up to the Agencies' discretion. As a result, the Agencies will no longer issue permits to protect those waters from discharges and in fact are already declining to do so. *Id.* ¶¶ 24-26. The Navajo Nation does not currently have the resources to fill this newly created permitting gap. *Id.* ¶¶ 16-17, 21-22, 37-38. Indeed, currently no tribes have CWA § 402 or 404 permit programs, due to the extensive resources and expertise they require; only three states (Florida, Michigan, and New Jersey) administer the Section 404 permit program. The diminished protection of off-reservation waters stemming from the reduction in CWA §§ 402 and 404 permits will further harm the Navajo Nation, since many off-reservation waters are upstream from and hydrologically connected to Navajo

Nation waters or impact Navajo Nation property on and off the Navajo Reservation. *Id.* ¶¶ 8, 26, 37, 40.

The Navajo Nation relies on CWA § 401 to review proposed projects on the Navajo Reservation that require federal permits and ensure that those projects will comply with Navajo water quality standards and other applicable laws. 33 U.S.C. § 1341(a)(1), (d); Ben Decl. ¶ 18. The Repeal and Replacement Rules, by greatly reducing the number of federal permits issued, allow discharges into Navajo Nation waters without review and certification taking place. Ben Decl. ¶¶ 24-25. In a similar fashion, the Repeal and Replacement Rules reduce the Navajo Nation's opportunities under CWA § 401(a)(2) to object to federal permits for discharges into hydrologically connected waters in neighboring jurisdictions that may cause violations of Navajo Nation water quality standards. 33 U.S.C. § 1341(a)(2); Ben Decl. ¶ 26. They also limit the applicability of CWA § 311, which protects WOTUS from oil spills. 33 U.S.C. § 1321(b), (j)(5), (s). Significant areas of the Navajo Nation are subject to oil and gas development, and oil and gas pipelines cross Navajo Nation lands. Ben Decl. ¶ 27.

Because so many of the Navajo Nation's waters are ephemeral, the majority of its waters will not be protected from immediate or upstream contamination if the Agencies' Repeal and Replacement Rules are allowed to stand. A decision vacating the Rules would redress these harms.

## STANDARD OF REVIEW[13]

The APA, 5 U.S.C. § 706(2), authorizes a court to hold unlawful and set aside agency

---

[13] Although this filing is captioned a motion for summary judgment it seeks review of final agency action based on the administrative record, meaning the standard of review for administrative appeals and not for summary judgment motions applies. *See* Plaintiff Navajo Nation's Motion for Summary Judgment at 1, n.1.

action found to be: (1) outside the scope of the agency's authority, (2) not in compliance with prescribed procedures, and (3) otherwise arbitrary, capricious or an abuse of discretion. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415-17 (1971); *Pub. Lands Council v. Babbitt*, 167 F.3d 1287, 1293-94 (10th Cir. 1999), *aff'd*, 529 U.S. 728 (2000). The standard of review requires the district court "to engage in a substantive review of the record to determine if the agency considered relevant factors or articulated a reasoned basis for its conclusions." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1580 (10th Cir. 1994).

An agency's interpretation of ambiguous statutory language is unlawful if it is not based on a permissible construction of the statute, examined in light of the statute's text, structure and purpose. *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 843 (1984); *Altera Corp. & Subsidiaries v. Comm'r*, 926 F.3d 1061, 1075 (9th Cir. 2019). An "interpretation that is 'inconsisten[t] with the design and structure of the statute as a whole,' does not merit deference." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 321 (2014) (internal citations omitted) (alteration in original); *Pub. Lands Council*, 167 F.3d at 1294.

Agency action will be set aside if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. v. State Farm*, 463 U.S. 29, 43 (1983). The agency must establish that it analyzed the relevant data and provide an explanation of its decision that includes a "rational connection between the facts found and the choice made." *Id.* at 43 (citation omitted). Agencies may change existing policies, but in doing so must "provide a reasoned explanation for the change." *Encino*

*Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (citing *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981-82 (2005)). A reviewing court may not "supply a reasoned basis for the agency's action that the agency itself has not given." *State Farm*, 463 U.S. at 43 (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). Instead, "[a]n agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Id.* at 50. Although this standard of review is ultimately narrow and agency action is "entitled to a presumption of regularity," review must nevertheless be "searching and careful," and "thorough, probing, and in-depth." *Overton Park*, 401 U.S. at 415-16; *Olenhouse*, 42 F.3d at 1574.

Under the APA, reviewing courts "*shall . . . set aside* agency action" found to be unlawful. 5 U.S.C. § 706(2) (emphasis added). Vacatur is the "usual" remedy when an agency action is arbitrary and capricious or otherwise not in accordance with law. *Guertin v. United States*, 743 F.3d 382, 388 (2d. Cir. 2014); *see Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014) ("vacatur is the normal remedy" for an APA violation).

## ARGUMENT

### I.   The Agencies' Repeal Rule was Arbitrary and Capricious and Not in Compliance with Prescribed Procedures, in Violation of the APA

#### A.  The Agencies Did Not Provide a Reasoned Explanation for Repealing the Clean Water Rule and Ignoring its Scientific Record

Agencies must give "good reasons" for reversing their policies. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). An agency must "provide a more detailed justification than what would suffice for a new policy created on a blank slate," when "its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests." *Id.*; *Renewable Fuels Ass'n v. EPA*, 948 F.3d 1206,

24

1255 (10th Cir. 2020); *see also Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1913-14 (2020). An unexplained inconsistency is "'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.'" *Encino*, 136 S. Ct. at 2126 (quoting *Brand X*, 545 U.S. at 981); *accord Renewable Fuels Ass'n*, 948 F.3d at 1255 (EPA action ignoring or failing to provide reasons for deviating from prior studies was arbitrary and capricious).

In the Repeal Rule, the Agencies did not bother to explain their reversal from the scientific record, findings, and agency expertise that underlay the Clean Water Rule but simply abandoned them, violating the standard articulated in *Fox*. The comprehensive, multi-year development process supporting the Clean Water Rule considered science, law, policy, and agency technical expertise. 80 Fed. Reg. at 37,056. In reversing course, the Agencies focused only on a few of the legal and policy concerns, a subset of a subset of the record, and ignored the rest. 84 Fed. Reg. at 56,639-40; *see State Farm*, 463 U.S. at 42 (noting a presumption "*against* changes in current policy that are not justified by the rulemaking record").

The Agencies claimed to be repealing the Clean Water Rule for four primary reasons, none of which addressed the scientific and factual basis for that rule. First, the Agencies asserted that the Clean Water Rule did not properly limit the scope of agency authority under the CWA, and in particular under Justice Kennedy's significant nexus test. 84 Fed. Reg. at 56,626, 56,639. This claim ignored the record of the Clean Water Rule and also was based on a flawed interpretation of Supreme Court case law and the CWA. The Clean Water Rule defined tributaries as "waters that are characterized by the presence of physical indicators of flow – bed and banks and ordinary high-water mark – and that contribute flow directly or indirectly to a traditional navigable water, an interstate water, or the territorial seas." 80 Fed. Reg. at 37,058. That definition acknowledged that

"streams are structurally connected to rivers through the network of continuous channels (bed and banks) that make these systems physically contiguous, and the very existence of a continuous bed and bank structure provides strong geomorphologic evidence for connectivity." Connectivity Report at 3-45. These features therefore provide precisely the "critical functions related to the integrity of other waters" that Justice Kennedy explained would constitute the requisite nexus to navigable waters. *Rapanos*, 547 U.S. at 779 (Kennedy, J., concurring).

The Agencies nevertheless asserted that the definition of "tributaries" in the Clean Water Rule "exceeded the jurisdictional limits envisioned in Justice Kennedy's significant nexus standard." 84 Fed. Reg. at 56,646. To support their conclusion, the Agencies took a portion of Justice Kennedy's opinion out of context: Justice Kennedy explained that the plurality's requirement of permanent flow would mean that "the merest trickle," if continuous, would be a WOTUS, whereas "torrents thundering at irregular intervals through otherwise dry channels would not." 547 U.S. at 769. The Justice used this example to show the illogic of the plurality's opinion and continued by explaining that "irregular flows" may not be "too insignificant to be of concern," especially in arid areas, *id.*, but the Agencies turned his words on their head. They claimed, incorrectly, that he "questioned jurisdiction over features with ''[t]he merest trickle" as potentially lacking a significant nexus to navigable waters. 84 Fed. Reg. at 56,646. The Agencies then characterized the complex ecological functions of tributaries as a "mere contribution of flow." *Id.* The Agencies' disregard of the scientific evidence contained in the Connectivity Report and their resulting misapplication of the significant nexus standard demonstrated a lack of "rational connection between the facts found and the choice made" that rendered their decision arbitrary and capricious. *State Farm*, 463 U.S. at 43, 56.

Tellingly, the Agencies' reliance on Justice Kennedy's significant nexus test to repeal the Clean Water Rule is contradicted by the Replacement Rule, in which the Agencies *rejected* the significant nexus test and substituted the narrower approach in Justice Scalia's plurality decision. *See* Section II.A. These conflicting positions, in virtually simultaneous rulemakings, highlight the arbitrary nature of the Agencies' justification for the Repeal Rule.[14]

Second, the Agencies stated that the Clean Water Rule did not accord "due weight" to the policy in CWA § 101(b) to "recognize, preserve, and protect" the role of states in preventing pollution and managing their resources. 84 Fed. Reg. at 56,626. On the contrary, the Clean Water Rule specifically recognized state and tribal authority in this regard, citing the role that states and tribes play both in implementing the CWA and in implementing their own programs. *See, e.g.*, 80 Fed. Reg. at 37,060. The Clean Water Rule recognized state and tribal rights in conjunction with fulfilling the primary purpose of the CWA, namely, "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters," as expressed in both Subsection 101(a) and, similarly, in Subsection 101(b) (recognizing "rights of States to *prevent, reduce, and eliminate pollution*" and "to plan the development and use (*including restoration, preservation, and enhancement*) of land and water resources"). 33 U.S.C. § 1251 (emphasis added). Indeed, even if these two provisions were not already harmonious, by construing them harmoniously the Clean

---

[14] The Agencies claimed in a footnote in the Repeal Rule that they were "not taking a position" on whether Justice Kennedy's significant nexus test "is or should be the controlling authority regarding the scope of federal jurisdiction under the CWA," 84 Fed. Reg. at 56,639 n.27, but they cannot have it both ways. The Agencies' attempt to both rely on their flawed interpretation of Justice Kennedy's test and simultaneously take "no position" on it is exactly the type of contradictory reasoning that the Supreme Court has deemed arbitrary and capricious. *See Fox*, 556 U.S. at 515-16.

Water Rule fulfilled one of the basic rules of statutory construction. *See*, *e.g.*, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132-33 (2000).

In the Repeal Rule, on the other hand, the Agencies ignored both the record, which demonstrated how the Clean Water Rule balanced CWA § 101(a) and (b), and the statutory language, and placed disproportionate emphasis on Section 101(b). They even elided the words "restoration, preservation, and enhancement" from their quotation of the latter subsection. 84 Fed. Reg. at 56,626. Moreover, the Agencies provided no analysis or explanation of whether or how the Repeal Rule would preserve or protect the "responsibilities and rights of States to prevent, reduce, and eliminate pollution," 33 U.S.C. § 1251(b). *See Sierra Club v. EPA*, 972 F.3d 290, 305 (3d Cir. 2020) (an agency must "justify and explain" its decision, "not simply adopt it via *ipse dixit* authority"); *D&F Afonso Realty Trust v. Garvey*, 216 F.3d 1191, 1196 (D.C. Cir. 2000) ("because the agency says so" is insufficient even under a "highly deferential standard of review").

Third, the Agencies claimed that the Repeal Rule was intended to avoid interpretations of the CWA that would push the envelope of their constitutional authority. 84 Fed. Reg. at 56,626. This claim simply repackages their first two flawed justifications for changing course and does nothing to address the Agencies' failure to grapple with the underlying factual and scientific record.

Fourth, the Agencies asserted that the distance-based limitations in the Clean Water Rule definition of "adjacent" waters suffered from procedural errors and lacked adequate record support. *Id.* The Agencies did not, however, mention this concern in the Proposed Repeal Rule, mentioned it only fleetingly in the Supplemental Proposed Repeal Rule by soliciting comment on it without taking a position, 83 Fed. Reg. at 32,241, and then suddenly identified it as one of the

"primary reasons" for the Repeal Rule, 84 Fed. Reg. at 56,626, 56,639-40. Similarly, the Agencies pointed to two district court decisions issued after the public comment period on the Supplemental Proposed Repeal had closed. *Id*. at 56,657. These *post hoc* rationalizations frustrate the notice-and-comment process and cannot be considered a reasoned explanation for the final repeal. *See Prometheus Radio Project v. FCC*, 652 F.3d 431, 449 (3d Cir. 2011) (quoting *Home Box Office Inc. v. FCC*, 567 F.2d 9, 35-36 (D.C. Cir. 1977)) (notice "must disclose in detail the thinking that has animated the form of a proposed rule and the data upon which that rule is based" and agency must "make its views known to the public in a concrete and focused form so as to make criticism or formulation of alternatives possible"); *Ctr. for Biol. Diversity v. Kelly*, 93 F. Supp. 3d 1193, 1205 (D. Idaho 2015) (agency violated APA when it "made a fundamental and dramatic change in reasoning based on materials not previously discussed or cited in the Proposed Rule").

The Agencies also failed to provide a defensible analysis of the consequences of moving from the Clean Water Rule back to the pre-2015 regime that the Repeal Rule imposed. *See Air All. Houston v. EPA*, 906 F.3d 1049, 1064, 1067-68 (D.C. Cir. 2018) (agency's failure to address earlier "determinations and findings" and analyze the forgone benefits of a rule it sought to delay was arbitrary and capricious). In particular, the economic analysis informing the Clean Water Rule found the benefits of replacing the pre-2015 regime exceeded the costs. Clean Water Rule EA at ix-xi. The Repeal Rule failed to explain why taking the exact opposite action would not result in a loss of those benefits. The Agencies made a stab at considering these impacts in an error-filled

economic analysis issued with the Proposed Repeal Rule,[15] but the Agencies ultimately stated that the Repeal Rule "is not based on the information in the agencies' economic analysis." 84 Fed. Reg. at 56,662. In light of the previous record evidence, it was arbitrary for the Agencies to omit meaningful analysis of the water quality protections (*i.e.*, benefits) that would be lost by reverting from the Clean Water Rule to the pre-2015 regime. S*ee Air All. Houston*, 906 F.3d at 1067 (faulting EPA for not "explain[ing] why the detailed factual findings regarding the harm that would be prevented . . . are now only speculative") (internal quotations and citation omitted).

Instead of properly analyzing the impacts of this reversal, the Agencies suggested that the pre-2015 regime was preferable because it would provide national consistency and was the "longstanding regulatory framework that is familiar to and well-understood by the agencies, States, Tribes, local governments, regulated entities, and the public," 84 Fed. Reg. at 56,661, but this conclusory statement is unsupported and even contradicted. The Agencies admitted that there was uncertainty in implementing the pre-2015 regime, 82 Fed. Reg. at 34,901, that the pre-2015 regulations "pose certain implementation challenges," 84 Fed. Reg. at 56,627, 56,660, 56,662, and that a primary motivation behind the Clean Water Rule was to provide clarity, *id*. The Agencies provided no analysis showing that the Clean Water Rule would have led to more regulatory uncertainty than the pre-2015 regime. As the Agencies knew, *id*. at 56,661, the Repeal Rule would also be subject to legal challenges. The claim of regulatory certainty under the old regime is also belied by the fact that the Agencies were simultaneously developing a new definition of WOTUS,

---

[15] *See, e.g.*, Comments of Jeffrey Shrader, Econ. Fellow and Jason Schwartz, Legal Dir., Institute for Policy Integrity (Sept. 27, 2017), R2017-0203-10362 (detailing errors in the Agencies' methodology).

the Replacement Rule, that would be a significant departure from the pre-2015 regime and would introduce a wave of district court litigation and attendant uncertainties, which has already occurred.

It was further arbitrary for the Agencies to claim benefits from a return to the prior relationship between the federal government and tribes, and the Navajo Nation in particular, regarding WOTUS determinations and all that ensues from them without considering how that relationship worked, how it was changed by the Clean Water Rule, and what a subsequent return to the pre-2015 regime would mean. In particular, the science-based clarity of the Clean Water Rule, based on the significant nexus test, facilitated implementation and enforcement of the CWA on the Navajo Nation, Ben Decl. ¶¶ 15, 38, which the Agencies were required but failed to consider. *Renewable Fuels*, 948 F.3d at 1255; *see also Dep't of Homeland Sec.*, 140 S. Ct. at 1913-14; *Fox*, 556 U.S. at 515-16; Response to Comments for Definition of "Waters of the United States"—Recodification of Pre-Existing Rules, at 77-78 (Sept. 5, 2019), R2017-0203-15694 (Repeal Rule RTC); Economic Analysis for the Final Rule: Definition of "Waters of the United States"—Recodification of Pre-Existing Rules, at ix (Sept. 5, 2019), R2017-0203-15695 (Repeal Rule EA) ("this analysis did not consider how the 573 federally-recognized tribes might respond to a change in CWA jurisdiction, nor did it include tribes in its calculations of costs and benefits").

**B. The Agencies Failed to Consider Important Aspects of the Problem**

Agency action must be "based on a consideration of the relevant factors." *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974); *N.M. Health Connections v. U.S. Dep't of Health & Hum. Servs.*, 946 F.3d 1138, 1162 (10th Cir. 2019). A rule is arbitrary and capricious "if the agency . . . entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43.

1.  <u>The Agencies Failed to Consider Whether the Repeal Rule Met the Objective of the CWA</u>

The sole objective of the CWA is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251 Water quality is *the* most important factor the Agencies were required to consider in crafting a WOTUS rule, yet the Agencies ignored water quality impacts when repealing the Clean Water Rule. The Agencies failed to evaluate the effect of the Repeal Rule on protection of the nation's waters. Moreover, by refusing to "undertake any substantive reconsideration" of either the Clean Water Rule or the pre-2015 regulatory regime, 82 Fed. Reg. at 34,903; *accord* 84 Fed. Reg. at 56,659-60, the Agencies made any meaningful analysis of the Repeal Rule impossible. The Agencies engaged in a new legal interpretation of WOTUS when promulgating the Repeal Rule, but that exercise did not obviate the Agencies' requirement to consider the impacts of their decision and whether alternatives to the Repeal Rule were available. *Dep't of Homeland Sec.*, 140 S. Ct. at 1913-14; *Farmers Union Cent. Exch., Inc. v. F.E.R.C.*, 734 F.2d 1486, 1511 (D.C. Cir. 1984) ("It is well established that an agency has a duty to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives.").

The Agencies' failure to consider water quality impacts when deciding to remove federal protections for broad categories of critically important waters ignored the most "important aspect of the problem" and rendered the Repeal Rule arbitrary and capricious. *State Farm*, 463 U.S. at 43; *accord Gresham v. Azar*, 950 F.3d 93, 102 (D.C. Cir. 2020) (loss of Medicaid coverage was an important factor the agency was required to consider because coverage was "principal objective of Medicaid"); *see* 5 U.S.C. §§ 553(c), 706(2).

2.   The Agencies Failed to Consider the Impact of the Repeal Rule on Tribal Waters and Treaty Rights

Protection of tribal waters raises fundamentally different issues from protection of state waters, yet the Agencies failed to consider those differences in the Repeal Rule. Approximately 9.5 percent of U.S. streamflow flows through tribal lands, and in the Lower Colorado region, which includes a significant portion of the Navajo Nation, approximately 86 percent of streamflow flows through tribal lands. *Streamflow Contributions from Tribal Lands to Major River Basins of the United States*, at 1, 11 (Sept. 11, 2018), attachment to R2018-0149-2990. Tribes have fewer resources and therefore less capacity than states to protect their waters. This disparity is recognized in the CWA, which requires states to develop water quality standards but makes it optional for tribes. Moreover, almost every state administers the CWA § 402 NPDES permitting program, but no tribes implement this program. Tribes rely on the federal government to implement CWA programs significantly more than states do.

Tribes also use their waters for different purposes than states. For example, tribes rely on their waters not only for drinking, recreation, and similar uses that states share, but also in many cases for subsistence uses and to support culturally significant plants, fish, and animals. The Navajo Nation's waters and water-dependent resources are essential to the Navajo Nation's world view and the life and well-being of its people. *See* Ben Decl. ¶¶ 10-11, 36.

In addition, the federal government has special obligations to protect tribal waters and their uses. The Navajo Nation and many other tribes have treaties with the United States that guarantee various rights, including rights to hunt, fish, and gather, and these rights require water quality sufficient to protect the resources and habitat at issue. *United States v. Adair*, 723 F.2d 1394, 1411, 1414-15 (9th Cir. 1983); *see also No Oilport! v. Carter*, 520 F. Supp. 334, 371-72 (W.D. Wash.

1981) (requiring examination of whether permit for proposed oil pipeline would impair tribe's treaty right to fish). Only Congress may abrogate tribal treaty rights, and only with specific and clearly expressed authorization. *Herrera v. Wyoming*, 139 S. Ct. 1686, 1696, 1698 (2019); *Menominee Tribe of Indians v. United States*, 391 U.S. 404, 412-13 (1968).

Along with treaty rights, the Navajo Nation and other tribes have reserved water rights that include both a sufficient quantity and sufficient quality of water for tribal uses. *Winters v. United States*, 207 U.S. 564, 576-78 (1908); *United States v. Gila River Valley Irrigation Dist.*, 920 F. Supp. 1444, 1448 (D. Ariz. 1996), *aff'd*, 117 F.3d 425 (9th Cir. 1997).[16] Tribes' reserved water rights are trust assets subject to federal protection. *See, e.g.*, 55 Fed. Reg. 9,223 (Mar. 12, 1990). These treaty and reserved water rights impose a duty on the United States to refrain from degrading the habitat on which those rights depend.

In addition, the United States has a trust responsibility to recognize and protect tribal lands, assets, and resources, which include the water that flows over and through tribal lands and the natural resources that depend on that water. *See, e.g.*, *Seminole Nation v. United States*, 316 U.S. 286, 296-97 (1942) (United States has a "moral obligations of the highest responsibility and trust"). EPA, the Corps, and all other federal agencies are responsible for ensuring that the trust

---

[16] *See, e.g.*, *In re: The General Adjudication of All Rights to Use Water in the Little Colorado River System and Source*, Contested Case No. CV6417-300, *In re Navajo Nation* (Apache Cty. Super. Ct. AZ) (addressing Navajo Nation water rights in Arizona); Partial Final Judgment and Decree of the Water Rights of the Navajo Nation, *State of New Mexico ex rel. State Eng'r v. United States*, CV-75-184, *Claims of the Navajo Nation*, No. AB-07-001, (11th Jud. Dist. NM, Nov. 1, 2013) (recognizing Navajo Nation water rights within the San Juan River Basin in New Mexico); Navajo-Utah Water Rights Settlement Act, § 1102 of Consolidated Appropriations Act, 2021, Pub. L. No. 116-260 (2020) (recognizing Navajo Nation water rights in the San Juan River Basin in Utah).

responsibility is given full effect and that "treaty rights are not abrogated or impinged upon absent an act of Congress." *N.W. Sea Farms, Inc. v. U.S. Army Corps of Eng'rs*, 931 F. Supp. 1515, 1519-20 (W.D. Wash. 1996); *Confederated Tribes of the Umatilla v. Alexander*, 440 F. Supp. 553, 555-56 (D. Or. 1977); *see also Nance v. EPA*, 645 F.2d 701, 710-11 (9th Cir. 1981) ("It is fairly clear that any Federal government action is subject to the United States' fiduciary responsibilities toward the Indian tribes.").

The Corps' Tribal Consultation Policy notes, "[w]here agency actions may affect Indian lands or off-reservation treaty rights, the trust duty includes a substantive duty to protect these lands and treaty rights 'to the fullest extent possible.'"[17] The policy states that the Corps "will ensure that it addresses Tribal concerns regarding protected tribal resources, tribal rights (including treaty rights) and Indian lands." *Id.* at 2-3. According to the Corps, "[f]ulfilling the Tribal trust responsibility is required by law" and doing so "is good for the Nation, the Tribes and the Corps."[18] Similarly, in its Indian Policy, EPA recognizes the federal trust responsibility and states it will "assure that tribal concerns and interest are considered whenever EPA's actions and/or decisions may affect reservation environments." The Agency commits that it will "give special consideration

---

[17] Corps, *Tribal Consultation Policy*, at 3 n.(g) (Oct. 4, 2012), https://www.spk.usace.army.mil/Portals/12/documents/tribal_program/USACE%20Native%20American%20Policy%20brochure%202013.pdf, at PDF pg. 17.

[18] R.L. Van Antwerp, *Memorandum for Commanders, Directors, and Chiefs of Separate Offices, US Army Corps of Engineers Re: Sovereignty and Government-to-Government relations with American Indian and Alaska Native Tribal Governments: USACE Tribal Policy Principles*, (May 10, 2010), https://www.spk.usace.army.mil/Portals/12/documents/tribal_program/USACE%20Native%20American%20Policy%20brochure%202013.pdf, at PDF pg. 11.

to Tribal interests in making Agency policy," including "in making decisions and managing environmental programs affecting reservation lands."[19]

The Navajo Nation's and other tribes' uses of their waters, their ability to protect them without federal assistance, and the Agencies' obligations to safeguard these resources were "important aspect[s] of the problem," *State Farm*, 463 U.S. at 43, that the Agencies were required but failed to consider. Although the Agencies acknowledged tribal concerns they did not address them, arguing instead that because the Clean Water Rule exceeded their statutory authority, that was reason enough to repeal it. Repeal Rule RTC at 76-77. On the contrary, even if the Clean Water Rule were invalid, the Agencies were still obligated to consider the impacts that repealing the rule would have on tribal waters and treaty protected rights before taking that action. *See Dep't of Homeland Sec.*, 140 S. Ct. at 1913-14.

The Agencies also asserted that "States and Tribes retain authority to protect and manage the use of those waters that are not navigable waters under the CWA," 84 Fed. Reg. at 56,633; *see also* Repeal Rule RTC at 75, 78. The Agencies did not, however, examine whether tribes (or states) would be able to protect their waters under their own authorities as fully as those waters had been protected under the Clean Water Rule. In the Agencies' own words, their analysis of the Repeal Rule "did not consider how the 573 federally-recognized tribes might respond to a change in CWA jurisdiction, nor did it include tribes in its calculations of costs and benefits," and it "did not

---

[19] Andrew R. Wheeler, *Reaffirmation of the EPA's Indian Policy* (April 5, 2019), https://www.epa.gov/sites/production/files/2019-04/documents/10apr19memo_reaffirming_epas_1984_indian_policy.pdf; EPA Policy for the Administration of Environmental Programs on Indian Reservations (Nov. 8, 1984), at 1, 3 https://www.epa.gov/sites/production/files/2015-04/documents/indian-policy-84.pdf.

account for potential effects related to subsistence fishing, rice growing, or cultural uses of water that are unique to tribes and their reliance on certain ephemeral features, wetlands, and isolated waters that would no longer be considered jurisdictional following the repeal of the 2015 Rule." Repeal Rule EA at ix. The Agencies' failure to consider the impact of the Repeal Rule on tribal waters and on tribes' uses of those waters, and their failure to respond in any genuine fashion to tribal concerns on this issue, violated the APA and tribal treaty rights and failed to honor the federal trust responsibility.

### C. The Agencies Promulgated the Repeal Rule Based on a Predetermined Outcome, Depriving the Public of a Meaningful Opportunity to Comment

The APA requires agencies to provide the public with a meaningful opportunity for input in the rulemaking process. 5 U.S.C. § 553(b), (c); *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 708 (10th Cir. 2009) ("A public comment period is beneficial only to the extent the public has meaningful information on which to comment."). For the process to be meaningful, agencies must remain open-minded. *See McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1323 (D.C. Cir. 1988) (EPA's response to comments evidenced "too closed a mind" and "[c]onsideration of comments as a matter of grace is not enough"); *cf. Air Transp. Ass'n of Am. v. Nat'l Mediation Bd.*, 663 F.3d 476, 487 (D.C. Cir. 2011) (decision-makers violate the Due Process Clause when they "act with an 'unalterably closed mind' and are 'unwilling or unable' to rationally consider arguments").

The decision to repeal the Clean Water Rule was made before the Agencies began the rulemaking process. As discussed above, the President himself stated that Exec. Order No. 13,778 paved the way for the Agencies to repeal the rule, and his EPA Administrator confirmed that the repeal process had already begun. These and other statements reveal that the Agencies' rulemaking

was based not on a true weighing of *whether* to "rescind[ ] or revis[e]" the Clean Water Rule,

Exec. Order ¶ 2, but rather on a forgone decision to withdraw the Clean Water Rule at any cost.[20]

*See Dep't of Comm. v. New York*, 139 S. Ct. 2551, 2575-76 (2019) (agencies must provide a

"reasoned explanation . . . to ensure that agencies offer genuine justifications for important

decisions, reasons that can be scrutinized by the courts and interested public."). For example, a

former senior official in EPA's water office described how Agency leadership ordered the office

to make findings supporting the Repeal Rule, resulting in a new economic analysis that disregarded

roughly $500 million of benefits expected from wetlands protection under the Clean Water Rule:

> "On June 13, my economists were verbally told to produce a new study that
> changed the wetlands benefit," said Elizabeth Southerland, who retired last month
> from a 30-year career at the E.P.A., most recently as a senior official in the agency's

---

[20] The predetermined nature of the rulemaking is also clear from then-Administrator Pruitt's statements, made in August 2017 and documented in a video produced by the National Cattlemen's Beef Association, that in the Clean Water Rule "the Obama Administration re-imagined their authority under the Clean Water Act and defined a Water of the United States as being a puddle, a dry creek bed, and ephemeral drainage ditches across this country." *EPA Administrator Scott Pruitt Urges Ranchers to File WOTUS Comments* (Aug. 16, 2017), attachment to R2017-0203-11645, *available at* https://www.youtube.com/watch?v=vTVd54WyhDQ&hd=1 (*see* Fisher Decl. ¶ 4). Administrator Pruitt urged viewers to submit comments supporting repeal of the rule, *id.*; the video directed viewers to visit BeefUSA.org to file comments, and that website in turn instructed visitors to "Tell EPA to Kill WOTUS Today!". Ex. 7, *Take Action Now–Tell EPA to Kill WOTUS Today!*, attachment to R2017-0203-11645; *see also* Ex. 8, *EPA Leader Pledges to Rescind and Replace WOTUS Rule*, Iowa Farm Bureau (Aug. 14, 2017), attachment to R2017-0203-11645. Similarly, on December 11, 2018, EPA Administrator Wheeler described the Clean Water Rule as an "undue regulatory burden that stifle[s] American innovation and economic development." Ex. 9, Andrew Wheeler, *Trump Administration's Waters of the United States Rule Gives Power Back to States*, Kansas City Star, (Dec. 12, 2018), https://www.kansascity.com/opinion/readers-opinion/guest-commentary/article222945575.html; Ex. 10, *EPA Acting Administrator Andrew Wheeler: "Trump Administration's Waters of the United States Rule Gives Power Back to States"*, The White House (Dec. 11, 2018), https://www.whitehouse.gov/briefings-statements/epa-acting-administrator-andrew-wheeler-trump-administrations-waters-united-states-rule-gives-power-back-states/; *see also* Comments of Stacy Meyers, Senior Couns. and Molly Kordas, Staff Att'y, Openlands and Kim Knowles, Staff Att'y, Prairie Rivers Network at 2 (Apr. 15, 2019), R2018-0149-5343.

water office.

"On June 16, they did what they were told," Ms. Southerland said. "They produced a new cost-benefit analysis that showed no quantifiable benefit to preserving wetlands."

Ms. Southerland and other experts in federal rule-making said such a sudden shift was highly unusual particularly since studies that estimate the economic impact of regulations can take months or even years to produce, and are often accompanied by reams of paperwork documenting the process.

"Typically there are huge written records, weighing in on the scientific facts, the technology facts and the economic facts," she said. "Everything's in writing. This repeal process is political staff giving verbal directions to get the outcome they want, essentially overnight."

Ex. 11, *Scott Pruitt Is Carrying Out His E.P.A. Agenda In Secret, Critics Say*, N.Y. Times (Aug. 11, 2017), attachment to R2017-0203-11645.

The Agencies' closed mind—and consequently flawed comment process—is also evidenced by the rushed rulemaking that commenced shortly after the President issued his Executive Order. The Proposed Repeal Rule provided a 60-day comment period but refused comments on the merits of the Clean Water Rule, the pre-2015 regime, or any future changes to the definition of WOTUS. 82 Fed. Reg. at 34,903. Even when the Agencies issued the Supplemental Notice, they set forth their "proposed" conclusions to repeal the Clean Water Rule without any supporting factual or scientific analysis and limited comments to the legal and policy reasons behind the repeal. 83 Fed. Reg. at 32,228. The Agencies' belated offer to accept limited comments on the rule they already intended to repeal was merely a call for information to support the conclusions they had already reached. *See McLouth Steel*, 838 F.2d at 1323 (while "defects in an original notice may be cured by an adequate later notice . . . that curative effect depends on the agency's mind remaining open enough at the later stage"); *see also S.C. Coastal Conservation*

*League*, 318 F. Supp. 3d at 966, 969 (invalidating Agencies' "hastily enacted" rule suspending effective date of the Clean Water Rule). Moreover, the Agencies provided only a 30-day comment period, compared to the more than 200-day comment period provided for the Clean Water Rule. 80 Fed. Reg. at 37,057.[21]

Furthermore, by segmenting the initiative to overturn the Clean Water Rule into two rulemakings (the Agencies' "two-step process," 82 Fed. Reg. at 34,899), the Agencies created a false choice between the Clean Water Rule and the pre-2015 regime; in reality, the Agencies had already chosen between the Clean Water Rule and the far less protective Replacement Rule.[22] *See* Repeal Rule RTC at 156 (noting that the pre-2015 regulations "pose certain implementation challenges and acknowledg[ing] criticisms" but declining to substantively respond to them and instead pointing to the future Replacement Rule). This segmentation was an "artificial narrowing of the scope of the regulatory problem" and was itself "arbitrary and capricious and . . . ground for reversal." *Home Box Office*, 567 F.2d at 36.

The predetermined outcome of these rulemakings likely contributed to the Agencies' failure to address the scientific record supporting the Clean Water Rule. In this way too the Agencies impermissibly foreclosed the public's ability to meaningfully review and comment on the Agencies' proposed actions and their consequences. *See N.C. Growers' Ass'n v. United Farm*

---

[21] *See* Exec. Order No. 12,866, § 6(a)(1), 58 Fed. Reg. 190 (Oct. 4, 1993) ("each agency should afford the public a meaningful opportunity to comment on any proposed regulation, which in most cases should include a comment period of not less than 60 days").

[22] The Agencies subsequently presented the Final Replacement Rule as a choice between it and the pre-2015 regime. 85 Fed. Reg. at 22,332 ("The [Repeal] Rule was finalized between the proposed and final rulemaking phases of this rule and changed the baseline for the analyses and discussion of potential effects on aquatic resources, CWA programs, and costs.").

*Workers*, 702 F.3d 755, 769-70 (4th Cir. 2012) (by failing to consider comments regarding the substance or merits of regulations that agency proposed to suspend and reinstate, agency failed to give interested persons an opportunity to participate in the rulemaking).

**II.   The Agencies' Replacement Rule was Arbitrary, Capricious, and Not in Accordance With Law or Prescribed Procedures, in Violation of the APA**

**A.   The Interpretation of WOTUS in the Replacement Rule is Not Permissible Under the CWA or Controlling Caselaw**

1.   The Replacement Rule is Inconsistent with the Text, Structure, and Purpose of the CWA

The purpose of the CWA is clear: to restore and maintain the integrity of our nation's waters. CWA § 101(a). To attain this goal, Congress recognized the need for "broad federal authority to control pollution," for even at the time it was understood that "'[w]ater moves in hydrologic cycles and it is essential that discharge of pollutants be controlled at the source.'" *Riverside Bayview*, 474 U.S. at 133 (citing S. Rep. No. 92-414, at 77 (1972), *reprinted in* 1972 U.S.C.C.A.N. 3668, 3742). As a result, "Congress chose to define the waters covered by the Act broadly." *Id.*; *accord Hubenka*, 438 F.3d at 1033 (quoting *Quivira Mining Co.*, 765 F.2d at 129) (CWA was intended "to cover, as much as possible, all waters of the United States instead of just some"). In *Hubenka*, in reasoning how to interpret the significant nexus test established in *Riverside Bayview* and *SWANCC*, the Tenth Circuit explained, "[g]iven the 'breadth of congressional concern for protection of water quality' evidenced in the text of the Clean Water Act and in its legislative history, this court concludes the potential for pollutants to migrate from a tributary to navigable waters downstream constitutes a 'significant nexus' between those waters." *Hubenka*, 438 F.3d at 1034 (quoting *Riverside Bayview*, 474 U.S. at 133).

As discussed above, *see* Legal and Factual Background, the majority of Justices in *Rapanos*

acknowledged the broad purpose of the CWA and rejected as unreasonable the plurality opinion authored by Justice Scalia, which restricted CWA jurisdiction to waters with "a continuous surface connection" to "relatively permanent, standing or continuously flowing bodies of water," 547 U.S. at 739, 742. The Justices explained that the plurality's limitations are "inconsistent with the Act's text, structure, and purpose," *id.* at 776 (Kennedy, J., concurring), and, similarly, "are without support in the language and purposes of the Act or in our cases interpreting it," *id.* at 768 (Kennedy, J., concurring); *id.* at 800 (Stevens, J., dissenting).

Justice Kennedy explained that the requirement of permanent, standing, or continuous flow "makes little practical sense in a statute concerned with downstream water quality," and "nothing in the statute suggests" that Congress drew a line to exclude irregular waterways. *Id.* at 769. Similarly, protection of wetlands is "critical to the statutory scheme." *Id.* at 775. Justice Kennedy also found that "a full reading of the dictionary definition [of waters] precludes the plurality's emphasis on permanence." *Id.* at 770. Justice Stevens explained that the plurality's relatively permanent requirement was arbitrary and defies common sense and common usage. *Id.* at 801.

Increased knowledge of hydrology has confirmed Congress's and the Courts' understanding. As the Agencies found after reviewing more than 1,200 peer-reviewed publications, "[t]he evidence unequivocally demonstrates that the stream channels and riparian/floodplain wetlands or open waters that together form river networks are clearly connected to downstream waters in ways that profoundly influence downstream water integrity." Connectivity Report at ES-5; *see generally id.* at ES-1 to ES-6, 3-1; *see also* Ex. 4, NN Comments on Replacement Rule at 7-10. For example, streams and wetlands play an integral role in improving water quality by trapping, storing, and transforming excess nutrients, buffering the

effects of flooding, and serving as habitat for aquatic species. Connectivity Report at ES-2 to ES-3. Moreover, "[t]he incremental effects of individual streams and wetlands are cumulative across entire watersheds," and "[d]ownstream waters are the time-integrated result of all waters contributing to them." *Id*. at ES-5, 6-10.

In the Replacement Rule, the Agencies excluded from CWA protection many waters that are critical to downstream water quality. The Replacement Rule defines WOTUS as covering only waters with "relatively permanent" flow, thereby excluding all ephemeral streams. 85 Fed. Reg. at 22,278, 22,286. However, the Agencies had conclusively established that ephemeral streams are sufficiently connected to downstream waters to affect water quality. *See* Connectivity Report at ES-2, 3-1; 80 Fed. Reg. at 37,057, 37,063, 37,065. The Replacement Rule also excludes non-adjacent wetlands from WOTUS, despite the science showing that even without a surface water connection, wetlands impact downstream water quality by performing the critical functions of storing excess nutrients and reducing flood risk. Connectivity Report at 4-1 to 4-2.

The exclusion of these waters undermines the very purpose of the CWA, and in doing so it "directly conflicts with [the] governing statute." *Maislin Indus. U.S. Inc. v. Primary Steel*, 497 U.S. 116, 134-35 (1990). The Agencies' WOTUS definition in the Replacement Rule therefore is unreasonable. *Id.*; *see also Util. Air Regul. Grp.*, 573 U.S. at 321; *Succar v. Ashcroft*, 394 F.3d 8, 23, 36 (1st Cir. 2005) (reasonableness assessed in light of statutory scheme and congressional intent).

2.  The Agencies Should Not Have Followed the *Rapanos* Plurality Opinion Because It was Rejected by a Five-Justice Majority

In the Replacement Rule, the Agencies "self-consciously intended to take the plurality opinion," "flesh out the details, and make it the new law of the land." *Colorado*, 445 F. Supp. 3d

at 1311 (citing 85 Fed. Reg. at 22,259-325). Indeed, that was President Trump's directive in Exec. Order No. 13,778 § 3, which the Agencies dutifully followed, *e.g.*, 85 Fed. Reg. at 22,288-89 ("The final rule's definition of 'tributary' is [] consistent with the *Rapanos* plurality's position that 'the waters of the United States' include only relatively permanent, standing, or flowing bodies of waters"); *id.* at 22,279 ("The final rule defines 'adjacent wetlands' to include all wetlands that abut [jurisdictional waters and] . . . other wetlands [with] certain regular hydrologic surface connections to [such waters]").

The Agencies lacked the authority to codify a statutory interpretation that was rejected as unreasonable by a majority of the Supreme Court Justices. When five or more Justices in a fractured case agree on a point of law, their determination is binding even if delivered in concurring or dissenting opinions. *E.g.*, *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 17 (1983) ("On remand, the Court of Appeals correctly recognized that the four dissenting Justices and Justice BLACKMUN formed a majority to require application of the *Colorado River* test."). *Accord Alexander v. Sandoval*, 532 U.S. 275, 281-83 (2001) (applying concurring and dissenting opinions to ascertain rule of law); *Alexander v. Choate*, 469 U.S. 287, 293 & nn.8-9 (1985) (same).[23] When a majority of the Supreme Court explains that an agency's interpretation of an ambiguous provision of a statute is unreasonable, the agency may not ignore that holding. *E.g.*,

---

[23] *See also United States v. Carrizales-Toledo*, 454 F.3d 1142, 1151 (10th Cir. 2006) (suggesting concurrence in fractured case was not law when "'three of the four Justices in the plurality *and* the four dissenters decisively rejected'" that holding) (citations omitted); *United States v. Duvall*, 740 F.3d 604, 616 (D.C. Cir. 2013) (Kavanaugh, J., concurring) ("[I]n those rare no-narrowest-opinion cases, the lower court still must strive to reach the result that a majority of the Supreme Court would have reached in the current case"); *United States v. Donovan*, 661 F.3d 174, 182 (3d Cir. 2011) ("we have looked to the votes of dissenting Justices if they, combined with votes from plurality or concurring opinions, establish a majority view on the relevant issue").

*Padilla-Caldera v. Holder*, 637 F.3d 1140, 1152-53 (10th Cir. 2011).

**B.  The Replacement Rule was Arbitrary and Capricious**

Even if their interpretation of the CWA were permissible, the Agencies' flawed decision-making process independently requires vacatur of the Replacement Rule under the APA. *See Mozilla Corp. v. FCC*, 940 F.3d 1, 49 (D.C. Cir. 2019) (agency's interpretation of statute was reasonable, but was "still arbitrary and capricious" for "fail[ing] to address an important and statutorily mandated consideration"); *Penobscot Air Servs., Ltd. v. FAA*, 164 F.3d 713, 719 (1st Cir. 1999) ("Even where [*Chevron*] deference is due, the agency's 'explication' of its reasoning must be 'not inadequate, irrational or arbitrary'" under the APA (citation omitted)).

> 1.  The Agencies Failed to Provide a Reasoned Explanation for Their Departure from Past Practice and the Scientific Record

Agencies may change existing policies, but must "provide a reasoned explanation for the change." *Encino*, 136 S. Ct. at 2125 (citing *Brand X*, 545 U.S. at 981-82). Furthermore, when an agency's "new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests," "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Fox*, 556 U.S. at 515-16; *see also Dep't of Homeland Sec.*, 140 S. Ct. at 1913-14. An unexplained inconsistency is "'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.'" *Encino*, 136 S. Ct. at 2126 (quoting *Brand X*, 545 U.S. at 981).

The Clean Water Rule was based on the Connectivity Report, which reviewed over 1,200 peer-reviewed studies—never since disputed—that document how wetlands and streams affect the integrity of downstream waters. The Agencies relied on that science, along with their "technical

expertise and extensive experience in implementing the CWA over the past four decades," to carry out the statutory objective to "restore and maintain" the nation's waters by protecting waters that "significantly affect the chemical, physical, or biological integrity of traditional navigable waters, interstate waters, or the territorial seas." 80 Fed. Reg. at 37,055, 37,060. In issuing the Replacement Rule, the Agencies summarily discarded over 40 years of agency practice, including the Clean Water Rule and the substantial record underlying it, without explaining why or justifying their contradictory approach.

The Clean Water Rule protected ephemeral streams with a bed, banks, and ordinary high-water mark precisely because the Agencies found that these streams significantly affect the chemical, physical, and biological integrity of downstream navigable waters. 80 Fed. Reg. at 37,055, 37,060, 37,068-69, 37,079. The Replacement Rule categorically excludes ephemeral streams even though many such waters were protected not only under the Clean Water Rule but also under prior definitions of WOTUS, *see, e.g.*, *id.* at 37,069, 37,079; 82 Fed. Reg. at 34,901-02; *Rapanos* Guidance at 1, 8, 12, and have been shown to "exert a strong influence on the integrity of downstream waters." 80 Fed. Reg. at 37,076. Ephemeral streams are particularly essential in the arid Southwest. Connectivity Report at ES-2, 5-7 to 5-8, B-59; 80 Fed. Reg. at 37,063, 37,076.

In a complete about-face, the Agencies stated that all ephemeral streams lack sufficient connections to navigable waters. 85 Fed. Reg. at 22,288. In reaching this conclusion, they disregarded the standard they articulated in the Repeal Rule (issued merely six months before), which was an interpretation of Justice Kennedy's significant nexus standard. *See* 84 Fed. Reg. at 56,646; Section I.A. They did so without even acknowledging, let alone substantively engaging with, the basis for their past practice, including the extensive scientific record regarding the

importance of ephemeral streams to downstream water quality.

The Connectivity Report also determined that "[w]etlands and open waters in non-floodplain landscape settings . . . provide numerous functions that benefit downstream water integrity," including "storage of floodwater; recharge of ground water that sustains river baseflow; retention and transformation of nutrients, metals, and pesticides; export of organisms or reproductive propagules to downstream waters; and habitats needed for stream species." Connectivity Report at ES-3. Yet the Replacement Rule eliminates jurisdiction over such wetlands with no analysis of the Connectivity Report or the resulting effects on water quality.

According to the Agencies, they limited federal jurisdiction to wetlands that are "inseparably bound up with" navigable waters, 85 Fed. Reg. at 22,308, 22,310, to ensure that the connection between the wetland and navigable water is more than "possible" or "speculative," *id.* at 22,310. However, this explanation does not address overwhelming scientific evidence that wetlands excluded by the rule have more than "possible" or "speculative" connections to nearby waters and are indeed "inseparably bound up with" them. The Agencies claimed that they relied on science to "inform[]" their decision to protect only wetlands that "abut" or have "regular" surface-water connections to other protected waters, *id.* at 22,313-15, pointing to evidence that "areas that are closer to rivers and streams have a higher probability of being connected than areas farther away." *Id.* (quoting Connectivity Report at ES-4). The rule, however, *excludes* many wetlands that are close to streams and rivers and *includes* wetlands far away so long as there is a "regular" surface-water connection. The Agencies' definition of "adjacent" does not turn on whether a wetland is close to or far away from a river or stream.

At most, the Agencies pay lip-service to the scientific record, claiming their approach is

based on the Science Advisory Board's suggestion that the Agencies recognize a "gradient of connectivity," *e.g.*, 85 Fed. Reg. at 22,288, 22,314. Yet the Replacement Rule's categorical exclusion of ephemeral streams is the exact opposite of the "gradient" approach, which recognizes that even "relatively low levels of connectivity can be meaningful in terms of impacts on the chemical, physical, and biological integrity of downstream waters," SAB Review of the Draft EPA Connectivity Report at 2, and that ephemeral features often exert greater effects on downstream water quality than more continuously flowing streams, *e.g.*, Connectivity Report at 2-18 to 2-19, 2-26, 5-8 to 5-9. The Agencies' superficial treatment of the connectivity gradient is also evident in their requirement that wetlands must abut or possess a surface connection to other jurisdictional waters to be protected, despite their connectivity and influence on navigable waters. *Id.* at 2-7, 4-22 to 4-29.

Merely referencing a spectrum of connectivity does not justify excluding entire categories of waters from the definition of WOTUS without regard to where they fall on the spectrum or how they affect downstream traditional navigable waters. The Agencies made no attempt to explain how they chose where on the gradient to draw jurisdictional lines, how those lines made sense on the ground, or why a departure from past practice was warranted. The Agencies declined to engage with the established record of their prior rules and cited no "changing circumstances," *State Farm*, 463 U.S. at 42, to explain their drastic departure from precedent. Even EPA's own Science Advisory Board criticized the Agencies' proposed exclusion of ephemeral streams from the definition of WOTUS, explaining that it "abandon[ed] the more expansive view of connectivity of waters accepted by current hydrological science" and concluding that the Proposed Replacement Rule lacks a scientific justification and may "introduc[e] new risks to human and environmental

48

health."[24] The Agencies made no attempt to address these criticisms, and their "unexplained departure" from the Clean Water Rule and its record renders the Replacement Rule arbitrary and capricious. *United Steel v. Mine Safety & Health Admin*., 925 F.3d 1279, 1284 (D.C. Cir. 2019); *see Organized Vill. of Kake v. Dep't of Agric.*, 795 F.3d 956, 968-69 (9th Cir. 2015) (en banc) (rule resting on "a direct, and entirely unexplained, contradiction of" prior findings was arbitrary).

Instead of grappling with the scientific record, the Agencies advanced a novel claim that excluding ephemeral streams and wetlands that lack certain surface water connections "strikes a better balance" between the Act's objective of protecting water quality in CWA § 101(a) and the policy in CWA § 101(b) of preserving states' "primary responsibilities and rights" to control water pollution. 85 Fed. Reg. at 22,261-62; *see also id.* at 22,252. Not only did the Agencies contort the meaning of Section 101(b) of the Clean Water Act, which recognizes the states' role in controlling water pollution in order to achieve the objective in Section 101(a), but also the Agencies failed to examine the import of their new policy interpretation, rendering it unexplained and unreasonable.

The Agencies never explain *why* ephemeral streams would be "more appropriately regulated by States and Tribes" or *why* the Replacement Rule strikes the right "balance" between the nation's water quality and state and tribal rights. Moreover, without analyzing the impact to water quality of excluding ephemeral waters and wetlands from WOTUS, the Agencies could not

---

[24] Ex. 12, Draft Commentary on the Proposed Rule Defining the Scope of Waters Federally Regulated Under the Clean Water Act, at 2, 4 (Oct. 16, 2019), attachment to R2018-0149-11589; *see also* Ex. 13, Commentary on the Proposed Rule Defining the Scope of Waters Federally Regulated under the Clean Water Act, at 2, 4 (Feb. 27, 2020). Judicial notice under Federal Rule of Evidence 201(b)(2) is appropriate for public records such as the Final SAB Commentary that are available on government websites. *See Sierra Club v. EPA*, 964 F.3d 882, 893 n.9 (10th Cir. 2020).

possibly reach such conclusions. The evidence shows that ephemeral streams are significantly connected to navigable waters, rendering them functionally indistinguishable from streams that the Agencies have determined warrant federal protection. The Agencies' "*ipse dixit*" that ephemeral streams should be regulated by states and tribes therefore "falls short of [the Agencies'] obligation to provide a 'satisfactory explanation for [their] action[s].'" *R.F.M. v. Nielsen*, 365 F. Supp. 3d 350, 379 (S.D.N.Y. 2019) (quoting *State Farm*, 463 U.S. at 43); *see Sierra Club*, 972 F.3d at 305 (an agency must "justify and explain" its decision, "not to simply adopt it via *ipse dixit* authority"); *D&F Afonso Realty Trust*, 216 F.3d at 1196 ("because the agency says so" is insufficient even under a "highly deferential standard of review").

The Agencies also state that the Replacement Rule "is intended to establish categorical bright lines that provide clarity and predictability for regulators and the regulated community." 85 Fed. Reg. at 22,325; *see also id.* at 22,273, 22,288 (similar). In reality, the Replacement Rule's core test for identifying jurisdictional waters is confusing and complex in application and unpredictable in its results. *See Dep't of Comm.*, 139 S. Ct. at 2575, (noting "[t]he reasoned explanation requirement of administrative law" means that courts "cannot ignore the disconnect between the decision made and the explanation given").

For example, under the Replacement Rule, streams must flow at least intermittently in a "typical year" to be jurisdictional, 85 Fed. Reg. at 22,339; adjacent wetlands are jurisdictional if a jurisdictional water flows into them in a "typical year," *id.* at 22,338; and lakes, ponds, and impoundments can be jurisdictional if they contribute flow to a jurisdictional water in a "typical year," *id.* The Agencies' "typical year" concept is supposed to delimit these and nearly every other category of jurisdictional waters, but the concept is fundamentally indeterminate and provides no

underlying principle to guide agency discretion. "Typical year" is defined as a time "when precipitation and other climatic variables are within the normal periodic range (*e.g.*, seasonally, annually) for the geographic area of the applicable aquatic resource based on a rolling thirty-year period." *Id.* at 22,339. Among other flaws, this definition fails to specify which period is to be averaged in calculating the normal periodic range, whether it be a "seasonal" or "annual" period or some other unspecified timeframe. The period determines whether precipitation will be viewed as "typical" or "atypical": a dry season could be atypical compared to the seasonal average, but precipitation over the whole year could be typical, or vice versa. Consequently, a given stream's flow could qualify as intermittent—and thus jurisdictional—or not, depending on whether precipitation in a given year (or season) is deemed typical or not. Regulators, polluters, and the public will struggle to evaluate waters under this variable and confusing standard. Indeed, the Navajo Nation is already struggling with this uncertainty, and has no historical practice, guidance, or even hydrological science to fall back upon. Ben Decl. ¶ 38. Adding to the confusion, the Agencies have encouraged landowners to make their own determination with respect to CWA jurisdiction, 85 Fed. Reg. at 22,292, while simultaneously acknowledging that doing so may result in an enforcement action. *Id.* Acknowledging the possibility of such an outcome without attempting to address or at least forestall it is the antithesis of reasoned rulemaking.

Finally, when the Agencies changed course from prior rules, they were "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Dep't of Homeland Sec.*, 140 S. Ct. at 1915. The Agencies ignored this requirement; for example, they failed to assess the Navajo Nation's significant reliance interests in the prior definitions of WOTUS, which covered a far wider scope

of waters than are covered under the Agencies' new definition, or to weigh those interests against the other factors the Agencies considered in deciding to change their longstanding policy. The Navajo Nation relied on the Agencies to issue permits that would protect the majority of Navajo waters, based on earlier definitions of WOTUS. Without consideration, the Replacement Rule upends this longstanding federal-tribal regulatory partnership, increases administrative costs and burdens, threatens to damage Navajo Nation resources, and drastically reduces federal water quality protections.

2. The Agencies Failed to Consider Important Aspects of the Problem

a. The Agencies Failed to Consider How the Replacement Rule Would Meet the Objective of the CWA

As was the case with the Repeal Rule, the Agencies ignored questions of water quality—the sole objective of the CWA, *see* Section I.B.1.—when excluding ephemeral streams and many wetlands from the definition of WOTUS in the Replacement Rule. Although the Agencies claimed that the Replacement Rule "effectively furthers [] the objective of the Act to 'restore and maintain the chemical, physical, and biological integrity of the nation's waters,'" 85 Fed. Reg. at 22,287, they provided no rational explanation, data, or analysis explaining how that could be the case, given the undisputed science to the contrary. In response to public comments pointing out their omission, the Agencies cite their "Economic Analysis" and "Resource and Programmatic Assessment"—two documents they created to accompany the rulemaking—as purported evidence that they considered water quality impacts when promulgating the Rule. *See* The Navigable Waters Protection Rule – Public Comment Summary Document, Topic 1 at 112-13 and Topic 11 at 2-3 (Apr. 21, 2020), R2018-0149-11574 (Replacement Rule RTC). Ironically, these documents

acknowledge that the rule could have significant adverse impacts on water quality across the country but claim the Agencies were unable to assess or quantify those impacts.

The Replacement Rule EA acknowledged that multiple potential harms could occur to "stream flows, water quality, drinking water treatment, endangered and threatened species habitats, and other ecosystem services" as a result of the rule. Replacement Rule EA at 105-06. The list of potential harms included increased dredging and filling of streams; reduced wetland habitats; increased flood risk; degraded aquatic habitats; greater waterbody impairments; greater pollutant loads; increased sedimentation; and harms to ecosystems and drinking water supplies from the increased likelihood of oil spills. *Id.* The rule could also harm "human uses of downstream water resources (e.g., fishing)." *Id.* at 106. Nevertheless, the Agencies made no attempt to assess these harms or reconcile them with the CWA's objective to protect the nation's waters. *See id.* at 171 (claiming that "data limitations constrain the agencies' ability to quantify and value the potential effects of the final rule" on CWA § 402 and 311 programs); *id.* at 164-68, 171-72 (listing numerous "data limitations" that create "uncertainty" in the case studies and nationwide CWA § 404 analysis).

What's more, the Agencies repeatedly insisted that the Replacement Rule "is *not based on* the information in the agencies' economic analysis or resource and programmatic assessment," and that these documents were "*not used* to establish the new regulatory text for the definition of 'waters of the United States.'" 85 Fed. Reg. at 22,332 (emphases added); *id.* at 22,335; *see also* Replacement Rule RTC Topic 11 at 3. In declaring their non-reliance on these documents, the Agencies must be taken at their word. It is a "foundational principle of administrative law" that a court "may uphold agency action only on the grounds that the agency invoked when it took the

action." *Michigan v. EPA*, 576 U.S. 743, 758, 760 (2015). The Agencies thus may not rely *post hoc* on these documents as evidence that they considered water quality impacts when defining WOTUS. *See Dep't of Homeland Sec.*, 140 S. Ct. at 1908-09.

All that remains of the Agencies' defense are their unsupported assertions that the Replacement Rule carries out the CWA's objective to protect water quality, *see, e.g.*, 85 Fed. Reg. at 22,252, 22,272, and appropriately "balances" that objective against other policy goals, *see, e.g.*, *id.* at 22,287, 22,308. Merely "[s]tating that a factor was considered . . . is not a substitute for considering it." *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986); *see Asarco, Inc. v. EPA*, 616 F.2d 1153, 1160 (9th Cir. 1980) (courts do not simply "take the agency's word that it considered all relevant matters"). By failing to consider water quality impacts when deciding to remove federal protections for broad categories of critically important waters, and by failing to provide any meaningful analysis of the significant harms that would ensue from their departure from the scientific record and prior policy, the Agencies ignored the most "important aspect of the problem" and thus rendered the Replacement Rule arbitrary and capricious. *See State Farm*, 463 U.S. at 43; *Gresham*, 950 F.3d at 102-03 (providing health care coverage was principal objective of Medicaid and agency's failure to consider whether action would result in coverage loss was arbitrary and capricious).

> b.  The Agencies Failed to Consider the Replacement Rule's Impact on Tribal Waters and Treaty Rights

When promulgating the Replacement Rule, the Agencies had a duty to consider the Navajo Nation's and other tribes' treaty rights, including reserved water rights and waters needed to protect rights to hunt, fish, and gather. This duty arose from the treaties themselves and the federal government's trust responsibility, discussed above in Section I.B.2. The Agencies were required

to avoid taking actions that would damage, degrade or destroy these rights. *See N.W. Sea Farms, Inc.*, 931 F. Supp. at 1519-20. The Agencies' failure to consider these tribal issues amounted to a failure to consider an important aspect of the problem, violating both the Agencies' trust responsibility and the APA.

Although the Agencies claimed to recognize tribal treaty rights, the federal trust responsibility, and the importance of water to tribes, they quickly dismissed their obligations by asserting that "treaty rights do not expand the scope of authority granted to the agencies by Congress." Replacement Rule RPA at 53; Replacement Rule RTC Topic 11 at 37-39. This assertion necessarily implies that any prior definitions of WOTUS, such as those in the Clean Water Rule and in the pre-2015 regime the Agencies' recodified with the Repeal Rule, were beyond the scope of the Agencies' authority.[25] Even if that assertion were correct, it still would not allow the Agencies to finalize a rule that would harm tribal waters without considering the impacts of their actions. *See Dep't of Homeland Sec.*, 140 S. Ct. at 1913-14.

The Agencies also attempt to justify the rulemaking by claiming that tribes retain their own inherent authority to protect and manage the use of waters that are no longer covered under the CWA. 85 Fed. Reg. at 22,270, 22,336-37; Replacement Rule RTC Topic 11 at 32, 39-40, Topic 13 at 32. The Agencies further assert that tribes can evaluate the most effective means of addressing their waters and may weigh the costs and benefits of doing so, and that CWA financial assistance grants are available for tribes to develop or refine water protection programs. Replacement Rule RTC Topic 11 at 35, 37. However, the Agencies' flawed economic analysis did

---

[25] Under this theory, moreover, the Agencies themselves are saying that the Repeal Rule was invalid because it extended the definition of WOTUS beyond the scope of the Agencies' authority.

not consider how tribes might respond to a restrictive interpretation of CWA jurisdiction, nor did it include tribes in its calculations of costs and benefits, Replacement Rule EA at 50. Likewise, it did not account for potential effects on subsistence fishing, the growing of wild rice, or other cultural uses of water that are unique to tribes, the reliance of many tribes on waters that will no longer be considered jurisdictional under the Replacement Rule, and the tribes' lack of resources to address these effects. Replacement Rule RTC Topic 11 at 35, 40.

### c. The Agencies Failed to Consider and Respond to Significant Comments

In addition to ignoring their trust responsibilities, the Agencies also ignored the Navajo Nation's and other tribes' comments that tribal waters should be treated differently given the significant differences between state and tribal waters.[26] For a public comment period to be meaningful, an agency must "consider and respond to significant comments received during the period for public comment." *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015). An agency "need not address every comment, but it must respond in a reasoned manner to those that raise significant problems." *City of Waukesha v. EPA*, 320 F.3d 228, 257 (D.C. Cir. 2003) (quoting *Reytblatt v. Nuclear Regul. Comm'n*, 105 F.3d 715, 722 (D.C. Cir. 1997)). Significant comments include those which raise relevant points and which, if adopted, would require a change in the proposed rule. *Altera Corp. & Subsidiaries*, 926 F.3d at 1081. The failure to respond to significant comments demonstrates that the agency's decision was not based on a consideration of the relevant factors. *Tex. Mun. Power Agency v. EPA*, 89 F.3d 858, 876 (D.C. Cir. 1996); *N.M. Health Connections v. U.S. Dep't of Health & Human Servs.*, 340 F. Supp. 3d 1112, 1167 (D.N.M. 2018).

---

[26] *E.g.*, Replacement Rule RTC Topic 11 at 28, 31-32, 34-35, 40.

The Navajo Nation requested that the Agencies carve out Navajo Nation waters, and those of other tribes upon their request, from the proposed new definition of WOTUS, leaving those waters subject to the Clean Water Rule. Ex. 5, NN Supp. Comments at 2. Alternatively, the Navajo Nation asked the Agencies to modify their proposal so that it would cover Navajo Nation waters as WOTUS. *Id.* at 2-8. The Navajo Nation explained that there are aspects of the relationship between the federal government and Indian tribes, and rights that stem from that relationship, that require the federal government to provide additional protections for tribal waters compared to those for state waters. *Id.* The Navajo Nation also explained that it and other tribes rely on the Agencies to implement most CWA programs on their behalf, because of this unique relationship and limitations on tribes' exercise of their regulatory authorities. *Id.* Further, the Navajo Nation explained that decisions balancing environmental protection and economic development may turn out differently when a tribal rather than a state perspective is taken into account. *Id.* Other tribes and tribal organizations made similar comments. *See, e.g.*, Comments of the National Tribal Water Council (NTWC) (April 1, 2019), at 21, R2018-0149-2990; Comments of the Region 9 Tribal Caucus, at 1, 9 (Apr. 15, 2019), R2018-0149-4928.[27] The Agencies altogether failed to respond to these comments, and therefore the Replacement Rule was not based on a consideration of all the relevant factors.

---

[27]    *See also* NTWC Supplemental Comments, at 2 (Sept. 18, 2019), https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0149-11550; Comments of Jamul Indian Village of Cal., at 1-2 (Sept. 20, 2019), https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0149-11553; Comments of the Cahto Tribe of the Laytonville Rancheria, at 2-3 (Sept. 20, 2019), https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0149-11554.

3.  The Agencies Promulgated the Replacement Rule Based on a Predetermined
    Outcome, Depriving the Public of a Meaningful Opportunity to Comment

For there to be a meaningful opportunity for public participation in the rulemaking process, the decisionmaker cannot have a closed mind. *See McLouth Steel*, 838 F.2d at 1323; discussion in Section I.C. The Repeal and Replacement Rules were undertaken as a package, with Step 1 being repeal of the then-existing Clean Water Rule and recodification of an older WOTUS rule as a stopgap measure, and Step 2 being replacement of the old rule with a new, restrictive definition of WOTUS that was ordained from the beginning. 82 Fed. Reg. at 34,899; *see also* 84 Fed. Reg. at 4,154; 85 Fed. Reg. at 22,250. In fact, before the Repeal Rule even was finalized, the Agencies had already proposed the Replacement Rule. This two-step rulemaking process was triggered by a single executive order, No. 13,778, subjecting the two rules to the same directives and goals. The Replacement Rule, as the second step in the WOTUS rulemaking, had the same predetermined outcome as the Step 1 Repeal Rule and similarly deprived the public of a meaningful opportunity to comment.

As discussed above, the President directed the Agencies to consider interpreting the term "navigable waters" in a manner consistent with the opinion of Justice Scalia in *Rapanos*. Exec. Order No. 13,778, § 3. In doing so, the President directed the Agencies to act based on his policy, including "promoting economic growth, minimizing regulatory uncertainty, and showing due regard for the roles of the Congress and the States under the Constitution," *id.* § 1, goals that are found nowhere in the CWA's objective. Administrator Wheeler explained that the Agencies were dutifully following this direction when signing the Proposed Replacement Rule:

> When President Donald Trump took office, he immediately began a process to remove and replace undue regulatory burdens that stifle American innovation and economic development. At the top of the list was the Obama Administration's 2015

Waters of the United States rule. Today, the Environmental Protection Agency and the Department of the Army are fulfilling the president's objective and proposing a new definition that would put an end to the previous administration's power grab.

. . .

Shortly after he took office, Trump issued an executive order directing EPA and the Army to review and replace, as appropriate, the 2015 definition with one that restores the rule of law and the role of states and landowners in managing their land and water resources. He also explicitly charged us to consider doing so in a manner consistent with Justice Antonin Scalia's opinion in the landmark Rapanos case.

Our proposed new definition would do just that.

Ex. 9, Andrew Wheeler, *Trump Administration's Waters of the United States Rule Gives Power Back to States* (Dec. 11, 2018); *see also Colorado*, 445 F. Supp. 3d at 1311 (citing 85 Fed. Reg. at 22,259-325) (Agencies "self-consciously intended to take the plurality opinion," "flesh out the details, and make it the new law of the land.").

By pursuing a predetermined outcome, the Agencies did not provide the promised substantive evaluation of the impacts of the Replacement Rule on water quality. They performed the same biased EA methodology improperly directed by Administrator Pruitt during the Repeal Rule. They failed to address the scientific record supporting the Clean Water Rule. And by failing to provide this substantive evaluation, they impermissibly foreclosed the public's right to meaningfully review and comment on the Agencies' proposed actions and their consequences. Instead, the Agencies repealed the Clean Water Rule as quickly as possible through their two-step process and replaced it with a rule that significantly and unreasonably narrows the water quality protections intended by Congress under the Clean Water Act.

## CONCLUSION

For the foregoing reasons, the Court should declare unlawful and vacate the Repeal Rule and Replacement Rule.

Dated: January 15, 2021

Respectfully submitted,

JILL GRANT & ASSOCIATES, LLC

/s/ Jill Elise Grant
Jill Elise Grant, N.M. Bar No. 7571
Ian Paul Fisher,* D.C. Bar No. 1672524
1319 F Street NW, Suite 300
Washington, D.C. 20004
Telephone: (202) 821-1950
Email: jgrant@jillgrantlaw.com
Email: ifisher@jillgrantlaw.com
* D.N.M.LR-Civ. 83.3(a) certification

*Attorneys for Plaintiff Navajo Nation*