IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**NAVAJO NATION,**

            **Plaintiff,**

**v.**                                            **Case No. 20-CV-602-MV/GJF**

**MICHAEL REGAN,** *et al.***,**

            **Defendants.**

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on Defendants' Opposed Motion for Voluntary Remand of the NWPR Without Vacatur and Unopposed Motion for Abeyance of Briefing on the 2019 Rule Claims [Doc. 32]. After having considered the motion and relevant law, the Court will grant the Motion, as well as Plaintiff's request that remand include vacatur.

## BACKGROUND

The Federal Water Pollution Control Act, commonly known as the Clean Water Act ("CWA"), seeks "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. Among other provisions, the CWA prohibits "the discharge of any pollutant by any person" without a permit or other authorization, 33 U.S.C. § 1311(a), to "navigable waters," defined as "the waters of the United States." *Id.* at 1362(7). The statute does not further define the phrase "waters of the United States."

The United States Army Corps of Engineers ("Corps") first promulgated regulations defining "waters of the United States" in the 1970s. Doc. 32 at 3. "For decades, that phrase was defined by regulation to include tributaries and impoundments of interstate waters and other

waters used in or affecting interstate or foreign commerce, as well as wetlands adjacent to such waters, including wetlands separated by manmade dikes or barriers, natural river berms, and beach dunes." *Pascua Yaqui Tribe v. EPA*, __ F. Supp. 3d __, No. 20-cv-266, 2021 WL 3855977, at *1 (D. Ariz. Aug. 30, 2021). In 2015, the Corps and the United States Environmental Protection Agency ("EPA") (collectively, the "Agencies") adopted the "Clean Water Rule" ("CWA"), which revised the regulatory definition of "waters of the United States." Doc. 32 at 3. "As part of the rulemaking process, the Agencies produced a review of scientific literature on the connections between tributaries, wetlands, and downstream waters," known as the "Connectivity Report." *Pascua Yaqui Tribe*, 2021 WL 3855977, at *2.

In 2017, then President Trump issued an executive order directing the Agencies to consider repealing the CWA. *Id.* In accordance with that order, the Agencies repealed the CWA and reinstated the pre-2015 regulations in the "2019 Rule." *Id.* Thereafter, in 2020, the Agencies redefined, and greatly narrowed, the term "navigable waters" in the "Navigable Waters Protection Rule" ("NWPR"). Doc. 34 at 2. Relevant here, the NWPR "categorically excludes all ephemeral streams – waters that flow in response to precipitation – and an untold number of intermittent streams from the definition of [waters of the United States] and thus from protection under the CWA." *Id.* at 2-3. "The Agencies published the NWPR notwithstanding feedback from the EPA Science Advisory Board that the NWPR conflicts with established science, disregards key aspects of the 2015 Connectivity Report, and weakens protection of the nation's waters in contravention of the CWA's objectives." *Pascua Yaqui Tribe*, 2021 WL 3855977, at *2.

On June 22, 2020, the Navajo Nation commenced the instant action, challenging both the NWPR and the 2019 Rule.  Doc 1.  Thereafter, on January 15, 2021, the Navajo Nation filed a motion for summary judgment on their claims.  Doc. 20.

Soon thereafter, following the presidential transition on January 20, 2021, President Biden issued an executive order stating that it is the policy of the current administration

> to listen to the science; to improve public health and protect our environment; to ensure access to clean air and water; to limit exposure to dangerous chemicals and pesticides; to hold polluters accountable, including those who disproportionately harm communities of color and low-income communities; to reduce greenhouse gas emissions; to bolster resilience to the impacts of climate change; to restore and expand our national treasures and monuments; and to prioritize both environmental justice and the creation of the well-paying union jobs necessary to deliver on these goals.

Executive Order 13990 ("EO 13990"), 86 Fed. Reg. 7,037 (Jan. 25, 2021).  EO 13990 directs federal agencies to "immediately review and, as appropriate and consistent with applicable law, take action to address the promulgation of Federal regulations and other actions during the last 4 years that conflict with these important national objectives, and to immediately commence work to confront the climate crisis."  *Id.*

In accordance with EO 13990, the Agencies have been reviewing the NWPR.  Doc. 32 at 7.  Based on their review, the Agencies "have decided to initiate new rulemaking to revise the definition of 'waters of the United States.'"  *Id.*  The Agencies have not provided an estimate of when a new regulatory definition will be published.

As a result of the Agencies' decision to initiate new rulemaking, the Agencies filed the instant motion "in lieu of filing a response to Plaintiff Navajo Nation's motion for summary judgment or a cross-motion for summary judgment."  *Id.* at 2.  The Agencies seek voluntary remand of the NWPR, but "are not requesting vacatur of the NWPR during the remand," given their "stated intent to address their substantial concerns with the NWPR through a new

3

rulemaking." *Id.* at 11. The Navajo Nation does not oppose and in fact "supports" the Agencies' request for remand of the NWPR, "but requests that the Court also vacate the Rule to prevent it from continuing to harm the Navajo Nation during the years it will take for the Agencies to finalize a replacement." Doc. 34 at 2.

## DISCUSSION

I.  <u>Voluntary Remand</u>

"Administrative agencies have an inherent authority to reconsider their own decisions, since the power to decide in the first instance carries with it the power to reconsider." *Trujillo v. Gen. Elec. Co.*, 621 F.2d 1084, 1086 (10th Cir. 1980). In accordance with this authority, an "agency may request a remand (without confessing error) in order to reconsider its previous position." *SKF USA Inc. v. United States*, 254 F.3d 1022, 1029 (Fed. Cir. 2001). Where such a request is made, "the reviewing court has discretion over whether to remand." *Id.* While a "remand may be refused if the agency's request is frivolous or in bad faith, . . . if the agency's concern is substantial and legitimate, a remand is usually appropriate." *Id.*

In support of their motion for voluntary remand, the Agencies state that they "have identified 'substantial and legitimate concerns' with the NWPR and intend to embark upon a rulemaking process to replace the rule." Doc. 32 at 9. "The Navajo Nation agrees with the Agencies that the NWPR must be revised or replaced" and thus "does not oppose the Agencies' request to remand the Rule." Doc. 34 at 4. There is no indication that the Agencies' request for voluntary remand is frivolous or made in bad faith. Given the Agencies' representations regarding its concerns about the NWPR and the Navajo Nation's agreement with the propriety of remand, the Court will grant the Agencies' request for voluntary remand.

II.     <u>Vacatur</u>

The Agencies are not requesting vacatur of the NWPR. The Navajo Nation, however, argues that vacatur is proper because leaving the NWPR "in place for an indeterminate amount of time, awaiting a rulemaking that has not even been scheduled and is likely to span a number of years . . . would result in 'significant, actual environmental harms' to the Navajo Nation, which, moreover, are likely to be 'cascading and cumulative.'" Doc. 34 at 5 (quoting Declaration of Radhika Fox, attached as Exhibit 1 to the Agencies' Motion).

The parties agree that vacatur "rests in the sound discretion of the reviewing court." Doc. 32 at 11; *see also Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1139 (10th Cir. 2010) ("Vacatur is an equitable remedy . . . and the decision whether to grant vacatur is entrusted to the district court's discretion"). This discretion exists regardless of whether the court has reached "a decision on the merits." *Center for Native Ecosystems v. Salazar*, 795 F. Supp. 2d 1236, 1242. (D. Colo. 2011). In deciding whether to vacate, the Court considers two factors, namely "the seriousness of the [rule's] deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *Allied-Signal, Inc. v. United States Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (citation omitted). Here, both factors weigh in favor of vacatur.

A.     <u>Seriousness of the NWPR's Deficiencies</u>

As the Navajo Nation argues, the "seriousness" of the NPR's deficiencies "is documented in the Agencies' own motion, declarations, and other statements." Doc. 34 at 7. Specifically, the Agencies assert that statements in the NWPR "call into significant question whether the agencies' consideration of science and water quality impacts in developing the rule was

consistent with" the goals of the CWA, and that the Agencies "have substantial and legitimate concerns regarding the adequacy of consideration of the CWA's water quality goals in the development of the NWPR."  Doc. 32-1 ¶¶ 12-13.  The Agencies further identify "significant concerns [] about the sufficiency of the agencies' consideration of the effects of the NWPR on the chemical, physical, and biological integrity of the nation's waters when determining the limits of the specific definitional language 'waters of the United States' in the NWPR," noting that "the NWPR did not look closely enough at the effect ephemeral waters have on traditional navigable waters when the agencies decided to categorically exclude all ephemeral waters."  *Id.* ¶ 14.

These concerns "are not mere procedural errors or problems that could be remedied through further explanation."  *Pascua Yaqui Tribe*, 2021 WL 3855977, at *5 (citing *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015)).  "Rather, they involve fundamental, substantive flaws that cannot be cured without revising or replacing the NWPR's definition of 'waters of the United States.'"  *Pascua Yaqui Tribe*, 2021 WL 3855977, at *5 (citing *Pollinator Stewardship Council*, 806 F.3d at 532).  "Accordingly, this is not a case in which the agency could adopt the same rule on remand by offering 'better reasoning or . . . complying with procedural rules.'"  *Pascua Yaqui Tribe*, 2021 WL 3855977, at *5 (citing *Pollinator Stewardship Council* 806 F.3d at 532).

Nor would vacatur "result in possible environmental harm."  *Pascua Yaqui Tribe*, 2021 WL 3855977, at *5 (citing *Pollinator Stewardship Council*, 806 F.3d at 532).  To the contrary, the statements of the Agencies support the Navajo Nation's contention that "remanding without vacatur would risk serious environmental harm."  *Pascua Yaqui Tribe*, 2021 WL 3855977, at *5.  The Agencies have "identified indicators of a substantial reduction in waters covered under

the NWPR compared to previous rules and practices," including "an increase in determinations by the Corps that waters are non-jurisdictional," including excluded ephemeral resources, "and an increase in projects for which CWA Section 404 permits are no longer required."   Doc. 32-1 ¶ 15.   Relevant here, the changes effected by the NWPR "have been particularly significant in arid states.   In New Mexico and Arizona, for example, of over 1,500 streams assessed under the NWPR, nearly every one has been found to be a non-jurisdictional ephemeral resource, which is very different from the status of the streams as assessed under both the Clean Water Rule and the pre-2015 regulatory regime."   *Id.* ¶ 16.   The Agencies further note that tribes in these arid areas "will disproportionately suffer from the reduction in protections, including tribal lands that intersect or are within the New Mexico state boundary," and that these "tribes lack the authority and the resources to independently regulate surface waters within and upstream of their reservations, and therefore cannot protect their scarce waters from upstream dischargers."   *Id.* ¶ 19.   The Agencies' own findings thus demonstrate that "allowing the Rule to remain in place" upon remand "would set back achievement of the environmental protection required by the CWA," thus presenting a very real possibility of serious environmental harm.   Doc. 34 at 10-11 (citation omitted).

For these reasons, the seriousness of the NWPR's deficiencies weighs in favor of vacatur.

B. <u>Disruptive Consequences of an Interim Change</u>

Vacatur is considered "disruptive" if "it set[s] back achievement of the environmental protection required" by statute.   *Nat. Res. Def. Council v. EPA*, 489 F.3d 1364, 1374 (D.C. Cir. 2007).   Here, vacatur would have no such disruptive consequences, as it would further (rather than set back) the goals of the CWA which, as discussed above, are contravened by the NWPR. As the Navajo Nation contends, vacating the NWPR would "simply reinstate the long-term status

quo, *i.e.*, the regulation defining ["waters of the United States"] that predated the Rule's effective date" and "applied for most of the past three decades." Doc. 34 at 10. Because vacating the NWPR would have the effect of preventing, rather than causing, environmental harm, it follows that the "interim change" caused by vacatur will not have "disruptive consequences." *Allied-Signal*, 988 F.2d at 150-51; *see also Pascua Yaqui Tribe*, 2021 WL 3855977, at *5 (noting that the pre-NWPR regime "is familiar to the Agencies and industry alike"). Nor is it likely that this "interim change" will itself "be changed" significantly, given the Agencies' representations that they plan to revise the NWPR precisely because of the environmental harm that it has occasioned by reversing the preexisting status quo. *Allied-Signal*, 988 F.2d at 150-51; *see also Pascua Yaqui Tribe*, 2021 WL 3855977, at *5 (noting that "the Agencies have expressed an intent to repeal the NWPR and return to [the earlier] regulatory regime while working on a new definition of 'waters of the United States'").

In response to the Navajo Nation's request for vacatur, the Agencies "candidly acknowledge[] that they share many of the Navajo Nation's concerns," but nonetheless argue that "a vacatur order . . . would interfere with the Agencies' new rulemaking." Doc. 35 at 4. The Agencies do not explain how or why vacating a rule that they themselves profess to be in need of revision would "interfere" with their rulemaking process. Nor have they provided any authority to suggest that such interference rises to the level of disruptive consequences that would tip the balance against vacatur. *See Pascua Yaqui Tribe*, 2021 WL 3855977, at *5. Indeed, if such interference were alone enough to prevent vacatur, vacatur would never be warranted on voluntary remand, where an agency has necessarily indicated its intent to engage in "new rulemaking." In short, the Agencies have not established that "[t]he consequences of an interim change [] support the unusual remedy of remand without vacatur." *Id.*

Nor can the Court agree with the Agencies that remand without vacatur "would not prejudice Navajo Nation, which is able to participate in the notice-and-comment opportunities provided by the new rulemaking." Doc. 35 at 5. As the Navajo Nation asserts, "[t]he Agencies have not provided any timeline for even proposing a new rule, let alone finalizing one. All signs point to a proposed rule being over a year away and a final rule being several more years away." Doc. 34 at 14. Without vacatur, the "cascading and cumulative downstream effects" of the NWPR, including "effects on water supplies, water quality, flooding, drought, erosion, and habit integrity," will continue unabated. *Id.* "Such pollution and destruction cannot easily be undone." *Id.* Given the Agencies' findings that tribes of the arid Southwest "will disproportionately suffer from the reduction in protections" occasioned by the NWPR, *see* Doc. 32-1 ¶ 19, the Navajo Nation is indeed likely to be prejudiced if the NWPR is not vacated.

Accordingly, the "disruptive consequences" factor weighs in favor of vacatur.

III. <u>Pending Issues</u>

The Navajo Nation's Complaint and Motion for Summary Judgment also challenge the 2019 Rule. Because the Agencies filed a Motion for Voluntary Remand in lieu of a response to the Navajo Nation's Motion for Summary Judgment, the Agencies have not responded to the Navajo Nation's challenges to the 2019 Rule. Because it may be beneficial to have further briefing focused on the 2019 Rule, the Court will deny without prejudice the Navajo Nation's Motion for Summary Judgment and will require the parties to meet and confer and file a proposal or proposals for further proceedings.

**CONCLUSION**

For the foregoing reasons, the Court finds that voluntary remand of the NWPR is appropriate and that such remand should include vacatur of the NWPR.

**IT IS ORDERED** that Defendants' Opposed Motion for Voluntary Remand of the NWPR Without Vacatur and Unopposed Motion for Abeyance of Briefing on the 2019 Rule Claims [Doc. 32] is **granted** to the extent that it requests voluntary remand of the Navigable Waters Protection Rule.

**IT IS FURTHER ORDERED** that the Navigable Waters Protection Rule is **vacated and remanded** for reconsideration to the United States Environmental Protection Agency and the United States Army Corps of Engineers.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment [Doc. 20] is **denied without prejudice.**

**IT IS FURTHER ORDERED** that within thirty (30) days after entry of this Memorandum Opinion and Order, the parties shall meet and confer and file a proposal or proposals for further proceedings.

DATED this 27th day of September 2021.

_____
MARTHA VÁZQUEZ
United States District Judge